**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN LIGGETT SR., Individually and on Behalf of All Others Similarly Situated, | Case No. 3:25-cv-7129 |
| Plaintiff, | CLASS ACTION |
| v. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| C3.AI, INC., THOMAS M. SIEBEL, and HITESH LATH, | DEMAND FOR JURY TRIAL |
| Defendants. | |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff John Liggett Sr. ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by C3.ai, Inc. ("C3" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of C3 AI's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired C3 AI securities between February 26, 2025, to August 8, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Defendants provided investors with material information concerning C3 AI's ability to perform in spite of its Chief Executive Officer's health situation and in providing expected revenue for the first quarter and full fiscal year 2026. Defendants' statements included, among other things, assurances that Chief Executive Officer, Defendant Siebel, was in sufficient health to effectively conduct his role, without any indication his health or the necessary accommodations utilized could jeopardize financial growth or the Company's ability to close deals. Defendants' statements further confidently discussed C3 AI's market opportunity, the demand for its products, and its ability to execute and capitalize on the growth opportunity before it.

3. Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of C3 AI's growth; notably, that its Chief Executive Officer health was having a significant impact on the Company's ability to close deals, that its management was unable or otherwise ineffectual in minimizing that impact, and that C3 AI would not be able to execute upon its profit and growth potential as a result.

4. On August 8, 2025, C3 AI announced disappointing preliminary financial results for the first quarter of fiscal 2026 and reduced its revenue guidance for the full fiscal year 2026. The Company attributed its poor sales results and lowered guidance on "the reorganization with new leadership" and the health ailments of its Chief Executive Officer.

5. Investors and analysts reacted immediately to C3 AI's revelation. The price of C3 AI's common stock declined dramatically. From a closing market price of $22.13 per share on August 8, 2025, C3 AI's stock price fell to $16.47 per share on August 11, 2025, a decline of about 25.58% in the span of just a single day.

**JURISDICTION AND VENUE**

6. Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant C3 AI is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11. Plaintiff purchased C3 AI common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in C3 AI is attached hereto.

12. C3 AI, Inc. is a California corporation with its principal executive offices located at 1400 Seaport Boulevard, Redwood City, CA 94063. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "AI."

13. Defendant Thomas M. Siebel ("Siebel") was, at all relevant times, the Founder, Chief Executive Officer, and Chairman of the Board of C3 AI.

14. Defendant Hitesh Lath ("Lath") was, at all relevant times, the Senior Vice President and Chief Financial Officer of C3 AI.

15. Defendants Siebel and Lath are sometimes referred to herein as the "Individual Defendants." C3 AI together with the Individual Defendants are referred to herein as the "Defendants."

16. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of C3 AI's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information n available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17. C3 AI is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to C3 AI under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

**A.  Company Background**

19. C3 AI is a global artificial intelligence application software company. The Company's C3 agentic AI platform enables customers to design, develop, deploy, and operate enterprise AI applications.

20. Through this platform, the Company offers various targeted AI applications geared toward specific industry and government use cases.

**B.  The Defendants Materially Misled Investors Concerning C3 AI's Ability to Perform Despite its CEO's Health Scare**

*February 26, 2025*

21. On February 26, 2025, Defendants issued their third quarter fiscal 2025 results. During the question-and-answer portion of the same-day earnings call, Defendant Siebel addressed his recent health concerns and assured investors of his ability to perform in his role during the following pertinent exchange:

> <Q: Patrick D. Walravens – Citizens JMP Securities, LLC – MD, Director of Technology Research, and Equity Research Analyst> Tom, would you be okay talking about the note that you published on February 18? So sorry, but if you could just talk about what the health setback was and what steps you're taking in terms of running the business, I think that would be great.
>
> <A: Thomas M. Siebel> . . . Now as it relates to operating the business, it has so -- Tom has to learn some new skills, and we put the accommodations in place. I mean, you know me to be intimately familiar with the details of this business, okay? And you can imagine that we spent exacting detail with this management team on how we were reorganizing this company around this new opportunity that's here.
>
> ***We've done the same -- we have the same meeting with all of our salespeople around from the world. I spent a lot of time personally with all of the -- a lot of time personally, okay, with all of the partners that we've discussed. I put the***

*accommodations in place for -- about really the only thing I can't do is read e-mail.*

So the -- so we put the [ compensation ] in place, there is somebody here with a hot computer, who reads the e-mails to me. I comment, I respond, I approve, I don't prove, what have you. I am here in the office. I am managing the business every day.

In the short term, my travel, the medical community has me on kind of -- they don't want me going real far or a high altitude. ***And so we've made arrangements for Jim Snabe, who you most certainly know or know of and one of our more distinguished directors***.

Jim, of course, was the Co-CEO of SAP, Chairman of Maersk, Chairman of Allianz, Chairman of [ Siemens ]. And so Jim assumed the role as a special assistant to the Chief Executive, okay? And he's filling in for the events that Tom can't do. Let's say, I was supposed to be at VivaTech at Paris or what have you or maybe we need to do an executive customer review at Shell in London.

And so this is how it's organized. ***I am fully engaged, managing every details of the business every day, as you know me a little bit and you know I'm generally in touch with those details***. My health is excellent, okay? So beyond all of the infirmities that I had, I just can't see.

(Emphasis added).

*May 28, 2025*

22.     On May 28, 2025, Defendants published their fourth quarter and full-year fiscal 2025 results. During the corresponding earnings call, Defendant Siebel discussed the state of the market demand and potential for C3 AI's business to grow, stating, in pertinent part:

Now let's look at where we are, the facts of the market in -- I'm sorry, May of 2025, okay? ***We have a generally acknowledged, large and rapidly growing market.*** And we look at the AI stack and the companies that are playing at the bottom of the stack. We have the silicon providers, the Intels, the AMDs, the NVIDIAs. Above that, we have the infrastructure providers, the Microsoft Azure, AWS, GCP, et cetera. On top of that, we have the people providing the foundation models like OpenAI and Anthropic, Facebook, et cetera. On top of that, we have the providers of many thousands of utilities that are out there that do things like platform independent, relational database persistence or key value stores or AutoML or virtualization or whatever it may be.

. . .

The result of this, we've experienced -- as a result of the kind of realization of this enterprise AI kind of reality, ***we've seen enormous growth in our market***, again,

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

> in the last few years, going from 6% to 16% to 25%. **And our focus, if we look at Q3 and Q4 of fiscal year '25 has been building an ecosystem to be able to address this huge sucking sound that we hear out there, that is the demand for enterprise AI applications**. And in order to address these applications, we need an army of partners. And so *we have been focused in the last few quarters on establishing this army of strategic partners and enabling this army of strategic partners to be effective at communicating the benefits of these applications and selling these applications*.
>
> . . .
>
> our revenue growth rate continues to exceed our expense growth rate. Fast math without the Excel spreadsheet. *It follows ipso facto, the cash possibility and non-GAAP profitability is simply a matter of scale*. And I expect in 2027 and beyond, we will cross that path into consistent cash positivity and an annualized non-GAAP profitability thereafter. So it was a great quarter, a great year. Customers are happy, products are excellent, market is huge. And if there is anybody else in the Enterprise AI applications business, I'm unaware of who they are.

(Emphasis added).

23. C3 AI's Agentic AI was in accord, pertinently stating on the call:

> And finally, we expect to see accelerating growth driven by the Generative AI and Agentic AI markets where our solutions are highly differentiated, highly beneficial and address a market opportunity that is incalculably large. The Enterprise AI landscape is at an inflection point and C3 AI stands ready to lead. The convergence of market demand and our proven capabilities creates a unique opportunity to drive sustained growth by combining best-in-class technology with a world-class network of partners and a relentless focus on customer value, we are poised to shape the future of business operations across industries. As we step into fiscal 2026, our path is clear. Our momentum is strong, and our commitment to delivering impactful AI solutions has never been greater.

24. Defendant Lath then took over the prepared remarks to pertinently provide the Company's guidance for the first quarter and full year of fiscal 2026, stating:

> Now I'll move on to our guidance for the next quarter. *Our revenue guidance for Q1 of fiscal '26 is $100 million to $109 million. For the full fiscal 2026, we are anticipating revenue in the range of $447.5 million to $484.5 million. Our guidance for non-GAAP loss from operations for the first quarter is $23.5 million to $33.5 million. And our non-GAAP loss from operations for the year, the guidance is $65 million to $100 million*. Our guidance is predicated on the assumption of geopolitical stability. Were there to be a situation that the U.S. government closed, the budget did not pass, or we see indications of global trade friction, given the reality of these market risks, those could have unknown and adverse consequences on our business results.

Last year, our revenue growth was 25% and our expenses grew by 18%. *As we approach fiscal '26, we expect the revenue growth rate to continue to exceed our expense growth rate. So profitability remains simply a matter of scale.* Our expectation is that we will cross into non-GAAP profitability during the second half of fiscal '27, and we expect to be free cash flow positive in the fourth quarter of fiscal '26 and in successive years thereafter.

(Emphasis added).

25. During the question-and-answer segment, Defendant Siebel highlighted his improving health and defended management's wider-than-typical full year guidance range during the following exchanges, in pertinent part:

<Q: Patrick D. Walravens – Citizens JMP Securities, LLC – MD, Director of Technology Research, and Equity Research Analyst> Wonderful. And then if I could ask a follow-up. With your permission, Tom, I hope this is okay. But in February, you informed us that you'd suffered a health setback and it was limiting your ability to travel and then you're going to have Jim Snabe help out, but I was delighted to hear on this call that you're -- I mean, you're probably not delighted to get out of red eye, but I was delighted to hear that you're getting on a red eye because that sounds like some positive development. So I don't know, any comments that you're okay sharing with us on that, I'm sure, would be greatly appreciated.

<A: Thomas M. Siebel> *I did get slowed down for a little bit. There's no question about it.* And I had -- it's very unlikely to work from home. You know that. And *I had to work from home for a little while and take it easy and recover*, but I will catch a red eye to Washington, D.C. tonight. I will be in Washington, D.C. again for 3 days, I think, 10 days from now after attending a wedding in Cabo. *So just when you thought it was safe, Pat, I'm back*.

. . .

<Q: Matthew Ryan Calitri – Needham & Company, LLC – Research Analyst> . . . looking at your FY '26 revenue guidance, the band of outcomes is considerably larger than what you've given in past quarters. How did you think through guidance construction this quarter? And what needs to happen to achieve the high end of that band versus the low end?

<A: Thomas M. Siebel> Well, we read the same newspaper that you guys read. And we do talk to the President, and I had dinner with the speaker of the house last night. I spoke with the leader of the Senate last week, and I'll meet -- and so we do know these people and we do read the newspaper. And we all know there is risk. There is risk in Europe. We have kinetic risk. We have geopolitical risk. We have risk -- we have budget risk of, in fact, the government even shutting down. And these are real. And we have companies out there that were withdrawing guidance altogether. And we thought in the interest of being -- we have to acknowledge that

these risks are real. And so that results -- as a result, we have a broader range than usual to accommodate the unanticipated. And when we deal with these guys who are making America great again, they seem to hit us with the unanticipated quite frequently. So that's it. We're just acknowledging very real risk -- market risk that's out there. And should it go bad, it's going to have an adverse effect on our business as it will, General Motors and everybody else in the world.

(Emphasis added).

### July 24, 2025

26. On July 24, 2025, C3 AI issued a press release announcing that the Company "has initiated a search for Mr. Siebel's successor as Chief Executive Officer of C3 AI."

27. Defendant Siebel was quoted in the release discussing his departure and assuring investors of his continued engagement in his current role until a successor is found, stating, in pertinent part:

> After being diagnosed with an autoimmune disease in early 2025, I have experienced significant visual impairment . . . **I will remain fully engaged as Chief Executive Officer of C3.ai** until such time as the C3.ai board appoints my successor after which I will continue in the role of Executive Chairman focusing on strategy, product innovation, strategic partner and customer relationships."

(Emphasis added).

28. The above statements in Paragraphs 20 to 27 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk to the Company's profitability from Defendant Siegel's health concerns. In truth, C3 AI's optimistic reports of growth, earnings potential, and anticipated margins fell short of reality as they relied far too heavily on the health and effectiveness of the Company's CEO. Despite repeated assurances, Defendant Siegel had not sufficiently recovered from his ailments to act in the same capacity for C3 AI as he had previously.

**C.    The Truth Emerges during C3 AI's First Quarter Preliminary Report**

### August 8, 2025

29. On August 8, 2025, Defendants issued a press release announcing preliminary financial results for the first quarter of fiscal 2026, in pertinent part, as follows:

**Fiscal First Quarter 2026 Preliminary Business Update**
- Total revenue for the quarter was $70.2 million – $70.4 million.
- GAAP loss from operations was ($124.7) million – ($124.9) million.
- Non-GAAP loss from operations was ($57.7) million – ($57.9) million.
- $711.9 million in cash, cash equivalents, and marketable securities as of July 31, 2025.

30. The same day, Defendants issued a second press release announcing a restructuring of its sales and services organizations. In the press release, Defendant Siebel spoke on the quarter's performance, stating, in pertinent part:

> The good news is we have completely restructured the sales and services organization, including new and highly experienced leadership across the board to ensure a return to accelerating growth and increased customer success at C3 AI. ***The bad news is that sales results in Q1 were completely unacceptable***. Having given this a lot of thought, I attribute this to ***two factors. One: It is clear that in the short term, the reorganization with new leadership had a disruptive effect. Two: As we have previously announced, I have had a number of health issues in the past six months*** including multiple hospitalizations and vision impairment. Unfortunately, dealing with these health issues prevented me from participating in the sales process as actively as I have in the past. With the benefit of hindsight, ***it is now apparent that my active participation in the sales process may have had a greater impact than I previously thought***.

(Emphasis added).

31. The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the February 26 and May 28, 2025, earnings calls. On those calls, Defendants continually praised high market demand for their products, continued growth, and repeatedly assured investors as to Defendant Siegel's health, while they simultaneously minimized the associated risks to the Company's ability to close deals and capitalize on its alleged growth potential.

32. Investors and analysts reacted immediately to C3 AI's revelation. The price of C3 AI's common stock declined dramatically. From a closing market price of $22.13 per share on August 8, 2025, C3 AI's stock price fell to $16.47 per share on August 11, 2025, a decline of about 25.58% in the span of just a single day.

33. A number of well-known analysts who had been following C3 AI lowered their price targets in response to C3 AI's disclosures. For example, Oppenheimer, while downgrading

to market performance and altogether removing their price target highlighted the Company's "extremely weak preliminary 1Q26 results," pertinently noting C3 AI "significantly lowered revenue expectations for 1Q26, from ~$105M to ~$70M, implying a 35% sequential decline and a major concern given the recurring nature of its Subscription revenues, suggesting the services are not working as advertised."

34. Similarly, Northland Capital Markets downgraded the stock, as C3 AI's "preliminary results not only missed [their] revenue estimates, but also came in lower than [their] subscription estimates, which are supposed to be relatively visible on a quarterly basis."

35. The fact that these analysts, and others, discussed C3 AI's shortfall and below-expectation results suggests the public placed significant weight on C3 AI's prior revenue and sales estimates. The frequent, in-depth discussion of C3 AI's guidance confirms that Defendants' statements during the Class Period were material.

### D. Loss Causation and Economic Loss

36. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of C3 AI's common stock and operated as a fraud or deceit on Class Period purchasers of C3 AI's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of C3 AI's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of C3 AI's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

37. C3 AI's stock price fell in response to the corrective event on August 8, 2025, as alleged *supra*. On August 8, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning C3 AI's forecasting processes and growth guidance, as well as concerning the capacity of Defendant Siegel to adequately perform in his roles.

38.     In particular, on August 8, 2025, C3 AI announced preliminary results for the first quarter of fiscal year 2026 significantly below both market expectations and the company's own prior guidance.

**E.     Presumption of Reliance; Fraud-On-The-Market**

39.     At all relevant times, the market for C3 AI's common stock was an efficient market for the following reasons, among others:

(a)     C3 AI's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)     C3 AI communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     C3 AI was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about C3 AI was reflected in and incorporated into the Company's stock price during the Class Period.

40.     As a result of the foregoing, the market for C3 AI's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in C3 AI's stock price. Under these circumstances, all purchasers of C3 AI's common stock during the Class Period suffered similar injury through their purchase of C3 AI's common stock at artificially inflated prices, and a presumption of reliance applies.

41.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense

that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### F. No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

42. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with updates to Defendant Siegel's health and his ability to effectively perform his roles in C3 AI, and then provided investors with revenue projections, which relied upon the effectiveness of Defendant Siegel, while failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

43. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

44. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of C3 AI who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

**CLASS ACTION ALLEGATIONS**

45. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired C3 AI's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

46. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, C3 AI's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by C3 AI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of June 2, 2025, there were 130.886 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

47. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

48. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of C3 AI;

(c)  whether the Individual Defendants caused C3 AI to issue false and misleading financial statements during the Class Period;

(d)  whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)  whether the prices of C3 AI's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

51.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.  This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

53.  During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of C3 AI common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire C3 AI's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

54. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for C3 AI's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

55. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

56. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of C3 AI's internal affairs.

57. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to C3 AI's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of C3 AI's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired C3 AI's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

58. During the Class Period, C3 AI's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of C3 AI's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of C3 AI's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of C3 AI's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

59. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

*Against the Individual Defendants*

*for Violations of Section 20(a) of the Exchange Act*

61. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about C3 AI's misstatements.

63. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by C3 AI which had become materially false or misleading.

64. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which C3 AI disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause C3 AI to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of C3 AI's common stock.

65. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same

1 | to cause C3 AI to engage in the unlawful acts and conduct complained of herein. Each of the
2 | Individual Defendants exercised control over the general operations of the Company and possessed
3 | the power to control the specific activities which comprise the primary violations about which
4 | Plaintiff and the other members of the Class complain.

5 |       66.     By reason of the above conduct, the Individual Defendants and/or C3 AI are liable
6 | pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 22, 2025　　　　　　　　　　　Respectfully submitted,

**LEVI & KORSINSKY LLP**

/s/ Adam Apton
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com

*Counsel for Plaintiff*