**QUINN EMANUEL URQUHART
  & SULLIVAN, LLP**
Harry A. Olivar, Jr. (Bar No. 143089)
harryolivar@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

Michael B. Carlinsky (*pro hac vice*)
Jesse Bernstein (*pro hac vice*)
Leigha Empson (*pro hac vice*)
Amy Shehan (*pro hac vice*)
michaelcarlinsky@quinnemanuel.com
jessebernstein@quinnemanuel.com
leighaempson@quinnemanuel.com
amyshehan@quinnemanuel.com
295 Fifth Avenue
New York, NY 10016
Telephone: (212) 849-7000

*Attorneys for Defendants C3.ai, Inc.,
Thomas M. Siebel, and Hitesh Lath*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN LIGGETT SR., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>C3.AI, INC., THOMAS M. SIEBEL, and HITESH LATH,<br><br>Defendants. | Case No. 3:25-cv-7129-TLT<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Date: June 23, 2026<br>Time: 2:00 p.m.<br>Location: Courtroom 9, 19th Floor<br>Before: Hon. Trina L. Thompson |

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................................1

FACTUAL BACKGROUND ..........................................................................................................3

     A.     C3's Operations And Business Model ..................................................................3

     B.     Mr. Siebel's Struggle With An Autoimmune Disease .........................................4

     C.     Mr. Siebel Announces His Resignation As CEO .................................................5

     D.     C3 Misses Revenue Guidance For Q1 2026 .......................................................6

LEGAL STANDARD ......................................................................................................................6

ARGUMENT ...................................................................................................................................7

I.     PLAINTIFF HAS FAILED TO PLEAD A MISREPRESENTATION OR OMISSION ..............................................................................................................7

     A.     Defendants Disclosed Mr. Siebel's Health Issues And The Risks Associated With The Loss Of Mr. Siebel's Management ............................................7

     B.     Defendants' Forward-Looking Statements Are Protected By The PSLRA Safe Harbor And Bespeaks Caution Doctrine.............................................9

     C.     Defendants' Statements Of Optimism Are Inactionable.......................................11

     D.     Plaintiff Does Not Allege Any Of The Statements Were False Or Misleading ............................................................................................................12

II.     PLAINTIFF HAS FAILED TO PLEAD A STRONG INFERENCE OF SCIENTER....................................................................................................................16

     A.     Plaintiff Ignores More Compelling, Non-Culpable Inferences...............................17

     B.     Stock Sale Allegations Do Not Plead A Strong Inference Of Scienter....................18

     C.     Plaintiff Fails To Plead Knowledge Of Falsity Or Deliberate Recklessness ...........20

III.     PLAINTIFF FAILS TO PLEAD LOSS CAUSATION.........................................................23

IV.     PLAINTIFF'S SECTION 20A CLAIM SHOULD BE DISMISSED ...............................24

V.     PLAINTIFF'S SECTION 20(A) CLAIM SHOULD BE DISMISSED..............................25

CONCLUSION ...............................................................................................................25

Case No. 3:25-cv-7129-TLT

DEFENDANTS' MOTION TO DISMISS

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Alphabet, Inc. Sec. Litig.*,
　1 F.4th 687 (9th Cir. 2021) .......................................................................................... 11

*In re Apple Computer Sec. Litig.*,
　886 F.2d 1109 (9th Cir. 1989) .................................................................................... 20

*In re Apple Inc. Sec. Litig.*,
　2020 WL 2857397 (N.D. Cal. June 2, 2020) .............................................................. 20

*Aramic LLC v. Revance Therapeutics, Inc.*,
　2024 WL 1354503 (N.D. Cal. Apr. 2, 2024) .............................................................. 22

*Bodri v. GoPro, Inc.*,
　252 F. Supp. 3d 912 (N.D. Cal. 2017) ....................................................................... 12

*In re BofI Holding, Inc. Sec. Litig.*,
　977 F.3d 781 (9th Cir. 2020) ...................................................................................... 23

*Brody v. Transitional Hosp. Corp.*,
　280 F.3d 997 (9th Cir. 2002) ...................................................................................... 15

*Browning v. Amyris, Inc.*,
　2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ........................................................... 22

*Buban v. O'Brien*,
　1994 WL 324093 (N.D. Cal. June 22, 1994) .............................................................. 25

*Chen v. Lyft, Inc.*,
　762 F. Supp. 3d 909 (N.D. Cal. 2025) ......................................................................... 9

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
　856 F.3d 605 (9th Cir. 2017) ...................................................................................... 18

*City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*,
　963 F. Supp. 2d 1092 (E.D. Wash. 2013) .................................................................. 17

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
　2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ........................................................... 21

*In re Cloudera, Inc.*,
　2021 WL 2115303 (N.D. Cal. May 25, 2021) ........................................................... 13

*Constr. Laborers Pension Tr. of Greater St. Louis v. Funko*,
　166 F.4th 805 (9th Cir. 2026) ..................................................................................... 11

*In re Countrywide Fin. Corp. Sec. Litig.*,
  2009 WL 943271 (C.D. Cal. Apr. 6, 2009) ................................................................... 25

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ...................................................................................... 9

*In re Cypress Semiconductor Sec. Litig.*,
  891 F. Supp. 1369 (N.D. Cal. 1995), *aff'd sub nom.*, *Eisenstadt v. Allen*, 113
  F.3d 1240 (9th Cir. 1997) ............................................................................................ 11

*Dabestani v. Geron Corp.*,
  2026 WL 861010 (N.D. Cal. Mar. 30, 2026) ............................................................... 21

*Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*,
  2021 WL 1056549 (N.D. Cal. Mar. 19, 2021) ............................................................. 18

*Espy v. J2 Glob., Inc.*,
  99 F.4th 527 (9th Cir. 2024) .................................................................................... 14, 21

*In re Fastly, Inc. Sec. Litig.*,
  2021 WL 5494249 (N.D. Cal. Nov. 23, 2021) ............................................................. 19

*Ferreira v. Funko Inc.*,
  2021 WL 8820650 (C.D. Cal. Oct. 22, 2021) .............................................................. 19

*In re First Marblehead Corp. Sec. Litig.*,
  639 F. Supp. 2d 145 (D. Mass. 2009) ............................................................................ 8

*In re Fusion-io, Inc. Sec. Litig.*,
  2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ................................................................ 14

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ..................................................................................... 9, 22

*Glazer Cap. Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ........................................................................................ 16

*In re Gupta Corp. Sec. Litig.*,
  900 F. Supp. 1217 (N.D. Cal. 1994) ......................................................................... 7, 25

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002) ...................................................................................... 8, 9

*Hampton v. Aqua Metals, Inc.*,
  2020 WL 6710096 (N.D. Cal. Nov. 16, 2020) ............................................................. 19

*In re Hansen Nat. Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) .................................................................. 19, 23

*Hefler v. Wells Fargo & Co.*,
   2018 WL 1070116 (N.D. Cal. Feb. 27, 2018)................................................................24

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
   189 F.3d 971 (9th Cir. 1999)..........................................................................................8

*Hoang v. Contextlogic, Inc.*,
   2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) .......................................................... 19, 20

*Jaszczyszyn v. SunPower Corp.*,
   2024 WL 3463348 (N.D. Cal. July 17, 2024) ................................................................16

*Kim v. Allakos Inc.*,
   2022 WL 17477094 (N.D. Cal. Dec. 6, 2022) ................................................................20

*Kipling v. Flex Ltd.*,
   2020 WL 7261314 (N.D. Cal. Dec. 10, 2020) ................................................................14

*Lamontagne v. Tesla, Inc.*,
   2024 WL 4353010 (N.D. Cal. Sep. 30, 2024), *aff'd sub nom., Oakland Cnty.
   Voluntary Emps. Beneficiary Ass'n v. Tesla, Inc.*, 2025 WL 3459471 (9th Cir.
   Dec. 2, 2025) ............................................................................................................ 7, 19

*In re Leapfrog Enter., Inc. Sec. Litig.*,
   200 F. Supp. 3d 987 (N.D. Cal. 2016) ...........................................................................12

*In re LeapFrog Enters., Inc. Sec. Litig.*,
   527 F. Supp. 2d 1033 (N.D. Cal. 2007) .............................................................. 11, 16, 19

*Lechner v. Infusystem Holdings, Inc.*,
   2017 WL 11593803 (C.D. Cal. Dec. 15, 2017) ..............................................................14

*Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*,
   39 F.4th 1092 (9th Cir. 2022)..........................................................................................7

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008).......................................................................... 12, 16, 20, 22

*N.Y.C. Fire Dep't Pension Fund v. Snowflake Inc.*,
   2026 WL 446309 (N.D. Cal. Feb. 17, 2026)..................................................................14

*In re Nektar Therapeutics*,
   2020 WL 3962004 (N.D. Cal. July 13, 2020) ................................................................18

*In re Netflix, Inc., Sec. Litig.*,
   964 F. Supp. 2d 1188 (N.D. Cal. 2013) ..........................................................................24

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020)..........................................................................................17

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
2016 WL 7475555 (N.D. Cal. Dec. 29, 2016) ................................................................... 13, 15

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
2018 WL 3126393 (N.D. Cal. June 26, 2018) ......................................................................... 18

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) .................................................................................................. 6

*In re Okta, Inc. Sec. Litig.*,
2023 WL 2749193 (N.D. Cal. Mar. 31, 2023) ........................................................................ 23

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) .......................................................................................... 7, 8, 23

*Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*,
2023 WL 1800963 (D. Ariz. Feb. 7, 2023) ............................................................................ 25

*In re Outset Med., Inc. Sec. Litig.*,
2026 WL 898283 (N.D. Cal. Mar. 30, 2026) .......................................................................... 11

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) .................................................................................... 10, 11, 21

*Prodanova v. H.C. Wainwright & Co.*,
993 F.3d 1097 (9th Cir. 2021) ................................................................................................ 20

*In re Rackable Sys., Inc. Sec. Litig.*,
2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ........................................................................... 18

*Reckstin Fam. Tr. v. C3.ai, Inc.*,
718 F. Supp. 3d 949 (N.D. Cal. 2024) .................................................................................... 19

*In re Redback Networks, Inc.*,
2006 WL 1805579 (N.D. Cal. Mar. 20, 2006) ....................................................................... 24

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) .................................................................................................. 12

*Rudolph v. UTStarcom*,
560 F. Supp. 2d 880 (N.D. Cal. 2008) .................................................................................... 22

*Sakkal v. Anaplan Inc.*,
557 F. Supp. 3d 988 (N.D. Cal. 2021) .................................................................................... 21

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
485 F. Supp. 3d 1113 (N.D. Cal. 2020) ............................................................................ 24, 25

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
2023 WL 11691540 (N.D. Cal. Aug. 18, 2023) ...................................................................... 20

*In re Semtech Corp.*,
    2025 WL 2884810 (C.D. Cal. Oct. 7, 2025) ................................................................. 7

*In re Silver Lake Grp., LLC Sec. Litig.*,
    108 F.4th 1178 (9th Cir. 2024) ...................................................................... 24, 25

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
    545 F. Supp. 3d 120 (S.D.N.Y. 2021) ...................................................................... 24

*Sneed v. Talphera, Inc.*,
    147 F.4th 1123 (9th Cir. 2025) ...................................................................... 18, 21

*In re Solarcity Corp. Sec. Litig.*,
    274 F. Supp. 3d 972 (N.D. Cal. 2017) ...................................................................... 14

*In re Sorrento Therapeutics, Inc. Sec. Litig.*,
    97 F.4th 634 (9th Cir. 2024) ...................................................................... 12

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    2000 WL 1727377 (N.D. Cal. Sep. 29, 2000) ...................................................................... 10

*In re Sunrise Techs. Sec. Litig.*,
    1992 WL 359636 (N.D. Cal. Sep. 22, 1992) ...................................................................... 12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ...................................................................... 16, 17

*In re Twitter, Inc. Sec. Litig.*,
    506 F. Supp. 3d 867 (N.D. Cal. 2020) ...................................................................... 19

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ...................................................................... 23

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ...................................................................... 17

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ...................................................................... 25

*Wenger v. Lumisys, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) ...................................................................... 16, 19

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ...................................................................... 11, 18

*Wilbush v. Ambac Fin. Grp., Inc.*,
    271 F. Supp. 3d 473 (S.D.N.Y. 2017) ...................................................................... 11, 12

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ...................................................................... 10, 11

*Xiaojiao Lu v. Align Tech., Inc.*,
  417 F. Supp. 3d 1266 (N.D. Cal. 2019) ............................................................................ 13, 24

*Yaron v. Intersect ENT, Inc.*,
  2020 WL 6750568 (N.D. Cal. June 19, 2020) ...................................................................... 24

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ............................................................................ 14, 17, 21, 25

## Rules / Statutes

15 U.S.C. § 78u-5(i)(1)(A) ...................................................................................................... 9

17 C.F.R. § 240.10b5-1 ......................................................................................................... 25

Fed. R. Civ. P. 12(b)(6) ........................................................................................................... 1

**<u>NOTICE OF MOTION AND MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

PLEASE TAKE NOTICE THAT on June 23, 2026 at 2:00 p.m. before the Honorable Trina L. Thompson in Courtroom 9, 450 Golden Gate Avenue, San Francisco, CA, Defendants C3.ai, Inc. ("C3" or the "Company"), and Thomas Siebel and Hitesh Lath (together, the "Individual Defendants" and with C3, "Defendants") will move this Court for an order dismissing with prejudice Plaintiff's Amended Complaint (ECF No. 60, "Complaint").  This Motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") and is based upon the following Memorandum; the Declaration of Harry A. Olivar, Jr. filed concurrently herewith; Defendants' Request for Judicial Notice filed concurrently herewith; the arguments of counsel; and any additional material as may be submitted to the Court before its decision.

**<u>ISSUES TO BE DECIDED</u>**

1.      Whether Plaintiff has failed to plead adequately that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), given that the Complaint identifies no materially misleading statements or omissions, does not plead facts showing that the alleged misstatements or omissions were made with scienter, and does not plead that any alleged conduct caused Plaintiff or the purported class losses.

2.      Whether Plaintiff has failed to plead that Mr. Siebel violated Section 20A of the Exchange Act, given that the Complaint fails to plead a primary violation and that Mr. Siebel traded contemporaneously with Plaintiff and to Plaintiff's disadvantage.

3.      Whether Plaintiff has failed to plead that either of the Individual Defendants violated Section 20(a) of the Exchange Act, given that the Complaint fails to plead a primary violation and that each Individual Defendant was a control person over any actionable alleged misstatement.

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

Plaintiff asks the Court to transform a CEO's unfortunate and unforeseen health struggles into securities fraud—such claims find no support in the securities law and should be dismissed.  On the very first day of the Class Period, C3's CEO, Thomas Siebel, disclosed that he was suffering from an autoimmune disease that had resulted in significant vision impairment.  Over the following months, Mr. Siebel provided regular updates on the disease and his expectations for how it would

affect his ability to run the Company.  Despite Mr. Siebel's transparency with investors about the intimate details of his health struggles, Plaintiff now cries fraud, claiming that Defendants somehow must have known from the beginning how Mr. Siebel's disease would progress and the effect it would have on C3's business.  Plaintiff ignores the far more plausible scenario that Defendants did not immediately know the full and precise ways in which Mr. Siebel's disease—which was rapidly evolving during the six-month Class Period—would impact his daily life and his management of the Company.  The Court should reject Plaintiff's attempts to use the securities laws as an insurance policy and his allegations that an executive suffering from an extreme and unforeseen disease committed securities fraud by not predicting exactly what his future would hold.

*First*, Plaintiff does not allege that Defendants made any materially misleading statement.  Several of the purported misstatements in the Complaint are projections for C3's financial results and expectations regarding Mr. Siebel's ability to continue managing the business, which are the precise types of forward-looking statements protected by the PSLRA's Safe Harbor.  Others are inactionable statements of opinion.  Even if Plaintiff had alleged a single potentially actionable statement, he has failed to allege with particularity *why* any statement was materially false when it was made.  That Mr. Siebel ultimately stepped down as CEO for medical reasons does not render his previous expectations regarding his continued role at the Company fraudulent.

*Second*, Plaintiff fails to allege particularized facts supporting an inference of fraudulent intent stronger than the obvious non-fraudulent inferences.  Absent from the Complaint is a single particularized fact demonstrating that any Defendant knew their public statements were false when made.  Plaintiff's heavy reliance on Mr. Siebel's ultimate decision to step down says nothing about any Defendant's knowledge during the Class Period as Mr. Siebel's disease rapidly developed.  Plaintiff's reliance on a single confidential witness—at the Company for only a portion of the Class Period—falls far short of pleading fraud, alleging only hearsay and vague allegations of Mr. Siebel's health issues that are in fact *consistent* with Defendants' disclosures during the Class Period.  Lacking meaningful allegations that Defendants knew any statements were false, Plaintiff falls back on purportedly "suspicious" stock sales, which are, in reality, untethered in time to the alleged fraud and unremarkable in size or purpose.  The far more compelling inference is that Defendants

transparently disclosed Mr. Siebel's health setback the very month the autoimmune disease "kick[ed] in," did not anticipate how the unexpected illness would impact Mr. Siebel and the business, and provided timely and transparent updates to investors as the situation evolved.

*Third*, Plaintiff has failed to plead that C3's financial results, which fell short of the Company's guidance at the end of the Class Period, were anything more than the materialization of a known—and repeatedly disclosed—risk. Plaintiff thus fails to adequately allege loss causation.

*Fourth*, Plaintiff's Section 20A claim fails, because Plaintiff has failed to plead a primary violation or that Mr. Siebel traded contemporaneously with Plaintiff and to Plaintiff's disadvantage.

*Finally*, Plaintiff has not alleged a primary violation or included sufficient allegations of control to state a control person claim under Section 20(a).

The Complaint should be dismissed in its entirety, with prejudice.

## FACTUAL BACKGROUND

### A.    C3's Operations And Business Model

Founded by Tom Siebel in 2009, C3 is an enterprise artificial intelligence ("AI") software company. ¶¶ 4, 6.[1] C3 offers a family of integrated AI products, including platforms, applications, and generative AI capabilities to retrieve data, analyze information, surface insights, and orchestrate workflows to drive business value. ¶ 4; Ex. A (2024 Form 10-K) at 7; Ex. B (2025 Form 10-K) at 7. C3 earns revenue through software subscriptions and professional services, including engineering and implementation services, consulting, and training. ¶ 5.

Despite C3's strong business model and successes, it warned investors that the business—focused on rapidly developing technology—was not without risks. Even before the Class Period, C3 expressly warned that it "ha[d] a history of losses" and "may not be able to achieve or maintain profitability in the future." Ex. A at 23. C3 further cautioned: "Historically, a limited number of customers have accounted for a substantial portion of our revenue. If existing customers do not renew their contracts with us, or if our relationships with our largest customers are impaired or terminated, our revenue could decline." *Id.* at 24.

---

[1] References to "¶ _" are to the Complaint. Unless otherwise noted, internal citations and quotation marks are omitted, and emphasis is added.

C3 also emphasized the importance of its founder and CEO, Mr. Siebel, to the Company's success and warned of the risks to the Company if he could no longer serve in that role. Indeed, months before the Class Period, C3 stressed that its "success depends in a large part upon the continued service of key members of [its] senior management team" and explicitly flagged that "[i]n particular, our founder and CEO, Thomas M. Siebel, is critical to [C3's] overall management, sales strategy, culture, strategic direction, engineering, and operations." *Id.* at 31. C3 further warned that "[t]he loss of any member of [its] senior management team could make it more difficult to execute [its] business strategy and, therefore, harm [the] business." *Id.*

**B.      Mr. Siebel's Struggle With An Autoimmune Disease**

On February 18, 2025, the first day of the purported Class Period, C3 published a "Note from Tom" on its website that disclosed that Mr. Siebel had "suffered a health setback" in the form of an "autoimmune disease … that has resulted in significant vision impairment." Ex. C (Note from Tom) at 1; *see also* ¶¶ 16, 43. Although Mr. Siebel expected that his illness would not affect his ability to remain actively engaged at the Company, Mr. Siebel shared that it would "limit [his] ability to travel" and that he "asked [Mr.] Jim Snabe … to assume the role of Special Advisor to the CEO to help fill in activities where [Mr. Siebel] may be constrained." Ex. C at 1; *see also* ¶ 16.

A week later, on February 26, 2025, the Company held an earnings call in which Mr. Siebel further discussed his health with analysts and investors. ¶ 46. Mr. Siebel disclosed that (i) he began experiencing "flu-like symptoms" sometime after December 25, 2024; (ii) those symptoms "lasted some weeks"; and (iii) once "*into February*, th[e] autoimmune disease kick[ed] in and attack[ed] [his] optical nerve," resulting in his vision being "impaired." *Id.* Regarding the business, Mr. Siebel explicitly told analysts and investors that he would need to "learn some new skills" and C3 had to put "accommodations in place," one of which was adding someone "who reads [] e-mails to" Mr. Siebel. ¶¶ 46-47. In other words, the very month the autoimmune disease "kick[ed] in," Mr. Siebel publicly shared his diagnosis and symptoms in detail and informed investors that he would need accommodations to continue working. *Id.*

A few days later, on March 3, 2025, Mr. Siebel spoke at an industry conference, again explaining that he had suffered "a lot of damage to [his] optical nerve" and that he had "significant

visual impairment." Ex. D (Citizens JMP Tech. Conf. Tr.) at 9. Mr. Siebel also spoke about the impact of his health setback on C3, explaining that Mr. Snabe was "advising" Mr. Siebel and "filling in for a lot of the events [Mr. Siebel] would normally do." *Id.* Mr. Siebel emphasized that Mr. Snabe had become "a more important part of the picture," further underscoring that Mr. Siebel had been constrained in his work. *Id.* Mr. Siebel explained that "[his] role is now much, much less supervisory," meaning "[w]e're delegating the responsibility," "[w]e're delegating the authority," and "we're delegating to the management team." *Id.* at 10. Mr. Siebel noted that this "transition" had been happening "over the last six months" but the Company had "now *accelerated it dramatically*." *Id.* at 9. A few weeks later, in May 2025, Mr. Siebel told analysts and investors during an earnings call that "[t]here's no question" that he "did get slowed down for a little bit." Ex. E (Q4 2025 Earnings Call Tr.) at 10.

C3 continued to warn investors that if Mr. Siebel could not continue in his role, the Company faced risks. As an example, on March 7, 2025, less than a month after Mr. Siebel informed investors of his health issues, C3 again flagged for investors that Mr. Siebel "had contracted an autoimmune disease and was experiencing significant vision impairment." Ex. F (Q3 2025 Form 10-Q) at 57. C3 again made clear that the loss of a senior member of management may "make it more difficult to execute our business strategy and, therefore, harm our business." *Id.* C3 again further warned that *if it "were to lose the services of our CEO … we may not be able to execute our business strategy," and that "[i]n particular, our founder and CEO, Thomas M. Siebel, is critical to our overall management, sales strategy, culture, strategic direction, engineering, and operations." Id.*

### C.    Mr. Siebel Announces His Resignation As CEO

On July 24, 2025—a mere five months after Mr. Siebel first announced he had contracted an autoimmune disease—C3 announced that Mr. Siebel would step down from his role as CEO but would "continue in the role of Executive Chairman focusing on strategy, product innovation, strategic partner and customer relationships." Ex. G (July 24, 2025 Form 8-K) at 3. Mr. Siebel explained that he had "experienced significant visual impairment" "[a]fter being diagnosed with an autoimmune disease in early 2025" and that "[f]or C3 AI to reach its full potential … the board and [Mr. Siebel] have initiated a search for a new CEO who can take the [C]ompany to the next level of

growth and success." *Id.* at 5.  Analysts noted that this followed the previously disclosed "health setback faced by Mr. Siebel." Ex. H (July 24, 2025 Canaccord Analyst Report) at 1.  According to Plaintiff, this announcement that C3 was searching for a new CEO in the wake of Mr. Siebel's health struggles partially "revealed" the alleged fraud, causing C3's stock price to decline.  ¶¶ 89-91.

### D.    C3 Misses Revenue Guidance For Q1 2026

On August 8, 2025, C3 announced it had completed the restructuring of its global sales and services organization, which had been underway over the past quarter, including the hiring of new "leadership across the board." Ex. I (Aug. 11, 2025 Form 8-K) at 10.  That same press release also reported preliminary financial results for Q1 2026, which fell short of the Company's prior guidance. *Id.*; ¶ 74.  Specifically, on May 28, 2025, while warning that it may not be able to achieve the results projected, C3 had issued guidance projecting it would bring in an estimated $100 to $109 million in revenue in Q1 2026.  Ex. J (May 28, 2025 Form 8-K) at 9.  On August 8, 2025, C3 instead reported preliminary revenue of $70.3 million.[2]   ¶ 74.   Mr. Siebel attributed the financial performance to (i) the "disruptive effect" of the "reorganization with new sales and services leadership" throughout Q1; and (ii) Mr. Siebel's own "*previously announced … health issues*" which "prevented [him] from participating in the sales process as actively as [he] [had] in the past." ¶ 75; Ex. I at 10.  Mr. Siebel emphasized that "*[w]ith the benefit of hindsight*, it is now apparent that [his] active participation in the sales process may have had a greater impact than [he] previously thought." ¶ 75; Ex. I at 10.  Plaintiff alleges this announcement of disappointing financial results "revealed" Defendants' purported fraud, and C3's stock price declined as a result.  ¶ 80.

### LEGAL STANDARD

To state a claim for securities fraud, Plaintiff must allege particularized facts showing (1) a misrepresentation or omission of a material fact; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014).  Section 10(b) claims are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA, which apply to "all elements of a

---

[2] C3's fiscal years end on April 30.  Ex. B at 98.

securities fraud action," *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604-05 (9th Cir. 2014), and "present no small hurdle for the securities fraud plaintiff," *Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1096 (9th Cir. 2022). Plaintiff cannot clear this hurdle.

<u>ARGUMENT</u>

**I.    PLAINTIFF HAS FAILED TO PLEAD A MISREPRESENTATION OR OMISSION**

Plaintiff alleges fourteen statements were materially false or misleading in light of Mr. Siebel's health issues and their impact on C3. ¶¶ 43-47, 52-53, 56-60, 64, 68.[3] *None* of these statements gives rise to securities fraud. As an initial matter, Defendants transparently and timely disclosed the risks facing C3, including risks related to Mr. Siebel's health and the effect losing Mr. Siebel would have on the Company. Further, the alleged misstatements are inactionable forward-looking statements, projecting C3's performance while warning of the very risks Plaintiff claims materialized here, and include inactionable corporate optimism, which cannot give rise to a securities fraud claim. Even if any of the alleged misstatements were actionable, Plaintiff does not allege with particularity facts rendering these statements false at the time they were made.[4]

**A.    Defendants Disclosed Mr. Siebel's Health Issues And The Risks Associated With The Loss Of Mr. Siebel's Management**

Contrary—and fatal—to Plaintiff's theory that Defendants hid the extent of Mr. Siebel's health issues, Defendants were transparent about the intimate details of Mr. Siebel's health and its anticipated effects from the start. Shortly after Mr. Siebel was affected by his unexpected and rapidly progressing autoimmune disease, he disclosed the disease to investors. *See supra* at 4.

---

[3] Based on ¶¶ 54 and 66, Plaintiff has alleged only seven statements are false or misleading (¶¶ 43, 47, 52-53, 59-60, 64); however, in an abundance of caution, Defendants address all statements attributed to them within Section VIII of the Complaint. There are also eight statements made by analysts in Section VIII of the Complaint (¶¶ 48-50, 61-62, 69-71) that cannot give rise to a claim both for the reasons explained herein and because Defendants are "not legally responsible for the statements by analysts." *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1227 (N.D. Cal. 1994); *In re Semtech Corp.*, 2025 WL 2884810, at *6 (C.D. Cal. Oct. 7, 2025) ("Plaintiff has not alleged that Defendants had any control over what each analyst included in their reports.").

[4] To the extent Plaintiff purports to allege scheme liability (¶ 111), that theory rests on the same allegations as the 10b-5(b) misstatements claim and thus fails for the same reasons. *See Lamontagne v. Tesla, Inc.*, 2024 WL 4353010, at *17 (N.D. Cal. Sep. 30, 2024), *aff'd sub nom., Oakland Cnty. Voluntary Emps. Beneficiary Ass'n v. Tesla, Inc.*, 2025 WL 3459471 (9th Cir. Dec. 2, 2025).

Mr. Siebel specifically disclosed he was suffering from "significant vision impairment," that his "ability to travel" would be "limit[ed]," and that he was bringing on an advisor to help in activities where he "may be constrained." Ex. C at 1. He also made clear that he "did get slowed down for a little bit" (Ex. E at 10) and would be "delegating" much more than before (Ex. D at 10). Throughout this time period, C3 issued repeated warnings about the risks of losing its senior management and Mr. Siebel in particular. *See supra* at 4-5. As Mr. Siebel's condition changed, he provided transparent updates, culminating in the search for a new CEO and disappointing financial results that followed. *See supra* at 4-6. This all happened in the span of less than six months, and it is difficult to imagine what more Defendants could have disclosed.

In addition to warning investors about the risks associated with Mr. Siebel's health and the Company's reliance on Mr. Siebel's management, C3 also warned of risks related to its financial results. C3 warned that it had "a history of losses … and [] may not be able to achieve or maintain profitability in the future." Ex. A at 23. C3 also warned investors about the risk of its reliance on large customers, noting that "[h]istorically, a limited number of customers have accounted for a substantial portion of our revenue. If existing customers do not renew their contracts with us, or if our relationships with our largest customers are impaired or terminated, our revenue could decline." *Id.* at 24. And C3 warned that "[o]ur business depends on our ability to attract new customers and on our existing customers purchasing additional subscriptions from us and renewing their existing subscriptions." *Id.* "If we are not able to attract new customers, it will have an adverse effect on our business, financial condition and results of operations." *Id.*

These transparent and repeated disclosures preclude Plaintiff's fraud claims, as the total mix of information available to investors made clear that Mr. Siebel was suffering from health issues that could—and did—affect the Company and its results. *See Or. Pub. Emps.*, 774 F.3d at 607 ("Plaintiffs' omissions theory fails to state a claim because the Defendants clearly disclosed material information to investors"); *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 976-977 (9th Cir. 1999) (misstatements not actionable where truth disclosed as part of "total mix of information"); *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155 (D. Mass. 2009) ("A plaintiff fails to plead an actionable § 10(b) claim predicated on the concealment of information if that

information was, in fact, disclosed."); *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002) (no liability for omission where "[t]he allegedly omitted facts were either disclosed or implied in the offering memoranda").  This is dispositive, and the Court need not look further to dismiss this case in its entirety and with prejudice.

**B.      Defendants' Forward-Looking Statements Are Protected By The PSLRA Safe Harbor And Bespeaks Caution Doctrine**

Several of the purported misstatements are forward-looking projections of financial results and expectations that are quintessential forward-looking statements protected by the PSLRA's Safe Harbor.  That Safe Harbor provides that "a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading."  *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 767 (9th Cir. 2023) (emphases in original).  Both prongs protect Defendants' statements here.

***Financial Forecasts* (Statements #9, #12).**  Plaintiff alleges that C3's revenue guidance for Q1 2026 and FY 26 in the May 28, 2025 Form 8-K (#9)[5] and Mr. Lath's statement during the May 28, 2025 earnings call repeating that revenue guidance (#12) were misleading.

These are classic forward-looking revenue projections protected by the PSLRA Safe Harbor. *See* 15 U.S.C. § 78u-5(i)(1)(A) (protecting "statement[s] containing a projection of revenues"); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (an "earnings projection is by definition a forward-looking statement"); *Chen v. Lyft, Inc.*, 762 F. Supp. 3d 909, 917 (N.D. Cal. 2025) (Thompson, J.) (projection of future financial results is forward-looking on its face).  This guidance was accompanied by meaningful cautionary language, rendering it inactionable.  Specifically, in the Form 8-K where Statement #9 was made and during the earnings call where Statement #12 was made, C3 warned that it would make forward-looking statements that were subject to "risks and uncertainties."  Ex. J at 11; Ex. E at 2.  The Company then directed investors to the risks identified in C3's SEC filings (*id.*), which provided extensive disclosures of risks related to financial results and to Mr. Siebel's health (*see supra* at 4-5).  *See Cutera*, 610 F.3d at 1112 (finding similar

---

[5] References to "#__"  refer to the numbered statements in Appendix A.

cautionary language sufficient); *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014) (similar).  Statements #9 and #12 are protected by the Safe Harbor for the independent reason that Plaintiff has failed to plead that these statements were made with *actual knowledge* of falsity, *i.e.*, that the projections would not be met.  *See infra* at 20-23.

***Mr. Siebel's Health Expectations And Business Plans* (Statements #1, #2, #11, #14).** Mr. Siebel's statements that his health setback "will not affect [his] ability to continue actively managing the business" (#1), that "Q4 will ensure" proper organization for expansion (#2), that he "will" travel to Washington D.C. (#11), and that he "will remain fully engaged as [CEO] of C3.ai until the board appoints [his] successor" (#14) are also forward-looking.  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021) (management's plans for future operations are forward-looking).

Statements #1 and #2 are protected by the Safe Harbor because that same disclosure warned that Mr. Siebel was suffering from "significant vision impairment" and that he was bringing on an advisor to help in activities where he was "constrained."  Ex. C at 1.  This language plainly made investors aware of the risks associated with his health setback.  These two statements are further protected by the Bespeaks Caution Doctrine, which protects forward-looking statements when cautionary language is included in other materials available to the market, including SEC filings. *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *10 (N.D. Cal. Sep. 29, 2000) (cautionary language need not be in the same document as the alleged misstatement to receive protection).  As described above (*see supra* at 4-5), C3 had expressly warned of the risks it faced if Mr. Siebel could not serve as CEO and risks related to the Company's financial performance.

Statement #11 about Mr. Siebel's travel plans is not actually alleged to have been false.  *See infra* at 12-13.  In any event, it was made during the May 28, 2025 earnings call and was accompanied by the same cautionary language that protects Statement #12.  *See supra* at 9.

Statement #14 is protected by the Safe Harbor because that same disclosure informed investors that "[a]fter being diagnosed with an autoimmune disease in early 2025, [Mr. Siebel] ha[d] experienced significant visual impairment" and that for C3 "to reach its full potential … the board and [Mr. Siebel] ha[d] initiated a search for a new CEO."  Ex. G at 5.  This language plainly made investors aware of the risks associated with Mr. Siebel's health setback.

***Risk Disclosures* (Statements #7, #13).** C3's risk disclosure that "if we were to lose the services of our CEO … we may not be able to execute our business strategy" (#7, #13) is likewise a forward-looking statement. *See, e.g.*, *Wochos*, 985 F.3d at 1195-96 (risk disclosures regarding potential operational difficulties were forward-looking). These disclosures are protected by the Safe Harbor because they themselves provide the very cautionary language necessary for that protection. *E.g.*, *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) (risk disclosures themselves are cautionary language). Nor can Plaintiff allege that the risks warned of had already come to pass but were undisclosed. *See infra* at 12-16.

## C.    Defendants' Statements Of Optimism Are Inactionable

Statements of optimism or "puffery" are not actionable because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Intuitive Surgical*, 759 F.3d at 1060. Statements that "business is *great*" (#6); that "the market has *never been larger*, the opportunity has *never been greater*, and our product family has *never been stronger*," and "[t]he company has *never been better positioned* to capitalize on all of this" (#2); and that Mr. Siebel was "*actively* managing" C3 "in a hands-on manner" (#1) and was "*fully* engaged" (#5, #14) are all statements of corporate optimism that are too general to have been relied on by a reasonable investor.[6] *See, e.g.*, *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 708 (9th Cir. 2021) (statement that company was "very, very engaged" in compliance was puffery); *In re Outset Med., Inc. Sec. Litig.*, 2026 WL 898283, at *24 (N.D. Cal. Mar. 30, 2026) ("demand for Tablo is strong and growing" is puffery); *Constr. Laborers Pension Tr. of Greater St. Louis v. Funko*, 166 F.4th 805, 823 (9th Cir. 2026) (statements that company is "well positioned" are puffery); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007) (collecting cases holding statements like "business couldn't be better" and noting "outstanding retail results" were inactionable puffery); *In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1376 (N.D. Cal. 1995) (similar), *aff'd sub nom.*, *Eisenstadt v. Allen*, 113 F.3d 1240 (9th Cir. 1997); *Wilbush v. Ambac Fin. Grp., Inc.*, 271

---

[6] *See also* #3 (C3 has "achieved *significant* milestones"); #10 (C3 has "seen *enormous growth* in [its] market"); #5 (Mr. Siebel's health was "*excellent*" aside from his lack of vision); #11 (Mr. Siebel was "*back*"); #14 (Mr. Siebel was "operating again *at 100%*").

F. Supp. 3d 473, 495 (S.D.N.Y. 2017) (goal of "actively managing" assets was puffery).  Statements #1-3, #5-6, #10-11, and #14 are thus inactionable and must be dismissed.

### D.    Plaintiff Does Not Allege Any Of The Statements Were False Or Misleading

Even if any of the alleged misstatements were actionable, "a plaintiff must allege *with particularity* each statement alleged to be misleading *and the reasons why it is misleading*."  *In re Sorrento Therapeutics, Inc. Sec. Litig.*, 97 F.4th 634, 640 (9th Cir. 2024); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) ("A litany of alleged false statements, unaccompanied by the pleading of *specific facts* indicating why those statements were false, does not meet [the particularity] standard.").  The Complaint falls far short of this requirement.

***Financial Results And Projections:***  Plaintiff alleges C3 misrepresented its financial results and projections.  *See* #6, #8, #9, #12.  *First*, Plaintiff does not allege C3's financial results were inaccurately reported.  Mr. Siebel's statement that C3's "[g]rowth rate has gone from … 6% to 16%" (#6) and C3's announcement that "[t]otal revenue for [Q4 2025] was $108.7 million, an increase of 26% compared to $86.6 million one year ago" (#8) are thus inactionable.  *In re Sunrise Techs. Sec. Litig.*, 1992 WL 359636, at *4 (N.D. Cal. Sep. 22, 1992) ("[A]ccurate historical financial reports of financial success are not actionable even though followed by periods of financial decline.").

*Second*, Plaintiff does not allege C3's revenue projections (#6, #9, #12) were false when made.  That C3 fell short of those projections does not render them misleading, and courts routinely reject similar fraud-by-hindsight claims.  *See In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1006 (N.D. Cal. 2016) ("[M]issed guidance alone generally does not render Defendants' financial project[ion]s false or misleading."); *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 930 (N.D. Cal. 2017) ("[G]uidance statements are not actionable."); *see also In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 882 n.12 (9th Cir. 2012) (similar).

***C3's Operations And Mr. Siebel's Activities:***  Many of the alleged misstatements—such as Mr. Siebel's statements that he "had to work from home for a little while" and "will catch a red eye to Washington D.C." (#11) and that "[w]e have quarterly executive reviews" and "almost daily sales reviews" (#6)—are simply not alleged to be false.  Plaintiff does not, for instance, allege Mr. Siebel

*did not* take the relevant flight or that C3 *did not* have the referenced reviews.  *See also* #5, #4, #11.  Similarly, Plaintiff does not allege C3 *did not* expand its "global distribution network" in Q3 (#3) or that C3's "focus" was *not* on "building an ecosystem" to address "the demand for enterprise AI applications" (#10).  *See also* #2 ("The market has never been larger, the opportunity has never been greater, and our product family has never been stronger.").  Plaintiff does not allege a single fact rendering these statements false.  *See, e.g.*, *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1276-77 (N.D. Cal. 2019) (dismissing claims where "tangential" allegations were "almost entirely untethered to the actual statements made by Defendants").

**Statements Regarding Mr. Siebel's Management**:     Statements regarding Mr. Siebel's active management (#1, #5, #14) are similarly not alleged to have been false at the time they were made.  Plaintiff alleges that Mr. Siebel's February 18, 2025 statement that his illness "will not affect [his] ability to continue actively managing the business in a hands-on manner" (#1) and his February 26, 2025 statement that he was "managing details of the business every day" (#5) were misleading, but absent from the Complaint is a single allegation that as of either of those dates, Mr. Siebel was not actively managing the business.[7]  *See Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016) (dismissing claim where "allegations omit contemporaneous facts that would establish a contradiction between the alleged [] misleading statements and reality").  In fact, *none* of Plaintiff's allegations as to Mr. Siebel's health—which fall short for the reasons below—are specific as to time.  *See id.* (plaintiffs "fail[ed] to allege that the facts existed and were known to Defendants *at the time the statements were made*") (emphasis in original); *In re Cloudera, Inc.*, 2021 WL 2115303, at *11 (N.D. Cal. May 25, 2021) (complaint failed to "plead specific facts indicating why the statements at issue were false when made").

The allegations attributed to Former Employee 1 ("FE1") do not connect the dots for Plaintiff.  When a complaint relies on statements from confidential witnesses, (i) "the confidential witnesses … must be described with sufficient particularity to establish their reliability and personal

---

[7] Similarly, Plaintiff fails to allege that Mr. Siebel's statement on July 24, 2025—when he announced he was stepping down as CEO—that he would remain "fully engaged" until his successor was appointed (#14) was false, even if it were actionable (*see supra* at 10-11).

knowledge," and (ii) "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of falsity." *Kipling v. Flex Ltd.*, 2020 WL 7261314, at *10 (N.D. Cal. Dec. 10, 2020). Where, as here, the complaint relies exclusively on a confidential witness to establish falsity, "the complaint must provide an adequate basis for determining that the witnesses in question have *personal knowledge* of the events they report." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).

FE1's allegation that he "hear[d] from the CRO" that "various customer deals were delayed because Mr. Siebel was unavailable" (*e.g.*, ¶ 41(b)) does not pass muster. To start, it is precisely the type of hearsay that courts routinely reject. *See Espy v. J2 Glob., Inc.*, 99 F.4th 527, 536-37 (9th Cir. 2024) (FE allegations that "rel[y] on secondhand information" "lack reliability and personal knowledge"); *Zucco*, 552 F.3d at 996 (rejecting confidential witnesses who "report[ed] only unreliable hearsay"); *Lechner v. Infusystem Holdings, Inc.*, 2017 WL 11593803, at *5 (C.D. Cal. Dec. 15, 2017) (rejecting allegations that "constitute[d] second-hand knowledge, largely consisting of hearsay statements"); *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015) (similar). But even if the Court were to consider the allegation, FE1 fails to provide *any* detail as to what deals were delayed, how many deals were affected, whether those deals affected revenue for Q1 2026, or why Mr. Siebel was unavailable. Without this detail, FE1's allegations lack the particularity necessary to render any statement false. *See N.Y.C. Fire Dep't Pension Fund v. Snowflake Inc.*, 2026 WL 446309, at *6 (N.D. Cal. Feb. 17, 2026) ("[I]t is entirely plausible that the CW testimony reflects a limited set of customers and that defendants' statements about the company as a whole were not false or misleading."); *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 999 (N.D. Cal. 2017) (CW allegation that "'many' contracts were of low credit quality" "lack[s] [] particularity" sufficient to allege falsity where "there is no allegation as to what 'many' means or whether the number of low quality contracts was sufficiently high to meaningfully alter the key operating metrics").[8]

---

[8] Moreover, FE1's allegation is belied by C3's results. C3 reported making new deals with many of its largest customers throughout Q1. Ex. K (Sep. 3, 2025 Form 8-K) at 5-6. Although Plaintiff alleges that C3 is deeply dependent on Mr. Siebel's relationships with these "lighthouse customers"

Similarly, FE1 is cited for the proposition that "there had been talk" that Mr. Siebel was "hospitalized for a week or two" at an unspecified time "after the April 2025 sales meeting" and "had a live-in health professional." ¶¶ 41(b), 54(a), 66(a).  In addition to being the precise type of hearsay courts do not credit (*see supra* at 14), these allegations do not establish that Mr. Siebel's statements regarding his ability to manage the business were false. *See Norfolk*, 2016 WL 7475555, at *3 ("[T]he facts purportedly inconsistent with Defendants' representations do not plausibly support an inference that the representations were false or misleading.").  In fact, a brief hospitalization and a live-in health professional are actually *consistent* with Mr. Siebel's detailed disclosures regarding his health:  (i) Mr. Siebel disclosed in February 2025 that he had suffered a "health setback" that "resulted in significant vision impairment" (¶¶ 16, 43) and that he "ha[d] to learn some new skills" and put "accommodations in place" (¶ 46), including appointing Mr. Snabe to "fill in activities where [Mr. Siebel] may be constrained" (Ex. C at 1) and hiring someone "who reads [] e-mails to [Mr. Siebel]" (¶ 47); and (ii) in May 2025, Mr. Siebel told analysts and investors that "[t]here's no question" that he "did get slowed down for a little bit" (Ex. E at 10).

Plaintiff asserts that these allegations are corroborated by C3's later disclosure in August 2025 that Mr. Siebel had been hospitalized (*e.g.*, ¶ 41(b)), but Plaintiff never specifies *when* Mr. Siebel was hospitalized, that it occurred before any of the alleged misstatements at issue, or that it was inconsistent with any of Mr. Siebel's statements.  *None* of the alleged misstatements made any representation regarding whether Mr. Siebel had been hospitalized.  *See* Appendix A; *see also Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006-07 (9th Cir. 2002) (dismissing statement that did not "affirmatively create an impression ... that differs ... from the one that actually exists").

FE1's allegation that, at some unspecified time, he or she "witnessed [Mr.] Siebel requiring assistance" to "sit in a chair" (¶¶ 41(b), 54(a), 66(a)) does not establish that Mr. Siebel's statements regarding his ability to manage the business were false.  Absent from the Complaint are any details regarding what assistance Mr. Siebel needed—and need for assistance is unsurprising in light of Mr. Siebel's transparent disclosures that he had lost his vision—or when or how the need for

---

(¶ 14), Plaintiff unsurprisingly fails to allege that C3 lost or delayed any deals with a lighthouse customer because of Mr. Siebel's health issues.

assistance affected C3's business.  In fact, the allegation's implication that Mr. Siebel must have been completely incapacitated is belied by his active participation in earnings calls and conferences during the Class Period.  *E.g.*, ¶¶ 46, 58-59, 82-84.

Mr. Siebel's later statements that he was "unable to participate as actively as [he] used to in the sales process" and that his involvement had "*greater impact than any of us knew*" (¶ 82) underscore the fraud-by-hindsight nature of this case.  Plaintiffs do not allege the extent to which Mr. Siebel's participation was limited or how any limitations were concealed when they are, in fact, *consistent* with his public statements as described above.  *See, e.g.*, *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1250 (N.D. Cal. 1998) (hindsight allegations fail "without specific references to specific facts demonstrating that the statements at issue were false or misleading when made").

***Risk Disclosures:***  Plaintiff alleges in a conclusory fashion that C3's risk disclosures (#7, #13) were misleading because the risks disclosed had already occurred (*i.e.*, C3 had already lost the services of Mr. Siebel due to his illness).  ¶¶ 53, 64.  But as discussed above (*see supra* at 12-16), Plaintiff fails to plead with particularity that C3 had, in fact, already lost the services of Mr. Siebel as CEO as of March (#7) or June (#13) 2025.  Absent such allegations, C3's risk disclosures are not alleged to have been materially misleading.  *See, e.g.*, *LeapFrog*, 527 F. Supp. 2d at 1048 (risk disclosures "constitute defendants' cautionary statements and are not actionable to the extent plaintiffs contend defendants should have stated that the adverse factors are affecting financial results rather than may affect financial results"); *Jaszczyszyn v. SunPower Corp.*, 2024 WL 3463348, at *11 (N.D. Cal. July 17, 2024) (similar).

## II.    PLAINTIFF HAS FAILED TO PLEAD A STRONG INFERENCE OF SCIENTER

To plead scienter, Plaintiff must allege "specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made."  *Metzler*, 540 F.3d at 1066; *see also Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008) (scienter requires "specific facts indicating no less than a degree of recklessness that strongly suggests actual intent").  It is not enough to allege facts from which an inference of scienter "could be drawn"; Plaintiff must "plead with particularity facts that give rise to a strong—*i.e.*, a powerful or cogent—inference," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S.

308, 323 (2007), that is "*at least as compelling* as any opposing inference," *Zucco*, 552 F.3d at 991 (emphasis in original). The Complaint fails to plead this strong inference, as it does not allege what *specific facts* any Defendant possessed that were contrary to their statements.

### A.      Plaintiff Ignores More Compelling, Non-Culpable Inferences

Plaintiff's theory of fraud assumes that Defendants somehow knew the effect Mr. Siebel's rapidly developing and unforeseen autoimmune disease would have on the Company and decided to keep it a secret from investors. *E.g.*, ¶ 24. But that "theory does not make a whole lot of sense." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). "It depends on the supposition that [D]efendants would rather keep the stock price high for a time and then face the inevitable fallout" once the extent of Mr. Siebel's illness and its effect on him and C3 were revealed. *Id.*

Here, the more compelling inference is that Mr. Siebel transparently disclosed his health issue the very month the autoimmune disease "kick[ed] in" (¶ 46; *see also* ¶ 43), and Defendants simply did not anticipate how much this unexpected illness would impact him and the business. *See Tellabs*, 551 U.S. at 324 ("[A] court must consider plausible, nonculpable explanations for the defendant's conduct[.]"). The Class Period spans a mere six months where Mr. Siebel's health and its effects were changing rapidly. It is illogical to suggest that someone who had unexpectedly contracted an autoimmune disease that resulted in significant vision impairment would immediately know the full and precise ways in which that health setback would impact his daily life and his role with his company. *See City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1143 (E.D. Wash. 2013) (no scienter where the "far more likely" inference is that "Defendants were unable to fully predict and account for the speed and scope of the collapse in the real estate and credit markets"); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 367 (S.D.N.Y. 2011) ("The more compelling inference … is that Defendants simply did not anticipate the full extent of the mortgage crisis and the resulting implications[.]"). It is much more plausible that Defendants' understanding of Mr. Siebel's health struggles and its effects on his management of the business evolved over the six-month Class Period. As an example, less than two weeks after Mr. Siebel disclosed his illness and optimistically said it would not affect his ability to "actively manag[e] the business" (#1), Mr. Siebel told the public that (i) he was "delegating the responsibility" and "the

authority" "to the management team," and (ii) C3 had "accelerated" this "transition" "dramatically." Ex. D at 9-10. An executive disclosing how he is navigating a new health challenge publicly and in real time is not securities fraud.

Further, as set forth above, Defendants disclosed in detail the importance of Mr. Siebel's leadership and management to the business's success and the risks associated with Mr. Siebel's health. *See supra* at 4-5. These "detailed risk disclosure[s] ... negate[] an inference of scienter." *Wet Seal*, 518 F. Supp. 2d at 1165. After all, Defendants "likely did not intend to defraud investors by concealing" the extent of Mr. Siebel's health setback and its impact on him and the business "while simultaneously disclosing that information in myriad contexts." *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1134 (9th Cir. 2025).

**B.    Stock Sale Allegations Do Not Plead A Strong Inference Of Scienter**

Plaintiff alleges that Mr. Siebel's stock sales create a strong inference of motive. ¶ 31.[9] As an initial matter, merely alleging motive is insufficient to adequately allege scienter. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017). For stock sales to even contribute to the scienter analysis, courts consider "(1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history." *Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2018 WL 3126393, at *9 (N.D. Cal. June 26, 2018). Stock sales "only give rise to an inference of scienter when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.*

*First*, Mr. Siebel's stock sales were all either to satisfy tax obligations (Ex. L (May 5, 2025 Form 4) at 1 n.2; Ex. M (June 3, 2025 Form 4) at 1 n.2)—which is insufficient to plead scienter, *see Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*, 2021 WL 1056549, at *7 (N.D. Cal. Mar. 19, 2021) (sales to "satisfy tax obligations" insufficient to establish scienter)—or pursuant to a pre-determined Rule 10b5-1 plan from 2024, before Mr. Siebel's illness (Ex. N (May 15, 2025

_____

[9] Plaintiff does not allege Mr. Lath sold *any* stock during the Class Period, undermining any inference of scienter as to Mr. Lath. *See In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 199703, at *9 (N.D. Cal. Jan. 13, 2010).

Form 4) at 1 n.1; Ex. O (June 12, 2025 Form 4) at 1 n.1; Ex. P (July 22, 2025 Form 4) at 1 n.1)—which "weighs *against* an inference of scienter," *In re Nektar Therapeutics*, 2020 WL 3962004, at *16 (N.D. Cal. July 13, 2020); *see also In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020); *In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *17 (N.D. Cal. Nov. 23, 2021).

*Second*, Plaintiff fails to plead any facts showing that Mr. Siebel's stock sales were suspicious in size, as the Complaint "does not contain any allegations concerning *what percentage of his holdings Siebel sold*." *See Reckstin Fam. Tr. v. C3.ai, Inc.*, 718 F. Supp. 3d 949, 986 (N.D. Cal. 2024) (scienter not adequately alleged); *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *16 (N.D. Cal. Nov. 16, 2020) (no scienter where the complaint "fails to include any allegations concerning the percentage of the[] holdings [defendants] sold"). The absence of such allegations is not surprising, as Mr. Siebel's stock holdings remained relatively stable through 2025. *Compare* Ex. Q (2024 Proxy Statement) at 56, *with* Ex. R (2025 Proxy Statement) at 54.

*Third*, Plaintiff fails to plead any facts showing that the timing of any alleged sale was suspicious. Plaintiff makes no effort to link any of Mr. Siebel's stock sales to any purported misstatement or corrective disclosure. *See, e.g.*, *LeapFrog*, 527 F. Supp. 2d at 1052 ("[P]laintiffs make no attempt to plead how the timing of any specific sale by any specific defendant is linked to intentional misrepresentations or omissions or gives rise to an inference of scienter as to specific misstatements or omissions."); *Lamontagne*, 2024 WL 4353010, at *15 ("[T]he stock sales … were not linked to any purported misstatement or corrective disclosure, and the timing of sales undermines any inference of scienter."); *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007) (similar).

For instance, Plaintiff's reliance on sales (¶ 55) long before the earliest corrective disclosure (*i.e.*, July 24, 2025) do not support scienter. *Ferreira v. Funko Inc.*, 2021 WL 8820650, at *35 (C.D. Cal. Oct. 22, 2021) (sales not suspicious where they "took place several months before Funko's corrective disclosures"); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1251 (N.D. Cal. 1998) ("[N]one of the sales occurred at suspicious times, such as immediately before a negative earnings announcement."). Further, Mr. Siebel's sale of stock *after* the purported July 24, 2025 "corrective disclosure" (¶ 73) undermines any inference of scienter. *Hoang v. Contextlogic, Inc.*, 2023 WL

6536162, at *26 (N.D. Cal. Mar. 10, 2023).[10]

**C.     Plaintiff Fails To Plead Knowledge Of Falsity Or Deliberate Recklessness**

Where, as here, Plaintiff's motive allegations fail, it "certainly makes it much less likely that a plaintiff can show a strong inference of scienter." *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1108 (9th Cir. 2021).  Plaintiff fails to plead with particularity facts establishing a strong inference that any Defendant knew their statements regarding Mr. Siebel's health or C3's financial results were false.  The Complaint's vague allegations that Defendants must have known their statements regarding Mr. Siebel's health and C3's projected revenues were false fall far short of pleading "specific contemporaneous statements or conditions" demonstrating intentionally false statements to investors. *Metzler*, 540 F.3d at 1066.  The deficiencies are obvious for each Defendant:

*Mr. Siebel:*     "The *glaring issue* with Plaintiff['s] allegations is that there are no particularized allegations supporting a strong inference that [Mr. Siebel was] aware or should have been aware of" anything that contradicted his statements. *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2023 WL 11691540, at *8 (N.D. Cal. Aug. 18, 2023) (Thompson, J.).  Absent from the Complaint is any specific allegation that Mr. Siebel's health at the time of each alleged misstatement was worse than what was conveyed or that Mr. Siebel knew how his health would affect C3's operations and revenue *at the time*.  Plaintiff's scienter allegations rely entirely on (i) allegations attributed to FE1; and (ii) fraud-by-hindsight based on purported post-Class Period "admissions."  Neither can satisfy Plaintiff's heightened and strict pleading burden.

*First*, FE1 offers no allegations that Mr. Siebel knew his statements were false when made.  As Plaintiff admits, FE1 lacked direct access to Mr. Siebel:  FE1 was *not* based in C3's headquarters where Mr. Siebel worked, was a lower-level employee who did not report to Mr. Siebel, and left C3

---

[10] Plaintiff's reliance on pre-Class Period sales (¶ 31 n.4) is irrelevant because the purported "fraud" had not yet begun.  In fact, these pre-Class Period sales demonstrate Mr. Siebel's Class Period sales were not suspicious. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) ("sales of stock *before* the class period are inconsistent with plaintiffs' theory that defendants attempted to drive up the price of Apple stock *during* the class period") (emphasis in original); *Kim v. Allakos Inc.*, 2022 WL 17477094, at *5 (N.D. Cal. Dec. 6, 2022) (similar); *cf. In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *21 (N.D. Cal. June 2, 2020) ("Plaintiff's only allegation regarding suspicious timing is that defendants made the sales while aware of the alleged risks, but plaintiff does not connect the timing to the manifestation or onset of any risk.").

halfway through the Class Period.  ¶ 41(a)-(b).  The lack of direct and meaningful contact with Mr. Siebel means FE1 cannot offer reliable statements about Mr. Siebel's state of mind.  *See Sneed*, 147 F.4th at 1134 (CW statements did not establish scienter where the CWs "never interacted with either executive"); *Intuitive Surgical*, 759 F.3d at 1062-63 (rejecting "impressions of witnesses who lacked direct access to the executives" and thus "lack[ed] first hand knowledge regarding what the individual defendants knew or did not know").

Given the lack of direct access, FE1 largely repeats hearsay about Mr. Siebel's health.  *See supra* at 14-15.  FE1's regurgitation of rumors cannot plead a strong inference of an intent to defraud.  *See supra* at 14; *Zucco*, 552 F.3d at 997 ("hearsay, accompanied by no details" cannot adequately allege scienter); *Espy*, 99 F.4th at 538-39 (FE's report that defendants "signed off on every acquisition" only establishes "general awareness" insufficient to allege scienter); *Dabestani v. Geron Corp.*, 2026 WL 861010, at *2 (N.D. Cal. Mar. 30, 2026) (disregarding CW's "vague and uncorroborated hearsay statement … of which CW1 did not have any personal knowledge" for purposes of scienter analysis).  In any event, even if credited, allegations of medical assistance or certain unspecified deal delays are both lacking in particulars and not inconsistent with Mr. Siebel's public statements about his management role.  *See supra* at 14-15.

The *only* allegation that FE1 offers based on personal knowledge is that on some unspecified date, Mr. Siebel "needed assistance" to "sit in a chair."  ¶ 41(b).  As an initial matter, without any allegations as to when the assistance was required, this allegation adds nothing to the scienter analysis.  *See Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 999 (N.D. Cal. 2021) (CW allegations "ultimately irrelevant because the CW reports [were] neither anchored in time nor tethered to any particular allegedly false or misleading statements"); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *18-19 (N.D. Cal. Dec. 17, 2019) (CW allegations "[did] not establish *when*" defendants took the alleged action).  In any event, that allegation is *consistent with Mr. Siebel's disclosure* that he had suffered "significant vision impairment" (¶ 43) that required C3 to put "accommodations in place," one of which was adding someone to "read[] e-mails to" him (¶¶ 46-47).  The alleged need for assistance to "sit in a chair" does not equate to knowledge that Mr. Siebel's statements regarding his management of C3 were false.  After all, as described above

(*see supra* at 16), Mr. Siebel continued to participate actively in conferences and earnings calls.

*Second*, Plaintiff relies on two post-Class Period statements that, according to Plaintiff, "confirm" Mr. Siebel was unable to participate in the business (¶¶ 81-82), but these two statements actually *undermine* any inference of scienter.  The September 3, 2025 press release stated that Mr. Siebel "had a number of *unanticipated* health issues" that "prevented [him] from participating in the sales process as actively as [he] ha[d] in the past," and during the September 3, 2025 earnings call, Mr. Siebel said he "ran into some *unanticipated* health issues" that led him to be "unable to participate as actively as [he] used to in the sales process."  ¶¶ 81-82.  Both statements support the more compelling, non-culpable inference (*see supra* at 17) that the extent of Mr. Siebel's health challenges was, indeed, unanticipated.  *Cf. Aramic LLC v. Revance Therapeutics, Inc.*, 2024 WL 1354503, at *14 (N.D. Cal. Apr. 2, 2024) ("[E]ven if a company knows that a problem exists, it could still honestly and in good faith report that [it] will continue to perform as expected. Management simply may have been confident that they could overcome the problems or merely underestimated the[ir] severity[.]"); *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *20 (N.D. Cal. Mar. 24, 2014) ("Acknowledging that Amyris had more trouble scaling up its process than anticipated does not show that the defendants always knew that the projections were unattainable or that they acted with scienter because it is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood.").

Plaintiff has set forth no particularized allegations that Mr. Siebel knew *during the Class Period* that his illness would cause him to be unable to participate in the sales process in a way that would affect C3's revenues.  *Metzler*, 540 F.3d at 1068 n.12 (where "plaintiffs fail to allege … that the Defendants were aware of the fraud during the Class Period," "post-Class Period statements do not rectify the lack of scienter pled elsewhere"); *Glazer*, 63 F.4th at 776 ("[t]he problem" with plaintiff's reliance on a "post-class period disclosure" is that defendant "made no admissions about the relevant [condition] as of the dates of the challenged statements").

**Mr. Lath:**  Plaintiff sets forth zero allegations supporting an inference of scienter—much less a strong one—as to Mr. Lath.  *See Rudolph v. UTStarcom*, 560 F. Supp. 2d 880, 891 (N.D. Cal. 2008) ("[P]laintiff must plead facts showing that *each* individual defendant acted with scienter[.]").

In fact, Mr. Lath's name appears in only five paragraphs in the Complaint.  ¶¶ 2, 21, 39, 46, 60.  The Complaint does not allege how and when  Mr. Lath would have known (i) the extent of Mr. Siebel's health issues, or (ii) how those health issues were affecting the business.  *See Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019) ("Plaintiffs fail[] to allege when and how any of the Individual Defendants became aware of any facts giving rise to [an] inference of scienter."); *In re Okta, Inc. Sec. Litig.*, 2023 WL 2749193, at *14 (N.D. Cal. Mar. 31, 2023) (similar).  To the extent Plaintiff relies on Mr. Lath's position as Senior Vice President and CFO to support an inference of scienter (¶ 39), that is insufficient.  *See Hansen*, 527 F. Supp. 2d at 1155 ("[T]he high rank of various Individual Defendants within Hansen is insufficient, without more, to infer a strong inference of scienter.").  Plaintiff's failure to plead any specific, particularized facts related to Mr. Lath's fraudulent intent warrants dismissal.

## III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

To plead loss causation by relying on corrective disclosures, a plaintiff must show that: "(1) a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements; and (2) the disclosure of the truth caused the company's stock price to decline and the inflation attributable to the misstatements to dissipate." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 (9th Cir. 2020).  Plaintiff must plead loss causation with particularity.  *Or. Pub. Emps.*, 774 F.3d at 605.  Plaintiff fails to do so for either of the two alleged corrective disclosures.

***July 24, 2025 Disclosure Of Search For A New CEO:***  C3's announcement that it would search for a new CEO (¶ 68) does not reveal the falsity of Defendants' statements because it merely represents the materialization of a known and disclosed risk.  Defendants had been telling investors for months that (i) Mr. Siebel "contracted an autoimmune disease" that impaired his vision and required accommodations (*supra* at 4-5); (ii) C3's "success depends in a large part" upon key members of its senior management; (iii) Mr. Siebel was "*critical*" to C3's "*sales strategy [and] culture*," and (iv) "[t]he loss of any member of [its] senior management team," including Mr. Siebel, "could make it more difficult to execute [its] business strategy and, therefore, *harm [the] business*." *E.g.*, Ex. S (Q2 2025 Form 10-Q) at 57; Ex. F at 57; Ex. B at 36.  Plaintiff cannot plead loss causation where, as here, the relevant stock drop was allegedly caused by such a materialization of a well-

known risk.  *See Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at \*10 (N.D. Cal. June 19, 2020) (no loss causation where loss stemmed from "known" rather than "hidden risk[s]"); *see also Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 146 (S.D.N.Y. 2021) (event is not a "corrective disclosure" if it is "materialization of a known risk").

*August 8, 2025 Financial Results:*  The August 8, 2025 disclosure of disappointing financial results (¶¶ 74-75) similarly cannot plead loss causation because it was a materialization of known risks.  C3 had repeatedly and extensively warned that (i) Mr. Siebel was experiencing health issues; (ii) if C3 lost Siebel's services, it could harm the business; and (iii) the Company might not meet revenue projections or guidance, and investors should not rely on forward-looking projections.  *See supra* at 3-5.  This precludes Plaintiff from using disappointing financial results as a purported corrective disclosure.  *Yaron*, 2020 WL 6750568, at \*10; *Sjunde*, 545 F. Supp. 3d at 146.

## IV.　PLAINTIFF'S SECTION 20A CLAIM SHOULD BE DISMISSED

Plaintiff's allegations that Mr. Siebel engaged in insider trading to Plaintiff's detriment should be dismissed.  A claim for insider trading under Section 20A requires "a predicate violation of the securities laws" and "facts showing that the trading activity of plaintiffs and defendants occur contemporaneously."  *Xiaojiao Lu*, 417 F. Supp. 3d at 1282.

*First*, the Complaint has failed to plead a primary violation, and thus Plaintiff's 20A claim also fails.  *In re Netflix, Inc., Sec. Litig.*, 964 F. Supp. 2d 1188, 1199 (N.D. Cal. 2013).

*Second*, Plaintiff fails to plead contemporaneous trades with Mr. Siebel.  *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1136 (N.D. Cal. 2020) (dismissing claim because plaintiff failed to plead contemporaneous trades).  The Ninth Circuit has explained "contemporaneous" means "existing, occurring, or originating during *the same time*."  *In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1189 (9th Cir. 2024); *see In re Redback Networks, Inc.*, 2006 WL 1805579, at \*7 (N.D. Cal. Mar. 20, 2006) ("[T]he same day standard is the only reasonable standard[.]"); *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at \*12 (N.D. Cal. Feb. 27, 2018) ("contemporaneous" appropriately means trading the same day or day after).  Only Plaintiff's June 11, 2025 purchase, which occurred on the same day as two sales by Mr. Siebel, is even potentially contemporaneous.  ¶¶ 118-19.  The Court should, at a minimum, dismiss the remaining purchases,

which occurred between 3 and 26 days after Mr. Siebel's closest preceding sales.  *See Buban v. O'Brien*, 1994 WL 324093, at *3 (N.D. Cal. June 22, 1994) (three-day gap not "contemporaneous"); *SEB*, 485 F. Supp. 3d at 1136 (two weeks "is far too long to be contemporaneous."); *Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*, 2023 WL 1800963, at *20 (D. Ariz. Feb. 7, 2023) ("a full week" gap not contemporaneous).

*Third*, in addition to the trades not being alleged to be contemporaneous, "shares purchased *below* the defendant's sale price *cannot satisfy* the contemporaneity requirement[] because it is impossible that those trades occurred with defendant at an unfair advantage."  *SEB*, 485 F. Supp. 3d at 1136.  All except the June 11 purchase should be dismissed because those purchases were at prices *lower* than Mr. Siebel's closest preceding sale.  ¶¶ 118-19.

*Fourth*, Mr. Siebel's sales that most closely preceded Plaintiff's purchases (¶ 118) were all made pursuant to a predetermined Rule 10b5-1 plan adopted before the Class Period (and thus before the alleged fraud).  *See supra* at 18.  This is fatal to any claim of insider trading.  *See* 17 C.F.R. § 240.10b5-1(c)(1)(i); *In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 943271, at *4 (C.D. Cal. Apr. 6, 2009) ("10b5-1 plans negate an inference that they made sales based on actual insider knowledge").  Plaintiff also fails to plead with particularity that as of any sale date, Mr. Siebel knew his health was allegedly worse than publicly disclosed or that the Company would miss revenue guidance.  *See supra* at 20-22; *Silver Lake*, 108 F.4th at 1191 (20A requires specific allegations of known material non-public information).

## V.    PLAINTIFF'S SECTION 20(a) CLAIM SHOULD BE DISMISSED

Plaintiff's failure to plead a primary violation requires dismissal of Plaintiff's Section 20(a) claim against the Individual Defendants.  *Zucco*, 552 F.3d at 990.  Even if Plaintiff had adequately alleged a primary violation, neither Individual Defendant is alleged to have been in control of the other's oral or written statements.  *Webb v. Solarcity Corp.*, 884 F.3d 844, 858 (9th Cir. 2018); *Gupta*, 900 F. Supp. at 1242-43 (individuals cannot be control persons over oral statements made by another).  Plaintiff's Section 20(a) claim should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

DATED: April 28, 2026

Respectfully submitted,

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

*/s/ Harry A. Olivar, Jr.*
Harry A. Olivar, Jr. (SBN 143089)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
harryolivar@quinnemanuel.com

Michael B. Carlinsky (*pro hac vice*)
Jesse Bernstein (*pro hac vice*)
Leigha Empson (*pro hac vice*)
Amy Shehan (*pro hac vice*)
295 Fifth Avenue
New York, NY 10016
Telephone: (212) 849-7000
michaelcarlinsky@quinnemanuel.com
jessebernstein@quinnemanuel.com
leighaempson@quinnemanuel.com
amyshehan@quinnemanuel.com

*Attorneys for Defendants*

Case No. 3:25-cv-7129-TLT
DEFENDANTS' MOTION TO DISMISS