United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN LIGGETT SR., et al., Plaintiffs, v. C3 AI, INC., et al., Defendants. | Case No. 25-cv-07129-TLT<br>**ORDER GRANTING MOTION TO DISMISS**<br>Re: Dkt. No. 68 |

## I. INTRODUCTION

Before the Court is Defendants C3.ai, Inc.'s ("C3"), Thomas Siebel's, and Hitesh Lath's (collectively, "Defendants") motion to dismiss Lead Plaintiff David Mottahedeh's ("Plaintiff") amended class action complaint. ECF 60 ("FAC"). Defendants also request judicial notice or incorporation by reference of 21 exhibits in support of their motion to dismiss.[1] ECF 68-22, ECF 74-4.

In this securities class action, Plaintiff asserts three claims against Defendants under the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. FAC ¶¶ 2–3, 109–23. Count I alleges that all Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by making false and misleading statements and omissions regarding: (1) Mr. Siebel's health; (2) Mr. Siebel's day-to-day management of C3; and (3) C3's finances. FAC ¶¶ 3, 16–25, 109–13. Count II alleges that Mr. Siebel violated Section 20A of the Exchange Act by engaging in insider trading contemporaneously with Plaintiff's purchases of C3 stock. FAC ¶¶ 114–21. Count

[1] Defendants' initial request, filed contemporaneously with their motion to dismiss, requests judicial notice and/or incorporation by reference of 19 exhibits. ECF 68-22 at 5–6. In connection with their reply, Defendants request judicial notice of 2 additional exhibits. ECF 74-4 at 2.

United States District Court
Northern District of California

III alleges that Mr. Siebel and Mr. Lath violated Section 20(a) of the Exchange Act because they are controlling persons within the meaning of the Exchange Act. FAC ¶¶ 122–23. Plaintiff brings these claims individually and on behalf of a proposed class of C3 investors who purchased or acquired C3 common stock between February 18, 2025 and August 8, 2025 ("Class Period").

After reviewing the parties' briefs, supplemental responses, oral arguments, and the relevant legal authority, and for the reasons below, the Court holds that Plaintiff fails to adequately allege that any of Defendants' statements or omissions were actionably false when made. Accordingly, the Court **DISMISSES** the FAC in its entirety **WITHOUT PREJUDICE** and **INCORPORATES BY REFERENCE** or **TAKES JUDICIAL NOTICE** of Defendants' 21 exhibits.

## II. BACKGROUND

### A. Procedural Background

On August 22, 2025, John Liggett Sr., individually and on behalf of all others similarly situated, filed a securities class action complaint against Defendants. ECF 1. Thereafter, on January 7, 2026, the Court granted Plaintiff David Mottahedeh's motion to be appointed lead plaintiff. ECF 56 at 1. Three weeks later, Plaintiff filed the FAC. *See generally* FAC.

On April 28, 2026, Defendants filed their motion to dismiss, which seeks dismissal of the FAC for failure to state a claim under Rule 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). ECF 68 at 9. Specifically, Defendants argue that Plaintiff fails to adequately plead: (1) falsity; (2) scienter; and (3) loss causation. ECF 68 at 10–11. In connection with their motion to dismiss, Defendants request judicial notice and/or incorporation by reference of 21 exhibits. ECF 68-22 at 5–6; ECF 74-4 at 2. On May 22, 2026, Plaintiff filed an opposition to the motion to dismiss and Defendants' request for judicial notice/incorporation by reference. ECF 71, 72. Thereafter, on June 3, 2026, Defendants filed a reply. ECF 74.

Both parties submitted responses to the Court's supplemental questions in advance of the Court's hearing on the motion to dismiss. ECF 75, 76, 77. The Court held oral argument on June 23, 2026.

**B. Factual Background[2]**

**i. Overview of the Parties**

Lead Plaintiff David Mottahedeh purportedly purchased or acquired C3 common stock during the Class Period and seeks to bring claims on behalf of himself and a proposed class of similarly situated C3 common stockholders. FAC ¶¶ 1–2, 36.

Defendant C3 is an enterprise artificial intelligence ("AI") application software company. FAC ¶ 4. C3 is a Delaware corporation headquartered in Redwood City, California, and its common stock trades on the NASDAQ exchange under the symbol, "AI." FAC ¶ 37.

Defendant Tom Siebel founded C3 in 2009. FAC ¶ 6. Mr. Siebel served as chairman of C3's board of directors ("Board") since the company's inception and as Chief Executive Officer ("CEO") from July 2011 until September 2025.[3] FAC ¶¶ 6, 38. As alleged in the FAC, Mr. Siebel is a highly successful tech entrepreneur whose leadership role at C3 has been critical to the company's success. FAC ¶¶ 6–15. Specifically, the FAC alleges that "C3's inherent value was Siebel's experience and network." FAC ¶ 15.

Defendant Hitesh Lath served as C3's Senior Vice President ("SVP") and Chief Financial Officer ("CFO") throughout the Class Period. FAC ¶ 39.

**ii. Confidential Witness Allegations**

Plaintiff relies on allegations from a single confidential witness to corroborate his allegations. FAC ¶¶ 41, 54, 66. This sole confidential witness ("FE1") worked as a Senior Director of Strategic Solutions at C3 from November 2024 to May 2025.[4] FAC ¶¶ 41, 54, 66. FE1 was

---

[2] For purposes of this Factual Background, the Court references facts alleged in the FAC. Defendants' request for judicial notice and/or incorporation by reference is addressed in Section III of this Order.

[3] For purposes of the motion to dismiss, the Court only considers Mr. Siebel's roles at C3 through the end of the Class Period and immediately thereafter. For informational purposes only, the Court notes that C3 recently filed a Form 8-K with the U.S. Securities and Exchange Commission ("SEC") announcing that Mr. Siebel would resume his role as CEO, effective May 8, 2026. ECF 74-2 at 3.

[4] FE1 departed C3 roughly halfway through the Class Period. FAC ¶¶ 2, 41, 54, 66.

United States District Court
Northern District of California

purportedly responsible for selling C3's technology to customers in the oil and gas sector, and FE1's reporting chain ultimately went up to the Chief Revenue Officer ("CRO"). FAC ¶ 41. The CRO allegedly held daily, company-wide sales meetings that FE1 regularly attended. FAC ¶ 41. Additionally, although FE1 did not work at C3's California headquarters, FE1 purportedly visited the headquarters regularly, "including for quarterly sales meetings." FAC ¶ 41.

Plaintiff relies on the following allegations from FE1 that he or she: (1) personally witnessed Mr. Siebel needing assistance to sit in a chair; (2) heard talk that after the April 2025 sales meeting, Mr. Siebel was hospitalized for 1–2 weeks and had a live-in health professional; (3) "[Mr.] Siebel had to sign off on everything, whether it be deals or expenses, and was required to be included on all emails to potential customers"; and (4) heard "from the CRO during multiple daily sales meetings during the Class Period that various deals were delayed because [Mr.] Siebel was unavailable." FAC ¶¶ 41, 54, 66.

**iii. Challenged Statements**

Plaintiff asserts securities fraud claims in connection with 6 alleged misstatements purportedly made by the Defendants during the Class Period.[5] FAC ¶¶ 43, 47, 53, 59–60, 64. According to Plaintiff, although Defendants disclosed that Mr. Siebel had developed an autoimmune condition, Defendants' misstatements were false and misleading because they concealed the seriousness of Mr. Siebel's illness, its impact on Mr. Siebel's day-to-day management of C3, and, ultimately, its negative effect on C3's financial results. FAC ¶¶ 3, 16–25, 54, 66. Each of these challenged statements (collectively, "Statements") is described in further detail below.

**1. "Note From Tom": February 18, 2025 ("Statement #1")[6]**

On February 18, 2025, C3 published a "Note from Tom" on its website. FAC ¶ 16. The

[5] In his answers to the Court's supplemental questions, Plaintiff confirmed that he is not alleging that Mr. Siebel's March 3, 2025 remarks at the Citizens JMP Technology Conference were false or misleading when made. *See* ECF 77 at 7–8.

[6] The numbering of these alleged misstatements differs from the numbering in the parties' motion to dismiss briefing.

note disclosed that Mr. Siebel had developed an autoimmune disease that "resulted in significant vision impairment." FAC ¶ 43. Despite this disclosure, the note stated that Mr. Siebel's health condition would not impact his ability to manage C3 in a hands-on manner. FAC ¶ 43. Specifically, the Note stated:

> I am sorry to report that I have suffered a health setback. Somehow, I picked up an autoimmune disease and that has resulted in significant vision impairment. ***The good news[] [is that] it will not affect my ability to continue actively managing the business in a hands-on manner. It will, at least for a while, limit my ability to travel*** . . . .

FAC ¶ 43.

The FAC alleges that the bolded text above was false and misleading, and further alleges that the "Note From Tom" contained optimistic statements regarding C3's expansion of its sales and services capacity in Q4 of FY2025, which had begun on February 1.[7] FAC ¶¶ 43–44. In essence, the FAC alleges that the "Note From Tom" painted a rosy picture of C3's market opportunities and growth prospects, while at the same time falsely reassuring investors that Mr. Siebel's health condition would not diminish his ability to continue his hands-on management of C3. FAC ¶¶ 43–44.

**2. Mr. Siebel's Q3 FY2025 Earnings Call Statement: February 26, 2025 ("Statement #2")**

Eight days after the "Note From Tom" was published on C3's website, C3 held a conference call to discuss C3's Q3 financial results. FAC ¶ 46. During the earnings call, Mr. Siebel was purportedly asked about his health condition and the steps that were being taken in terms of C3's business operations. FAC ¶ 46. As alleged, Mr. Siebel described the onset of his autoimmune condition and its impact on his vision. FAC ¶ 46. Mr. Siebel also stated that in terms of C3's business operations, he had "to learn some new skills[] and [C3] put the accommodations in place." FAC ¶ 46. According to Plaintiff, Mr. Siebel's earnings call remarks falsely and misleadingly reassured investors that he was in excellent health and was still managing C3 every day (alleged

[7] C3's fiscal year runs from May 1 to April 30. FAC ¶ 5 n.1. As used herein, the term fiscal year shall be referred to as "FY," and each quarter of the fiscal year shall be referred to as "Q1," "Q2," "Q3," or "Q4," as applicable.

false and misleading remarks highlighted in bold below):

> ***[Y[ou know me to be intimately familiar with the details of this business, okay?*** And you can imagine that we spent exacting detail with this management team or how we were reorganizing this company around this new opportunity that's here. We've done the same – we have the same meeting with all of our salespeople around . . . the world. ***I spent a lot of time personally . . . okay, with all of the partners that we've discussed***. I put the accommodations in place . . . – about really the only thing I can't do is read e-mail. [W]e put the [accommodation] in place[.] [T]here is somebody here with a hot computer who reads the e-mails to me[.] ***I comment, I respond, I approve***, I don't prove what have you. ***I am here in the office. I am managing the business every day***.
>
> * * *
>
> ***I am fully engaged managing details of the business every day*** as you know me a little bit and you know I'm generally in touch with those details. ***My health is excellent, okay?*** So beyond all of the infirmities that I had, I just can't see.

FAC ¶ 47.

The FAC further alleges that following the Q3 earnings call, several analysts issued reports discussing Mr. Siebel's health disclosure. FAC ¶¶ 48–50. The analysts' reports were generally positive and purportedly indicated that Mr. Siebel's health condition would not impact his management of C3. FAC ¶¶ 48–50.

**3. Form 10-Q Risk Disclosure Statement: March 7, 2025 ("Statement #3")**

On March 7, 2025, C3 filed its Q3 Form 10-Q with the SEC. FAC ¶ 53. The 10-Q included a risk disclosure that warned of the risks associated with a potential loss of Mr. Siebel's services as CEO. FAC ¶ 53. According to Plaintiff, this risk disclosure was false and misleading because it: (1) characterized the risks it described as mere possibilities, even though they had already occurred; and (2) reassured investors that Mr. Siebel's health condition would not affect his management of C3 (alleged false and misleading text highlighted below in bold):

> ***If*** we were to lose the services of our CEO or other members of our senior management team, we ***may*** not be able to execute our business strategy.

> Our success depends in . . . large part upon the continued service of key members of our senior management team. In particular, ***our founder and CEO, Thomas M. Siebel, is critical to our overall management, sales strategy, culture, strategic direction, engineering, and operations***. In addition, Mr. Siebel is a recognized leader in information technology and is critical to the continued development of our C3 AI Software. On February 18, 2025, Mr. Siebel informed the Company that he had contracted an autoimmune disease and was experiencing significant vision impairment. In that communication, ***Mr. Siebel also stated that this health setback was not impacting his ability to manage the business in a hands-on manner***. . . .

FAC ¶ 53.

**4. Mr. Siebel's FY2025 Earnings Call Statement: May 28, 2025 ("Statement #4")**

On May 28, 2025, C3 held an earnings call to discuss its FY2025 earnings results. FAC ¶ 58. During the call, Mr. Siebel purportedly touted C3's growth, with a focus on C3's expanding partner ecosystem and increasing number of salespeople. FAC ¶ 58. During the same call, Mr. Siebel disclosed that his health issues had limited his ability to travel and had slowed him down "for a little bit," but that he would be catching a red-eye flight the night of the earnings call. FAC ¶ 59. As alleged in the FAC, Mr. Siebel's health update falsely and misleadingly conveyed that he had recovered and was "back" (alleged false and misleading remarks highlighted in bold below):

> [Analyst]: And then if I could ask a follow-up. With your permission, Tom, I hope this is okay. But in February, you informed us that you'd suffered a health setback and it was limiting your ability to travel and then you're going to have Jim Snabe help out, but I was delighted to hear on this call that you're – I mean, you're probably not delighted to get out of red eye, but I was delighted to hear that you're getting on a red eye because that sounds like some positive development. So[,] I don't know, any comments that you're okay sharing with us on that, I'm sure, would be greatly appreciated.
>
> [Siebel]: I did get slowed down for a little bit. There's no question about it. And I had – it's very unlike me to work from home. You know that. And I ***had to work from home*** for a little while and ***take it easy and recover, but I will catch a red eye to Washington, D.C. tonight. I will be in Washington, D.C. again for three days***, I think, 10 days from now after attending a wedding in. So just when you thought it was safe . . . ***I'm back***.

FAC ¶ 59.



United States District Court
Northern District of California

United States District Court
Northern District of California

**5. Mr. Lath's FY2025 Earnings Call Statement: May 28, 2025 ("Statement #5")**

During the same May 28, 2025 earnings call, Mr. Lath provided C3's revenue guidance for Q1 FY2026. FAC ¶ 60. Plaintiff alleges that the revenue guidance itself was false and misleading, and lacked a reasonable basis. FAC ¶ 66. As alleged in the FAC, C3's revenue guidance was underpinned by "[Mr.] Siebel's purported health recovery and ability to travel." FAC ¶ 60. In essence, Plaintiff alleges that the revenue guidance was falsely optimistic, given the seriousness of Mr. Siebel's health condition and its detrimental impact on his ability to manage the company. FAC ¶¶ 60, 66. Plaintiff further alleges that analyst reporting following the May 28 earnings call was positive, and that analysts expressed confidence in C3's future sales growth and in Mr. Siebel's recovery. FAC ¶¶ 61–62.

**6. Form 10-K Risk Disclosure Statement: June 23, 2025 ("Statement #6")**

On June 23, 2025, C3 filed its Form 10-K with the SEC for FY2025. FAC ¶ 64. As alleged in the FAC, the 10-K contained a false and misleading risk disclosure regarding the potential loss of Mr. Siebel's services as CEO that was identical to the risk disclosure in C3's Q3 FY2025 10-Q. FAC ¶ 64.

**iv. C3's Announcement That Mr. Siebel Would be Stepping Down as CEO**

On July 24, 2025, C3 filed a Form 8-K with the SEC. FAC ¶ 68. In the 8-K's exhibits, C3 announced that Mr. Siebel and C3's Board would be initiating a search for a new CEO, as Mr. Siebel's health condition impaired his vision and ability to travel. FAC ¶ 68. As alleged in the FAC, the Form 8-K's exhibits also falsely reassured investors that Mr. Siebel had "regained [his] strength," and, apart from his vision impairment, was "operating again at 100%."[8] FAC ¶ 68 (emphasis omitted). The 8-K's exhibits further reassured investors that Mr. Siebel would "remain fully engaged" as CEO until the Board appointed a successor. FAC ¶ 68 (emphasis omitted). Plaintiff alleges that C3's stock price dropped from $29.16 per share to $26.00 per share following

[8] Plaintiff does not seek to hold Defendants liable for any statements made in the CEO announcement.

C3's announcement that Mr. Siebel would be stepping down as CEO. FAC ¶ 72. In addition, the FAC alleges that analysts reacted negatively to the announcement, but that Citizens JMP's report emphasized that C3 would still benefit from Mr. Siebel's continued management of C3 as Executive Chairman. FAC ¶¶ 69–71. Plaintiff further alleges that this announcement constituted a partial disclosure by which information that had previously been concealed from the market was gradually being revealed. FAC ¶¶ 89–90.

**v. C3's Q1 FY2026 Revenue Miss**

In August 2025, C3 issued a press release preliminarily announcing its financial results for Q1 FY2026. FAC ¶ 74. As alleged in the FAC, C3's preliminary reported revenue was "approximately 34% below its previously issued guidance range." FAC ¶ 74. In the wake of this missed revenue guidance, C3 purportedly issued a second press release that attributed the revenue shortfall to Mr. Siebel's health condition and a restructuring of C3's sales and services organization, including new leadership. FAC ¶ 75. According to Plaintiff, this press release revealed facts that had previously been concealed from the market: (1) the true severity of Mr. Siebel's health issues, which included multiple hospitalizations; and (2) that Mr. Siebel's health issues had detrimentally affected his ability to actively participate in the sales process. FAC ¶ 75. Following C3's revenue miss, Plaintiff alleges that C3's stock price dropped by nearly 30 percent. FAC ¶ 80. Additionally, the FAC alleges that analysts' reactions to this announcement were overwhelmingly negative, and that multiple analysts downgraded C3 as a result. FAC ¶¶ 76–79. Plaintiff further alleges that these press releases were disclosures that revealed the truth to the market about Mr. Siebel's illness, its impact on his day-to-day management of C3, and its effects on C3's revenue. FAC ¶¶ 89–90, 93.

**vi. Mr. Siebel's Alleged Insider Stock Sales**

Plaintiff also alleges that Mr. Siebel engaged in insider trading, both before and during the Class Period. FAC ¶¶ 31, 55, 67, 73. According to the FAC, Mr. Siebel sold 665,432 shares of C3 stock for over $20 million in January 2025, and 652,153 shares for over $21 million between



United States District Court
Northern District of California

February 1 and February 17, 2025. FAC ¶ 31 n.1. As alleged, these pre-Class-Period stock sales occurred after he developed his illness in December 2024 and before he disclosed his health condition to the market on February 18, 2025. FAC ¶ 31 n.4. Plaintiff further alleges that prior to January 2025, Mr. Siebel had not sold any shares of C3 stock since November 2021. FAC ¶ 31.

Plaintiff alleges that during the Class Period, Mr. Siebel sold over 4 million shares of C3 stock at artificially inflated prices for more than $81 million. FAC ¶ 31. Specifically, Plaintiff alleges that Mr. Siebel (1) sold 1,265,380 C3 shares between March 14, 2025 and April 16, 2025 for proceeds of over $26 million; (2) sold 1,848,753 C3 shares between May 2, 2025 and July 18, 2025 for proceeds of more than $47 million; and (3) sold 336,000 C3 shares on August 4, 2025 for proceeds of over $7 million. FAC ¶¶ 55, 67, 73. In addition to using Mr. Siebel's alleged insider trades as evidence of scienter (ECF 71 at 25–27),[9] Plaintiff also brings a claim against Mr. Siebel under Section 20A of the Exchange Act based on certain alleged Class Period insider stock sales (FAC ¶¶ 114–21).

**vii. Post-Class-Period Disclosures**

Plaintiff also attempts to use certain post-Class-Period statements to demonstrate falsity and scienter. FAC ¶¶ 81–88. As alleged, on September 3, 2025, C3 announced its final Q1 FY2026 financial results, which confirmed the missed revenue guidance that C3 had preliminarily announced in August. FAC ¶ 81. Similar to its August announcement, C3 purportedly attributed the revenue shortfall to: (1) "the reorganization with new sales and services leadership"; and (2) Mr. Siebel's "unanticipated health issues," which prevented him "from participating in the sales process as actively as [he had] in the past." FAC ¶ 81 (emphasis omitted).

---

[9] In the context of a securities class action, a defendant acts with scienter if she "made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (citation and internal quotation marks omitted), *as amended* (Feb. 10, 2009).

Later that day, Mr. Siebel spoke on an earnings call to discuss C3's Q1 FY 2026 results. FAC ¶ 82. Mr. Siebel purportedly discussed the financial results and noted that, because of his health issues, he "was unable to participate as actively as [he] used to in the sales process and the coordination of resources necessary to make these sales processes successful and come to closure." FAC ¶ 82 (emphasis omitted). In addition, Mr. Siebel remarked that "[i]n hindsight, it's clear that [his] active involvement in that sales process had a greater impact than any of us knew." FAC ¶ 82 (emphasis omitted). During the earnings call, Mr. Siebel also noted that Q1 FY2026 was the first quarter in which C3 had missed its revenue guidance and purportedly reaffirmed that he would remain engaged in managing C3. FAC ¶¶ 83–85. The FAC further alleges that an analyst asked Mr. Siebel how much his health issues contributed to the revenue miss. FAC ¶ 86. In response to the analyst's question, Mr. Siebel purportedly attributed 70 percent of the revenue shortfall to "sales rep disruption" and 30 percent to "not being as involved in the details as [he'd] previously been." FAC ¶ 86.

## III. INCORPORATION BY REFERENCE AND JUDICIAL NOTICE

Defendants ask the Court to incorporate by reference or take judicial notice of 21 exhibits, which consist of SEC filings, call transcripts, an analyst report, and a C3 website announcement.[10] ECF 74-4 at 9–10. Plaintiff opposes Defendants' requests to the extent that they ask the Court to consider the exhibit's contents in resolving factual disputes. ECF 72 at 4–5. Additionally, Plaintiff opposes Defendants' request for judicial notice of certain SEC filings (Ex. A, L–S) because Defendants do not "identify[] the specific facts within those documents that are the subject of their request." ECF 72 at 4–5. Plaintiff further opposes Defendants' request for judicial notice of

[10] On reply, Defendants added Exhibits T and U to their request for judicial notice and/or incorporation by reference. At the hearing on the motion to dismiss, the Court asked if Plaintiff had any objection to the Court taking judicial notice of these additional exhibits. Plaintiff objects only to the extent that Defendants are asking the Court to consider the exhibits' contents for their truth.

Exhibits A and S because they are pre-Class-Period SEC filings that "were neither relied upon nor cited in the [FAC]." ECF 72 at 5. Subject to the limitations discussed below, the Court **GRANTS** Defendants' requests.

Under the incorporation-by-reference doctrine, a Court can "treat[] certain documents as though they are part of the complaint itself." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). "[A] defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Id.* (citation omitted). Here, the Court holds that Exhibits B–C, E–G, I, and K are incorporated by reference because they form the basis of Plaintiff's claims. *See Das v. Unity Software Inc.*, No. 5:22-CV-03962-EJD, 2024 WL 1141733, at *6 (N.D. Cal. Mar. 15, 2024) (incorporating earnings call transcripts and SEC filings by reference, where "the Amended Complaint necessarily relie[d] on statements in these documents as the basis for [plaintiffs'] claims"). The Court further notes that Plaintiff does not oppose these exhibits' incorporation by reference, "so long as the facts are not used to challenge Plaintiff's well-pleaded allegations." ECF 72 at 4. Accordingly, the Court **GRANTS** Defendants' request to incorporate Exhibits B–C, E–G, I, and K by reference, but the Court will not assume the truth of these documents' contents to resolve genuinely disputed facts at the pleading stage. *See Khoja.*, 899 F.3d at 1003; *Das*, 2024 WL 1141733, at *6.

Separate from the incorporation-by-reference doctrine, "[t]he [C]ourt may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Court "must take judicial notice if a party requests it and the [C]ourt is supplied with the necessary information." Fed. R. Evid. 201(c).

Here, the Court takes judicial notice of Exhibits D, H, and J because they can be considered for the purpose of determining what information was available to the market. *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004) (taking judicial notice of analyst report relied upon by plaintiff in complaint); *Chi. & Vicinity Laborers' Dist. Council Pension Fund*

*v. Amplitude, Inc.*, No. 24-CV-00898-VC, 2025 WL 82206, at *1 (N.D. Cal. Jan. 13, 2025) ("[J]udicial notice can be taken of SEC filings, press releases, conference call transcripts, and analyst reports for the purpose of determining what information was available to the market."); *Steamfitters Loc. 449 Pension & Ret. Sec. Funds v. Extreme Networks, Inc.*, 824 F. Supp. 3d 983, 996 (N.D. Cal. 2026) (taking judicial notice of earnings call transcripts and public SEC filings "for the purpose of determining what information was available to the market or [for their] existence in the public domain"). The Court further notes that Plaintiff does not oppose Exhibits D, I, and J's incorporation by reference "so long as the facts are not used to challenge Plaintiff's well-pleaded allegations." ECF 72 at 3–4. Plaintiff is silent on whether these exhibits may be judicially noticed. ECF 72. In addition, the Court takes judicial notice of Exhibits A and L–U, as these SEC filings are "public documents whose accuracy cannot reasonably be questioned." *Das*, 2024 WL 1141733, at *7.

The Court rejects Plaintiff's argument that Exhibits A and S are irrelevant because they are pre-Class-Period SEC filings that are not cited in the FAC. ECF 72 at 5. Contrary to Plaintiff's assertions, this Court may take judicial notice of documents that are not referenced in the FAC. *See Cement Masons & Plasterers Joint Pension Tr. v. Equinix, Inc.*, No. 11-01016 SC, 2012 WL 685344, at *8 n.5 (N.D. Cal. Mar. 2, 2012) ("A court may consider materials, even if they are not referenced in the pleading, so long as they meet the requirements for judicial notice set forth in Federal Rule of Evidence 201."). Further, the Court holds that it may take judicial notice of these SEC filings for the fact of their existence. *In re Diamond Foods, Inc.*, Sec. Litig., No. C 11-05386 WHA, 2012 WL 6000923, at *16 (N.D. Cal. Nov. 30, 2012) ("Commission filings are appropriate for judicial notice, even where filed outside the class period."). Based on similar reasoning, the Court takes judicial notice of Exhibit U. *See id.* At this stage, however, the Court declines to "consider the truth of the statements within the [SEC] filings or . . . [to] use [them] to resolve any factual disputes." *Das*, 2024 WL 1141733, at *7.[11]

[11] The Ninth Circuit has stated that "[s]ales according to pre-determined plans may 'rebut [] an inference of scienter.'" *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008) (citation omitted). Here, however, the Court need not consider the Forms 4 for their truth, as the Court concludes that Plaintiff has failed to adequately allege that any challenged misstatements were false or misleading when made. The Court acknowledges that there is a split in authority amongst district courts in this Circuit regarding whether Forms 4 may be used to determine

Defendants' requests for judicial notice and/or incorporation by reference are **GRANTED**, subject to the limitations set forth above.

## IV. LEGAL STANDARD

### A. Rule 12(b)(6)

Under Rule 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To overcome a motion to dismiss, a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) (citation and internal quotation marks omitted).

### B. PSLRA and Rule 9(b)

"Securities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the [PSLRA]." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Plaintiffs alleging securities fraud must plead all the elements of a

---

if trades were made pursuant to 10b5-1 trading plan or pursuant to tax withholding obligations. *Compare City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1059 (N.D. Cal. 2012) ("[C]ourts may take judicial notice of SEC Forms 4, even when not referenced in the pleading, to prove that stock sales were made pursuant to a Rule 10b5–1 trading plan."), *with Hadian v. Fate Therapeutics, Inc.*, No. 3:23-CV-00111-RBM-AHG, 2024 WL 4246083, at *9 (S.D. Cal. Sept. 19, 2024) (collecting cases on both sides of split and declining to assume the truth of the matters asserted in Forms 4 for purposes of disputing trading and scienter allegations). Here, however, the Court need not consider any judicially noticed SEC filings for their truth and therefore does not do so.

securities fraud action with particularity, including "circumstances constituting fraud or mistake." *Id.* at 604–05 (citation and internal quotation marks omitted); Fed. R. Civ. P. 9(b).

In addition, under the PSLRA, plaintiffs are required to "plead with particularity both falsity and scienter." *Zucco Partners*, 552 F.3d at 990 (citation and internal quotation marks omitted). To properly plead falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

## V. DISCUSSION

### A. Count I: Plaintiff Fails to Adequately Plead a Claim Under Section 10(b) of the Exchange Act and Rule 10b-5.

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (citation and internal quotation marks omitted).

Defendants seek dismissal of the FAC under Rule 12(b)(6) and the PSLRA on the grounds that Plaintiff is unable to adequately allege actionable falsity, scienter, or loss causation. ECF 68 at 15–32. For the reasons explained below, Plaintiff fails to adequately plead that any statement or omission was false or misleading when made.

**i. False or Misleading Statements**

Statements and omissions are actionably false if they "directly contradict what the defendant knew at that time or create an impression of a state of affairs that differs in a material way from the one that actually exists." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023) (citations and internal quotation marks omitted). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false," does not meet the falsity standard. *Metzler*, 540 F.3d at 1070.

**1. The February Statements (Statements #1–2)**

On February 18, 2026, C3 published a "Note From Tom" on its website disclosing that Mr. Siebel had developed an autoimmune condition that resulted in significant vision impairment. FAC ¶ 16. Mr. Siebel further disclosed that his condition would limit his ability to travel and that Mr. Snabe, another C3 director, would assume the role of Special Advisor to the CEO, effective immediately, to assist Mr. Siebel. FAC ¶ 43; ECF 68-5. Plaintiff, however, asserts that the "Note From Tom" was false and misleading because it stated that Mr. Siebel's condition would not "affect [his] ability to continue actively managing the business in a hands-on manner." FAC ¶¶ 43, 54 (emphasis omitted); *see also* FAC 71 at 12. According to Plaintiff, Defendants "doubled down" on their efforts to conceal the seriousness of Mr. Siebel's health condition and its impact on C3 when Mr. Siebel spoke during an earnings call eight days later. ECF 71 at 11–12; FAC ¶¶ 46–47, 54. On the earnings call, Mr. Siebel stated, in relevant part, that he was "fully engaged managing the details of the business every day," was "in the office," was commenting on and responding to emails, and that his health was "excellent." FAC ¶ 47 (emphasis omitted).

In Plaintiff's view, Statements #1 and #2 were materially false or misleading when made because they concealed the truth about Mr. Siebel's health condition and its detrimental impact on C3 from the market. FAC ¶¶ 43, 46–47, 54; ECF 71 at 11–12. To reinforce this view, Plaintiff cites an analyst report published one day after Mr. Siebel's earnings call remarks. ECF 71 at 12 (citing

FAC ¶ 49). The analyst report stated that C3 had argued that there was "zero diminishment in [Mr. Siebel's] engagement with the business and that he remain[ed] in [the] office every day."[12] FAC ¶ 49 (emphasis omitted).

Defendants make various arguments in support of their position that the February Statements were not actionably false or misleading. ECF 68 at 15–19, 21–24. This Court need only consider one. Namely, Defendants argue that Plaintiff's FAC lacks particularized allegations that would allow the Court to plausibly infer that the Statements #1–2 were false or misleading when made. ECF 68 at 21–24. The Court agrees.

In the FAC, Plaintiff relies on three main sources to support its allegations of falsity. First, Plaintiff relies on confidential witness allegations from FE1, such as: (1) "hearing from the CRO [at] multiple daily sales meetings during the Class Period that various deals were delayed because Siebel was unavailable"; and (2) reports of "talk" that Mr. Siebel had been hospitalized after the April 2025 sales meeting for 1 or 2 weeks and had a live-in health professional. FAC ¶ 54. Second, Plaintiff alleges that FE1's allegations were corroborated by C3's and Mr. Siebel's August 2025 disclosure that Mr. Siebel had experienced "a number of health issues, 'including multiple hospitalizations.'" FAC ¶ 54. Third, Plaintiff relies on post-Class-Period disclosures from September 2025, in which Mr. Siebel purportedly admitted that his reduced ability to actively participate in the sales process had contributed to C3's Q1 FY2026 revenue shortfall. FAC ¶¶ 81–82, 86. None of these sources, however, allow the Court to plausibly infer that: (1) Mr. Siebel was not in the office managing C3 every day in February 2025; (2) he was not commenting on and responding to emails; or (3) his health, aside his disclosed vision impairment, was anything less than

---

[12] While Plaintiff notes that analyst reports can shed light on "what reasonable investors would have understood," ECF 71 at 12 (quoting *Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 872 (W.D. Wash. 2022)), Plaintiff's analyst report allegations do not demonstrate that Defendants' February Statements were false or misleading when made (FAC ¶¶ 48–50).

excellent. *See In re Cloudera, Inc.*, 121 F.4th 1180, 1187 (9th Cir. 2024) (noting that a securities action complaint "cannot rely on hindsight; rather, it must explain why the statements were false or misleading at the time they were made") (citation and internal quotation marks omitted); *Menon v. Maxeon Solar Techs., Ltd.*, No. 24-CV-03869-EMC, 2025 WL 1223559, at *11–14 (N.D. Cal. Apr. 28, 2025) (no time-specific allegations establishing falsity when the challenged statements were made).

Nonetheless, even if Defendants' statements were not literally false, Defendants have a duty not to mislead investors. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("Statements literally true on their face may nonetheless be misleading when considered in context. . . ."); *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670–72 (N.D. Cal. 2021) (holding that statements were actionably misleading, when viewed together and in unique context of COVID-19 pandemic, where they created the misleading impression that the company was about to develop COVID-19 vaccine). Simply put, "once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1136–40 (N.D. Cal. 2017) (holding that omission of key user metric was misleading, where company's statements reassured investors that user engagement trends were positive, when key user metric was flat or declining) (cleaned up). Plaintiff, however, fails to adequately allege that any adverse facts existed in February 2025 that needed to be disclosed. *See Menon*, 2025 WL 1223559, at *11–14.

As a threshold matter, FE1's hearsay allegation "that various deals were delayed" at some unspecified point during the Class Period because Mr. Siebel was unavailable (FAC ¶ 54) are too generalized to support an inference of falsity. *See Barker v. Nextracker Inc.*, No. 24-CV-09467-PCP, 2026 WL 657744, at *5 (N.D. Cal. Mar. 9, 2026) ("The former employee statements do not create a plausible inference of material misrepresentation because they do not establish that project delays were significant enough either in number or magnitude to undermine [defendants']

statements."); *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 998–1002 (N.D. Cal. 2017) (holding that plaintiffs failed to adequately allege that key operating metrics were false, where plaintiffs relied on vague confidential witness allegations that were insufficient to explain how the operating metrics were artificially inflated). Likewise, FE1 only reported that there was "talk" that Mr. Siebel was hospitalized after the April 2025 sales meeting—not in February (FAC ¶ 54). *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 776 (9th Cir. 2023) (plaintiffs failed to plead with particularity that statements about experience of sales force were false or misleading, where confidential witness allegations did nothing to establish that statements were false when made); *Menon*, 2025 WL 1223559, at *11–14. Thus, FE1's allegations do not plausibly allege falsity because they provide no information about Mr. Siebel's health or his day-to-day management of C3 in February 2025. *See Glazer*, 63 F.4th at 776; *Menon*, 2025 WL 1223559, at *12.

For similar reasons, Plaintiff's allegations regarding Defendants' subsequent disclosures from August and September 2025 do not support a plausible inference that the February Statements were false or misleading when made. *See Glazer*, 63 F.4th at 776 (holding that post-class-period "admission" about declining percentage of ramped up sales staff did not support a finding of falsity, where "the disclosure pertained only to *conditions existing after the statements* were made"). To plead actionable falsity, "there must have been some contemporaneous information that would have shown that the statements were false at the exact time that defendants made them." *Smith v. NetApp, Inc.*, No. 19-CV-04801-JST, 2021 WL 1233354, at *6 (N.D. Cal. Feb. 1, 2021). Defendants' subsequent statements do not demonstrate that, as of February 2025, there were any facts inconsistent with Statements #1–2. *See Glazer*, 63 F.4th at 776. Defendants' subsequent disclosures reveal that Mr. Siebel: (1) had health issues during the Class Period; (2) was hospitalized multiple times at unspecified points during the Class Period; and (3) experienced health issues that reduced his ability to participate as actively in the sales process as he had in the past. FAC ¶¶ 54, 75, 81–

United States District Court
Northern District of California

82, 86. They do not allow the Court to infer that Mr. Siebel was hospitalized in February or that he was not in the office every day actively managing C3 when the February disclosures were made. *See Glazer*, 63 F.4th at 776. These subsequent disclosures fail to either contradict Defendants' February Statements or supply the Court with facts sufficient to infer that Defendants concealed material facts from the market. *See In re Align Tech., Inc. Sec. Litig.*, No. 20-CV-02897-MMC, 2021 WL 1176642, at *6– 7 (N.D. Cal. Mar. 29, 2021) (subsequent statements regarding slowdown of sales in China in June did not establish that defendants had omitted material facts about state of China sales growth as early as April), *aff'd sub nom. Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092 (9th Cir. 2022). Therefore, Plaintiff fails to adequately allege that Statements #1–2 were false or misleading when made.

**2. March 7, 2025 Form 10-Q Risk Disclosure (Statement #3)**

On March 7, 2025, C3 filed its 10-Q for Q3 2025 with the SEC. FAC ¶ 53. The 10-Q included a risk disclosure that warned investors that if C3 lost Mr. Siebel's services as CEO, C3 might not be able to execute its business strategy. FAC ¶ 53. The risk disclosure further stated that on February 18, 2025, Mr. Siebel had informed C3 that he had developed an autoimmune disease that resulted in significant vision impairment. FAC ¶ 53. In that same communication, "Mr. Siebel also stated that his health setback was not impacting his ability to manage the business in a hands-on manner, and that Jim H. Snabe, a member of [the] Board . . . had assumed the interim role of Special Advisor to the CEO to assist where and as needed." ECF 68-8 at 13. As alleged, this risk disclosure was false and misleading when made because the warned-of risk had already occurred. FAC ¶¶ 53–54. According to Plaintiff, the warned-of risk had already occurred by March 7, 2025 because Mr. Siebel's health condition "had already substantially hindered [C3's] ability to capitalize on its business strategy that was admittedly critical to its business operations." FAC ¶ 54.

Defendants argue that Statement #3 was not actionably false or misleading when made because: (1) it is protected as a forward-looking statement under the PSLRA safe harbor; and (2)

Plaintiff fails to adequately allege that C3 had already lost Mr. Siebel's services as CEO by March 7, 2025, or that any deals had been delayed or any hospitalizations had occurred. ECF 68 at 19, 24; ECF 74 at 12–13.

The Court need not determine whether the PSLRA safe harbor applies because Plaintiff fails to adequately allege that Statement #3 was false or misleading when made. *See Menon*, 2025 WL 1223559, at *11–14 (no falsity, where plaintiff failed to allege that defendant contacted dealers before expiration of contractual non-circumvention clause). Plaintiff correctly points out that the Ninth Circuit has held that a risk disclosure can be misleading (ECF 71 at 17), where it presents a risk as hypothetical that may have already come to fruition. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 702–05 (9th Cir. 2021) (holding that risk disclosure that described potential cybersecurity risks in 10-Q was materially misleading, where defendant failed to disclose existence of known privacy vulnerability); *In re Facebook*, 87 F.4th at 949–50 (similar); *Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc.*, 166 F.4th 805, 827 (9th Cir. 2026) (holding that inventory-related disclosures were actionably misleading, where "[a] reasonable investor could have been misled to believe that the current state of affairs was different from the one that actually existed with the exploding inventory"); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("[L]earning that stop-work orders might be issued is quite different from knowing they were in fact issued. One indicates a risk, the other a certainty. It goes without saying that investors would treat the two differently."). Unlike in Plaintiffs' cited Ninth Circuit cases (ECF 71 at 17), here, there is no indication that the risk of losing Mr. Siebel's services as CEO had materialized by March 7, 2025 (FAC ¶ 68). *See Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, No. 22-CV-03023-TLT, 2024 WL 5399664, at *17 (N.D. Cal. Sept. 18, 2024) (holding that risk disclosures were not adequately alleged to be false, where plaintiffs failed to allege that warned-of risks "came 'to fruition' by the time the challenged statements were made"). Nor does the FAC contain any time-specific allegations that would support an inference that Mr. Siebel's health condition was

materially affecting his hands-on-management of C3 as of March 7, 2025. *See Menon*, 2025 WL 1223559, at *12 ("Even if CW-1's information could be deemed reliable, the information is not sufficient to establish falsity, particularly because it is not clear from the [complaint] what the timing of the interactions between Maxeon and the dealers was.").

Plaintiff's reliance on FE1's generalized allegations about "various deals" being delayed and a hospitalization that occurred after the April 2025 sales meeting (FAC ¶ 54) are insufficient to support an inference of falsity. *See Barker*, 2026 WL 657744, at *5; *Menon*, 2025 WL 1223559, at *12. Similarly, Defendants' subsequent disclosures from August and September 2025 do not demonstrate the existence of any factual inconsistencies with the March 7, 2025 risk disclosure or any adverse information that Defendants should have disclosed. *See Glazer*, 63 F.4th at 776; *In re Align Tech., Inc.*, 2021 WL 1176642, at *6–7. The FAC does not contain particularized facts allowing the Court to plausibly infer that, on March 7, 2025, Mr. Siebel's health condition "had already substantially hindered the Company's ability to capitalize on its business strategy." FAC ¶ 54. Accordingly, Plaintiff fails to adequately allege that Statement #3 was false or misleading when made.

**3. May 28, 2025 FY 2025 Earnings Call Statement (Statement #4)**

On May 28, 2025, Mr. Siebel spoke during an earnings call to discuss C3's FY2025 financial results. FAC ¶¶ 58–59. During the call, Mr. Siebel admitted, in response to a question about his health, that he "did get slowed down for a little bit," and that he "had to work from home for a little while to take it easy and recover." FAC ¶ 59 (emphasis omitted). Mr. Siebel also stated that he was getting on red-eye flight to Washington, D.C. that night and was "back." FAC ¶ 59 (emphasis omitted). Plaintiff argues that Mr. Siebel's earnings call comments, when viewed in context, were materially false and misleading. ECF 71 at 14–16. According to Plaintiff, Statement #4 gave investors the false impression that Mr. Siebel had recovered and was back to traveling, when, in reality, he was suffering from a serious health condition that hampered his ability to manage C3.

FAC ¶ 66; ECF 71 at 16. Plaintiff further points to analyst reports as evidence that Defendants had deceived the market. FAC ¶ 62.

Defendants push back against these allegations. Specifically, Defendants argue that Plaintiff fails to allege any particularized facts establishing that Statement #4 was false when made, and that Mr. Siebel's remark that he was "back" constituted inactionable puffery. ECF 68 at 20–24; ECF 74 at 13. Defendants further argue that FE1's allegations and Defendants' subsequent disclosures fail to demonstrate that Statement #4 was false or misleading when made. ECF 68 at 23–24. Although it is a close call, the Court holds that the FAC lacks sufficient particularized allegations to plausibly infer that Statement #4 was false or misleading when made.

In his opposition to the motion to dismiss, Plaintiff appears to argue that Statement #4 was actionably misleading, rather than false. ECF 71 at 14. As the Ninth Circuit has recognized, "[c]ontext matters" when assessing whether a statement or omission was misleading. *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025). When read in context, the May 28, 2025 earnings call transcript indicates that Mr. Siebel had been experiencing health challenges, but that his ability to travel was improving (ECF 68-7). It did not say anything that would have given reasonable investors the impression that Mr. Siebel's ability to travel was back to its pre-illness levels or that his management of C3 was completely unaffected by his illness. *Cf. Purple Mountain Tr. v. Wells Fargo & Co.*, 432 F. Supp. 3d 1095, 1102 (N.D. Cal. 2020) (noting that disclosures that were limited to issues regarding sales practices would not have led a reasonable investor to believe that the company's auto insurance programs were issue-free).

Similarly, although Mr. Siebel stated that he was getting on a red-eye flight and was "back" (FAC ¶ 59 (emphasis omitted)), Defendants' subsequent disclosures regarding Mr. Siebel's health and its impact on his sales process participation (FAC ¶¶ 75, 81–82, 86) are not inconsistent with Statement #4. When viewed in the context of the full earnings call, it is apparent that Statement #4 largely concerned Mr. Siebel's travel plans. ECF 68-7. Moreover, Mr. Siebel's optimistic remark



United States District Court
Northern District of California

that he was back is akin to corporate puffery and not "capable of objective verification." *See Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) ("[A]n allegedly misleading statement must be 'capable of objective verification.'") (citation omitted). *Compare Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022) (holding that certain statements made in response to analyst questions were inactionable puffery, and were not misleading in context, where "company's sales were *still growing* in China, albeit at a diminished rate"), *with City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1041 (N.D. Cal. 2018) ("The Court finds that plaintiffs have sufficiently alleged material falsity with regard to the challenged market performance statements because Friedman's rosy representations concealed that RH Modern was suffering from a severe lack inventory and defendants were receiving customer complaints and canceled orders regarding the same.").

Although Mr. Siebel's May 28 remarks were made in response to analyst questions, there is no indication that his optimism about being "back" was baseless or created a misleading impression. *Funko*, 166 F.4th at 823–24 (vague and optimistic remarks about company's inventory made in response to analyst questions were inactionable, and executives did not have a duty to disclose more detailed information). As Defendants point out, the market already knew that, among other things: (1) Mr. Siebel was dealing with an illness that caused significant vision impairment; (2) Mr. Snabe, another C3 director, was assisting Mr. Siebel as Special Advisor to the CEO and was becoming "a more important part of the picture"; (3) it was "very clear" that Mr. Siebel's role was "much, much less supervisory"; and (4) more responsibility was being delegated to the management team (ECF 68-5 at 2; ECF 68-6 at 10–11). *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) ("In this case, 'the market already knew' of the difficulties facing Intuitive . . . In context, any reasonable investor would have understood Intuitive' s statements as mere corporate optimism.") (citation omitted). Thus, the overall context in which Statement #4 was made does not support an inference of falsity.

Nor do FE1's allegations do the trick. FE1's generalized allegations "that various deals were delayed" due to Mr. Siebel's unavailability (FAC ¶ 66) are too vague to establish that Statement #4 was false or misleading when made. *See Barker*, 2026 WL 657744, at *5. By contrast, FE1's allegation that there was "talk" that Mr. Siebel was hospitalized for 1 to 2 weeks after the April 2025 sales meeting and had a live-in health professional (FAC ¶ 66) is consistent with Mr. Siebel's subsequent disclosure that he was hospitalized multiple times during the Class Period. *Cf. Shenwick*, 282 F.Supp.3d at 1134. Nonetheless, the omission of facts regarding Mr. Siebel's hospitalizations from Statement #4 does not render it false or misleading. As stated by the Ninth Circuit, "Section 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required . . . only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Weston Fam. P'ship*, 29 F.4th at 620 (citation and internal quotation marks omitted).

The Court acknowledges that investors may have desired more information about Mr. Siebel's health condition and the exact degree to which he continued to personally manage C3. This lack of detail, however, is insufficient to give rise to a securities fraud claim, as there is no indication that Statement #4 was misleading when made. *See id.* at 615 ("Securities laws . . . do not require real-time business updates or complete disclosure of all material information whenever a company speaks on a particular topic.").

**4. May 28, 2025 Revenue Guidance (Statement #5)**

During the same May 28 earnings call discussed above, C3's CFO, Mr. Lath, presented C3's revenue guidance for Q1 FY2026. FAC ¶ 60. Plaintiff alleges that this "optimistic revenue guidance" was underpinned by "[Mr.] Siebel's purported health recovery and ability to travel." FAC ¶ 60. As alleged in the FAC, C3's revenue guidance lacked a reasonable basis because it "was highly dependent on Siebel's ability to execute on his leadership responsibilities in the sales organization." FAC ¶ 66. According to Plaintiff, "Defendants knew but failed to disclose that

despite earlier assurances, Siebel's illness had significantly and further diminished his effectiveness, he had been hospitalized, and he was not managing day-to-day details or the sales processes." ECF 71 at 19; *see also* FAC ¶ 66.

Defendants disagree and argue that: (1) Plaintiff fails to adequately allege that the revenue guidance was false when made; and (2) such guidance is inactionable under the PSLRA safe harbor. ECF 68 at 17–18, 20; ECF 74 at 14. The Court need not consider whether the revenue guidance is protected under the PSLRA safe harbor because Plaintiff fails to adequately allege falsity.

Under prevailing Ninth Circuit precedent, "[f]or a forward-looking statement such as . . . public guidance to constitute a material misrepresentation giving rise to Section 10(b) or Rule 10b–5 liability, a plaintiff must prove either (1) the statement is not actually believed [by the speaker], (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388 (9th Cir. 2010) (citation and internal quotation marks omitted).[13] This standard applies even when a forward-looking statement is not protected by the PSLRA safe harbor. *Id.* at 388 n.2; *see also M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*, No. CV 17-1479 PA (MRWX), 2017 WL 5635425, at *7 (C.D. Cal. Oct. 30, 2017). As previewed above, Plaintiff argues that the May 28 revenue guidance was false or misleading when made because it lacked a reasonable basis and Defendants were aware of undisclosed facts that seriously undermined the revenue guidance's accuracy. ECF 71 at 19–20.

FE1's vague allegation that various unspecified deals were delayed because of Mr. Siebel's unavailability fails to establish falsity. *Cf. Barker*, 2026 WL 657744, at *5. By contrast, FE1's

[13] The Ninth Circuit has held that the second method for pleading falsity is only available under an omissions theory of liability and not under a material misrepresentation theory. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017).

allegation that Mr. Siebel was hospitalized for 1 or 2 weeks after the April 2025 sales meeting and had a live-in health professional has some weight because it lines up with Mr. Siebel's own August 2025 statement that he had been hospitalized multiple times during the Class Period. *Cf. Shenwick*, 282 F.Supp.3d at 1134.

Nonetheless, hospitalizations alone are insufficient to show that the revenue guidance was false or misleading when made. Mr. Siebel's hospitalizations demonstrate that he was receiving medical care, but they do not allow the Court to plausibly infer that C3's Q1 FY2026 revenue guidance lacked a reasonable basis. *In re Oracle Corp.*, 627 F.3d at 388. Nor does the undisclosed fact of Mr. Siebel's hospitalization seriously undermine the accuracy of C3's revenue projections. *In re Oracle Corp.*, 627 F.3d at 388. Unlike in *Lucid Alternative Fund, LP v. Five9, Inc.*, 821 F. Supp. 3d 1073, 1090–91 (N.D. Cal. 2026), which is cited by Plaintiff (ECF 71 at 19), here, there was no failure to disclose known facts indicating that business was struggling or that C3 was performing below its projections and expectations. Here, the Court cannot conclude that Statement #5 lacked a reasonable basis or omitted facts that seriously undermined its accuracy without speculating about Mr. Siebel's health status and its effect on his management of C3 and the sales process. *Cf. Juniper Networks*, 2013 WL 2156358, at *5 (rejecting confidential witness's "statement that Juniper took 'a cheap way' to meet its announced revenue targets" as speculative). In short, the FAC lacks particularized facts sufficient to show that Statement #5 was false or misleading when made.

For similar reasons, Defendants' subsequent disclosures regarding C3's missed revenue guidance are insufficient to establish that Statement #5 was false or misleading when made. *See In re Cloudera, Inc.*, 121 F.4th at 1187. These disclosures show that: (1) C3 missed its Q1 FY 2026 revenue guidance; (2) Mr. Siebel experienced health issues and multiple hospitalizations during the Class Period; (3) Mr. Siebel's health condition prevented him from being as actively involved in the sales process as he had been in the past; and (4) the revenue shortfall was attributed to C3's

restructuring of its sales and services organization and Mr. Siebel's reduced participation in the sales process. FAC ¶¶ 75, 81–82, 86. They do not indicate that, as of May 28, there was no reasonable basis for C3's revenue guidance. *In re Oracle Corp.*, 627 F.3d at 388. Nor do they indicate that the revenue guidance's accuracy was seriously undermined simply because Mr. Siebel was experiencing health challenges or was not as involved in the sales process as he had been previously. *In re Oracle Corp.*, 627 F.3d at 388. Requiring Defendants to disclose the precise details of Mr. Siebel's health treatments and the exact degree of his day-to-day sales process involvement or management of C3 would transform missed revenue guidance into securities fraud. *See In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1006 (N.D. Cal. 2016) ("As a general proposition, missed guidance alone generally does not render Defendants' financial project[ion]s false or misleading."); *Smith*, 2021 WL 1233354, at *6 ("Merely because defendants made optimistic statements and later admitted a more pessimistic reality does not show that the difference is attributable to fraud."). It would also impose a completeness rule on Defendants' disclosures, counter to Ninth Circuit precedent. *See Weston Fam. P'ship*, 29 F.4th at 615 ("[A] company can speak selectively about its business so long as its statements do not paint a misleading picture."); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not. To be actionable under the securities laws, an omission must be misleading. . . ."). The Court declines to do so.

Accordingly, the Court holds that Plaintiff fails to adequately allege that Statement #5 was false or misleading when made.

**5. June 23, 2025 FY2025 10-K (Statement #6)**

On June 23, 2025, C3 filed its FY2025 10-K with the SEC, which contained the same complained-of risk disclosure as Statement #3. FAC ¶ 64; *see also* ECF 68-4 at 15; ECF 68-8 at 13. As with Statement #3, the risk disclosure referenced the "Note From Tom" on February 18,

2025, including Mr. Siebel's statement that "his health setback was not impacting his ability to manage the business in a hands-on manner, and that Jim H. Snabe, a member of [the] Board . . . had assumed the interim role of Special Advisor to the CEO to assist where and as needed." ECF 68-4 at 15; ECF 68-8 at 13. Because Statements #3 and #6 are substantially identical, the parties' legal arguments are similar as well. ECF 68 at 24; ECF 71 at 16–19; ECF 74 at 12–14. Indeed, the only difference between the two risk disclosures is that Statement #6 was made later in the Class Period. As such, Plaintiff argues that the temporal proximity between the June 23 risk disclosure and C3's July 24 announcement that Mr. Siebel would be stepping down as CEO is "highly probative of falsity." ECF 71 at 18. Defendants counter that temporal proximity, by itself, is insufficient. ECF 74 at 14. This Court agrees.

The Ninth Circuit has noted that, "without more, temporal proximity alone does not satisfy the particularity requirements of Rule 9(b)." *Weston Fam. P'ship*, 29 F.4th at 622. Nonetheless, as Plaintiff's cited authorities demonstrate, temporal proximity, when coupled with other allegations, can demonstrate falsity. *See, e.g.*, *RH, Inc.*, 302 F. Supp. 3d at 1042 (concluding that temporal proximity between CEO's public statements about positive market performance and CEO's subsequent internal memo disclosing adverse information was "significant," where internal memo described performance-related issues and stated that company had "let its customers 'die'"); *Shankar v. Zymergen Inc.*, No. 21-CV-06028-VC, 2022 WL 17259057, at *2 (N.D. Cal. Nov. 29, 2022) (temporal proximity between registration statement and adverse disclosures was only one of numerous factors supporting conclusion that statements were misleading). Thus, both Ninth Circuit precedent and Plaintiff's own cited authorities demonstrate that he cannot rely solely on the temporal proximity between Statement #6 and the July 2025 announcement that Mr. Siebel would be stepping down as CEO. *Weston Fam. P'ship*, 29 F.4th at 622; *RH, Inc.*, 302 F. Supp. 3d at 1042; *Shankar*, 2022 WL 17259057, at *2.

FE1's allegations that various unspecified deals were delayed due to Mr. Siebel's unavailability are too vague to establish that Statement #6 was false or misleading when made. *See Barker*, 2026 WL 657744, at *5. The Court finds that FE1's reports of talk that Mr. Siebel was hospitalized for 1 to 2 weeks after the April 2025 sales meeting and had a live-in health professional are consistent with Mr. Siebel's subsequent admission that he experienced multiple hospitalizations during the Class Period. *Cf. Shenwick*, 282 F.Supp.3d at 1134. However, Defendants were not required to disclose every relevant fact regarding Mr. Siebel's health. *See Weston Fam. P'ship*, 29 F.4th at 615. Without particularized allegations showing that Mr. Siebel's hospitalizations prevented him from managing C3 in a hands-on manner or diminished his provision of services as CEO such that C3 could not effectively capitalize on its business strategy, the omitted fact of Mr. Siebel's hospitalizations is insufficient to establish falsity. *See id.* at 620 ("[A] company must disclose a negative internal development only if its omission would make other statements materially misleading.").

Nor are Defendants' subsequent disclosures from August and September 2025 sufficient. FAC ¶¶ 75, 81–82, 86. They indicate that Mr. Siebel was hospitalized multiple times during the Class Period and could not participate as actively in the sales process as he had in the past. FAC ¶¶ 75, 81–82, 86. These factors, in turn, contributed to C3's Q1 FY2026 missed revenue guidance. FAC ¶¶ 75, 81–82, 86. However, the August and September 2025 disclosures do not indicate that Mr. Siebel was unable to manage C3 in a hands-on manner or that, as of June 23, 2025, the warned-of risks in Statement #6 had already come to fruition. *See Smith*, 2021 WL 1233354, at *7 (holding that plaintiff had adequately alleged falsity of risk disclosure in 10-K, where post-class period statement operated as an admission that warned-of risk materialized in second half of the fiscal quarter, when 10-K was filed). Moreover, these subsequent disclosures do not demonstrate the existence of any contemporaneous facts inconsistent with Statement #6. *See Glazer*, 63 F.4th at 776 ("The problem with Plaintiffs' 'admission' argument is not that Forescout's *disclosure* occurred

after the statements were made, but that the disclosure pertained only to *conditions existing after the statements* were made (at the *end* of 2019). Forescout made no admissions about the relevant percentage as of the dates of the challenged statements.").

Taken together, Plaintiff's allegations indicate that Mr. Siebel announced that he would be stepping down as CEO shortly after C3 filed its June 2025 10-Q. FAC ¶¶ 64, 68. They also demonstrate that Defendants did not disclose every detail about Mr. Siebel's medical treatment or the exact degree of his day-to-day management of C3 or participation in the sales process. In short, these allegations demonstrate that there is more information that Defendants could have disclosed. *See Weston Fam. P'ship*, 29 F.4th at 615. They do not, however, demonstrate the existence of particularized facts sufficient to show that Statement #6, whether affirmatively or by omission, was false or misleading when made. *See Weston Fam. P'ship*, 29 F.4th at 615, 620.

**ii. Scienter and Loss Causation**

Defendants also challenge scienter and loss causation. However, because the Court finds that Plaintiff has failed to allege falsity, the Court need not reach these elements. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) ("[W]e find the issue of falsity to be dispositive, and we therefore do not reach the issues of scienter or loss causation with respect to that complaint.").

The Court holds that Plaintiff has failed to allege falsity. Accordingly, the Court **GRANTS** the motion to dismiss as to Count I of the FAC **WITHOUT PREJUDICE**.

**B. Count II: Plaintiff Fails to Adequately Plead a Contemporaneous Insider Trading Claim Against Mr. Siebel Under Section 20A of the Exchange Act.**

"Section 20A of the Exchange Act creates a private cause of action for 'contemporaneous' insider trading." *Reckstin Fam. Tr. v. C3.ai, Inc.*, 718 F. Supp. 3d 949, 992 (N.D. Cal. 2024) (citations and internal quotation marks omitted). "To satisfy § 20A, a plaintiff must plead [(1)] a predicate violation of the securities laws; and (2) facts showing that the trading activity of plaintiffs

and defendants occur[red] contemporaneously." *See id.* (citations and internal quotation marks omitted).

Mr. Siebel argues that Plaintiff's contemporaneous trading claim against him should be dismissed because: (1) Plaintiff fails plead a predicate violation; (2) Plaintiff fails to plead contemporaneous trades with Mr. Siebel; (3) all but one of Plaintiff's purchases were for prices lower than Mr. Siebel's closest preceding stock sales; and (4) Mr. Siebel's sales that most closely preceded Plaintiff's stock purchases were made pursuant to a 10b-5 trading plan. ECF 68 at 32–33. As explained above, Plaintiff fails to plead a predicate violation of Section 10(b) of the Exchange Act or Rule 10b-5 for false or misleading statements. *See In re Netflix, Inc. Sec. Litig.*, 647 F. App'x 813, 816 (9th Cir. 2016). For that reason, the Court declines to reach Defendants' other arguments, and **DISMISSES** Count II of the FAC **WITHOUT PREJUDICE**.

### C. Count III: Plaintiff Fails to Adequately Plead Control Person Liability Under Section 20(a) of the Exchange Act.

"In order to prove a prima facie case under [Section] 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . . ; and (2) that the defendant exercised actual power or control over the primary violator . . . ." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "Section 20(a) provides derivative liability for those who control others found to be primarily liable under the [Exchange] Act." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012). "Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same." *Id.*

In their motion to dismiss, Mr. Siebel and Mr. Lath argue that Count III should be dismissed because: (1) Plaintiff fails to plead a primary violation; and (2) neither Mr. Siebel nor Mr. Lath "is alleged to have been in control of the other's oral or written statement." ECF 68 at 33. The Court agrees with Mr. Siebel and Mr. Lath. Plaintiff's failure to properly allege a primary violation of

Section 10(b) and Rule 10b-5 requires dismissal of their Section 20(a) claim as well. *See In re Netflix*, 647 F. App'x at 816. Accordingly, Count III of the FAC is **DISMISSED WITHOUT PREJUDICE**.

### D. The Court Grants Leave to Amend the FAC.

Pursuant to Rule 15(a)(2), A party may amend its pleadings with the opposing party's written consent or the Court's leave. Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* This policy is applied with "extreme liberality." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation and internal quotation marks omitted). The nonmovant bears the burden of demonstrating why leave to amend should not be granted. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987). The Supreme Court has outlined five factors to consider in deciding whether leave to amend is warranted: (1) bad faith on the part of the movant, (2) undue delay by the movant, (3) repeated amendments by the movant, (4) undue prejudice to the nonmovant, and (5) futility of the proposed amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Here, Defendants assert, without argument or support, that the FAC should be dismissed with prejudice. *See* ECF 68 at 9, 11, 17, 33. After weighing the Rule 15(a) factors, the Court holds that leave to amend is **GRANTED**.

Plaintiff may not plead new claims or add new parties. Should the scope of any amendment exceed the leave to amend granted by this order, the Court will strike the offending portions of the pleading under Rule 12(f). *See* Fed. R. Civ. P. 12(f). Over Defendants' objection, Plaintiff may file a second amended complaint no later than **August 7, 2026**.

## VI. CONCLUSION

For the reasons explained above, Plaintiff fails to adequately plead that any of Defendants' statements or omissions were false or misleading when made. Accordingly, Count I does not state a claim under Section 10(b) and Rule 10b-5. Counts II (contemporaneous trading) and III (control

person liability) do not state a claim either because Plaintiff fails to adequately allege a primary violation of the Exchange Act.

Accordingly, the Court **DISMISSES** the FAC in its entirety **WITHOUT PREJUDICE** and **WITH LEAVE TO AMEND**. Should Plaintiff choose to file a second amended complaint, he may not add any new claims or parties and must file such amendment no later than **August 7, 2026**.

IT IS SO ORDERED.

Dated: July 14, 2026

TRINA L. THOMPSON
United States District Judge