ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (213113)
HAILEY S. ZANUTTO (358143)
SHAO-JIA CHANG (356004)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
shawnw@rgrdlaw.com
hzanutto@rgrdlaw.com
schang@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN LIGGETT SR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>C3 AI, Inc., et al.,<br><br>Defendants. | Case No. 3:25-cv-07129-TLT<br><br><u>CLASS ACTION</u><br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

## TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

III. SUMMARY OF AMENDMENTS IN THE SECOND AMENDED COMPLAINT ..... 5

IV. SUMMARY OF FACTS ..... 8

V. JURISDICTION AND VENUE ..... 14

VI. THE PARTIES ..... 15

VII. SOURCES OF INFORMATION ..... 15

VIII. CONTROL PERSONS ..... 17

IX. FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ..... 18

- A. C3 Announces that Siebel Suffered Health Scare but Continues Hands-On Management of the Company ..... 18
- B. C3 Announces Financial Results and Reaffirms Siebel's Day-to-Day Leadership ..... 19
- C. C3 Reports 4Q25 and FY25 Financial Results and Reaffirms Siebel Is Back Leading the Sales Staff ..... 26
- D. C3 Announces that Siebel's Illness Would Require Him to Step Down as CEO ..... 32

X. THE TRUE IMPACT OF SIEBEL'S ILLNESS ON C3'S FINANCIAL PERFORMANCE IS REVEALED ..... 35

- A. Defendants Preannounce 1Q26 Financial Results, Badly Missing Revenue Outlook, Restructuring Sales Force, and Departure of Tom Siebel ..... 35
- B. Post-Class Period Admissions Reveal Extent of Siebel's Health Issues and Confirm Siebel's Inability to Participate in Sales Process Due to Poor Health Was Significant Cause of Revenue Guidance Miss ..... 37

XI. LOSS CAUSATION AND ECONOMIC LOSS ..... 44

XII. NO SAFE HARBOR ..... 46

XIII. APPLICABILITY OF FRAUD ON THE MARKET AND *AFFILIATED UTE* PRESUMPTION OF RELIANCE ..... 47

XIV. CLASS ACTION ALLEGATIONS ..... 48

XV. PRAYER FOR RELIEF ........ 51

XVI. JURY DEMAND ........ 52

# I. INTRODUCTION[1]

1. Lead Plaintiff David S. Mottahedeh ("Plaintiff" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following, based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters and supported by, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of C3.ai, Inc.'s ("C3" or "Company") public documents, United States Securities and Exchange Commission ("SEC") filings, analyst reports, media reports, and other publicly disclosed information about Defendants (defined herein). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2. This is a securities fraud class action alleging violations of the anti-fraud provisions of the federal securities laws on behalf of all who purchased or acquired C3 common stock from February 18, 2025 through August 8, 2025, inclusive (the "Class Period"). The claims asserted herein are brought against C3 and two of its current and/or former C3 Board of Directors ("Board") members or executive officers: Tom Siebel ("Siebel"), the Company's founder, Chairman, and Chief Executive Officer ("CEO"), and Hitesh Lath ("Lath"), the Company's Senior Vice President, Chief Financial Officer ("CFO"), and Chief Administrative Officer.

3. During the Class Period, Defendants violated §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), 78t-1, and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, by making materially false and misleading statements and omissions concerning Siebel's ongoing participation in the day-to-day leadership of C3, including his indispensable role in directing the sales organization, securing and retaining key customer relationships, and performing the core CEO functions that were central to C3's operations and commercial success, despite a debilitating illness he contracted in late 2024.

---

[1] Unless otherwise specified, all emphasis is added.

## II. BACKGROUND

4. C3 is an enterprise artificial intelligence ("AI") application software company that provides a platform for building and deploying custom enterprise AI applications and pre-built AI solutions for various industries and global corporations. Such applications aim to improve a corporation's operations, analyze information, and orchestrate workflows. C3's competitive advantage is its purported ability to "make it simple to scale enterprise AI," and capitalize on a market opportunity Defendants described as, "certainly greater than [a] $1 trillion addressable market, maybe a $2 trillion addressable market."

5. As reported in the Company's fiscal year 2025 ("FY25") Form 10-K, C3 earns revenue through software subscription, comprised of software licenses, initial production deployments of C3's AI applications, and runtime and hosting fees, and through professional services, including engineering and implementation services, consulting, and training.[2] According to the Company, a substantial majority of its revenue is generated from subscriptions to its software:

> ***Subscriptions***
>
> Our subscription revenue is primarily comprised of software licenses, software-as-a-service offerings, stand-ready COE support services, initial production deployments of our C3 AI Applications or Generative AI, and runtime and hosting fees. . . .
>
> Within subscription revenue, [the Company] include[s] revenue from contracts with customers that are based on our consumption-based pricing model. This model typically begins with a paid "Initial Production Deployment" phase of generally up-to six months that may include developer access to the C3 Agentic AI platform, one or more C3 AI Applications or C3 Generative AI, and COE support services with typically unlimited runtime. Following the initial production deployment period, customers either pay a monthly fee and consumption charges using vCPU and vGPU hours as the metric to calculate payment or enter into a time-certain multi-period commitment that may include consumption charges. We also charge the customer any hosting fees incurred by us for hosting in our own cloud instance.
>
> ***Professional Services***
>
> . . . [P]rofessional services primarily include prioritized engineering services, paid implementation services, consulting, and training. We maintain a

[2] C3's fiscal year runs from May 1 to April 30.

professional services organization that offers resources, methodologies, and experience to help customers develop and deploy enterprise-scale AI applications.

6. C3 was founded in 2009 by Siebel, who served as the Chairman of the Company's Board from its inception, and as CEO from July 2011 until September 2025, when he transitioned to the role of Executive Chairman.

7. Siebel is a billionaire tech entrepreneur who built his reputation and fortune as an early employee and executive at Oracle Corporation between 1984 and 1990, and when he sold his self-named software company, Siebel Systems, to Oracle Corporation in 2006 for $5.8 billion.

8. From C3's founding, Siebel relied on his network and entrepreneurial reputation to propel the Company forward. Siebel has often alluded to the role his connections and influence played in C3's formation. For example, in a July 2022 *Forbes* article titled: "Can Tom Siebel Fulfill His Vision To Make C3 AI One Of The World's Next Great Software Companies?" Siebel boasted that, "'[o]n a Friday night in December of 2008[,] I sent out an email to about 25 people, every name of which you would know and raised $20 million by Sunday.'" The article described Siebel as the "legendary Silicon Valley entrepreneur," whose "billionaire status and history for success" was the reason he "had no trouble attracting both a world class team and financing" for C3.

9. C3's SEC filings also detail how Siebel's continued active leadership was integral to the Company's success. For example, the Company's FY25 Form 10-K explained that: "[o]ur success depends in a large part upon the continued service of key members of our senior management team. In particular, our founder and CEO, Thomas M. Siebel, is critical to our overall management, sales strategy, culture, strategic direction, engineering, and operations. In addition, Mr. Siebel is a recognized leader in information technology and is critical to the continued development of our C3 AI Software." The same Form 10-K emphasized Siebel's reputation and prestige in its discussion of C3's marketing strategy, demonstrating the Company leveraged Siebel's public persona to enhance C3's brand awareness and market credibility.[3]

[3] C3, Fiscal Year 2025 Annual Report (Form 10-K), 17 (filed June 23, 2025).

10. The industry's perception of C3 is inextricably linked to Siebel and his prior successes. In a May 2023 article titled "C3.AI Faces Reports of Product Delays, Micromanagement From Tom Siebel," *Bloomberg* quoted Stanford Business School Lecturer and Venture Capitalist Robert E. Siegel, who wrote a case study about C3 in 2019, as saying, "'C3 is absolutely a bet on Tom.'" The article also describes C3's style and strategy as "fundamentally a reflection of its founder [Siebel]," including because much of the Company's core leadership "dates back to the Siebel Systems days."

11. Investment analysts likewise recognized that C3's business and growth prospects were heavily dependent on Siebel's leadership and sales execution. For example, on November 20, 2024, notwithstanding "a number of risks," Citizens JMP "continue[d] to like [C3's] story" in part because "Siebel has deep experience in the software industry and navigated his prior company, Siebel Systems, to a good outcome." Similarly, on September 4, 2024, BofA Global Research identified Siebel as "an integral part of both the R&D and go-to-market functions."

12. C3's market-entry strategy has been, and continues to be, focused on establishing partnerships with large corporations or "lighthouse customers," including multinational corporations and government entities. According to the Company, C3's lighthouse customers serve as proof points for potential customers in their respective industries. C3 uses these proof points and their respective outcomes to initiate discussions at numerous leading companies in each sector, thereby expanding C3's market reach. C3's FY25 Form 10-K explained that the Company's business strategy has resulted in a customer base made up of a relatively small number of large organizations.[4]

13. As such, C3's growth and revenue strategy relies heavily on creating and maintaining its critical partnerships with lighthouse customers, often called a "partner ecosystem" by the Company. For example, during fiscal year 2024 ("FY24"), 91 of the 191 agreements closed, *i.e.*, 48%, were originated or executed through C3's partnerships with Google Cloud, Amazon

[4] C3.ai, Fiscal Year 2025 Annual Report (Form 10-K), 72 (filed June 23, 2025).

Web Services, and Microsoft. And, during the first quarter 2025 ("1Q25"), approximately 72% of agreements closed were facilitated through C3's partnerships.

14. Siebel emphasized the importance of senior executive-level participation during the sales process while presenting at the May 20, 2024, J.P. Morgan Global Technology, Media and Communications Conference. Siebel explained that a global corporation's decision to engage C3 is not constrained by traditional department budgets, but instead is a "CEO-level decision[]," where the CEO "makes the budget then it happens." As a result, Siebel's direct involvement in cultivating relationships and engaging senior executives at well-established multinational corporations, including executives with whom he had longstanding personal relationships, was critical to C3's ability to secure and retain these key customers.

15. Significantly, many of C3's partnerships with such lighthouse customers are predicated on relationships with Siebel. For instance, on a December 9, 2024 second quarter 2025 ("2Q25") conference call, Siebel announced C3's expanded "strategic alliance" with Microsoft, and informed the market that he and Microsoft's Chief Customer Officer Judson Althoff were "executive sponsors of the alliance." An analyst asked Siebel about the history of the Microsoft relationship and "how [Siebel] got it to this point," specifically, "[d]id [Siebel] work with Judson at some point at Oracle?" Siebel explained:

> Judson and I did not overlap with Oracle, but he was at Oracle. He ran alliances at Oracle at the time that Oracle acquired Siebel Systems in January 2006, and many of the Siebel people went to work for him. . . . [O]ur relationship between Microsoft and C3 is pretty much always been driven between well Judson and I. And this agreement was put together with Judson, and I and he are coordinating this very closely.

16. C3's inherent value was Siebel's experience and network, a fact recognized by industry peers, potential C3 customers, and investors – each of whom gave significant weight to Siebel's presence and participation when deciding to partner with, hire, or invest in the Company.

## III. SUMMARY OF AMENDMENTS IN THE SECOND AMENDED COMPLAINT

17. After assessing the totality of the facts alleged in the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF 60), on July 14, 2026, the Court

issued an Order Granting Motion to Dismiss, identifying certain deficiencies in the falsity element of Plaintiff's Rule 10b-5 claim and providing leave to amend. ECF 84 ("MTD Order").

18. The MTD Order recognized that, based on the allegations, Defendants failed to disclose all of the details concerning Mr. Siebel's medical treatment, the exact degree of his day-to-day management of C3, or his participation in the sales process. MTD Order at 31. The MTD Order further acknowledged that, based on the allegations, Defendants' August and September 2025 admissions established three facts: (1) "Mr. Siebel experienced health issues and multiple hospitalizations during the Class Period"; (2) "Mr. Siebel's health condition prevented him from being as actively involved in the sales process as he had in the past"; and (3) "the revenue shortfall was attributed to C3's restructuring of its sales and services organization and Mr. Siebel's reduced participation in the sales process." *Id.* at 27-28. Moreover, the Court found that these admissions were consistent with a report by FE1 that Siebel was hospitalized for one or two weeks after the April 2025 sales meeting and needed a live-in health professional. *Id.* at 27, 30.

19. The Second Amended Class Action Complaint for Violations of the Federal Securities Laws ("SAC") directly addresses the pleading deficiencies identified by the Court in the MTD Order. In particular, the SAC pleads additional contemporaneous accounts of former employee witnesses regarding Siebel's actual presence in the office and day-to-day management of the Company, his lack of participation in the sales strategy and execution, and the complications around his health and resulting repeated hospitalizations. The SAC also includes additional specific allegations of admissions by Siebel further detailing the scope of his health conditions during the Class Period, including multiple hospitalizations first disclosed on August 8, 2025, and previously undisclosed open-heart and pulmonary surgeries during the Class Period, which incapacitated him and prevented him from performing his critical responsibilities, especially those involving the active leadership of the Company and its sales organization.

20. For example, the MTD Order found that there were insufficient "time-specific allegations that would support an inference that Mr. Siebel's health condition was materially affecting his hands-on-management of C3 as of March 7, 2025." *Id.* at 21-22. The SAC addresses that deficiency by adding the firsthand account of a former C3 employee based at the Company's

headquarters in Redwood City, California. The former employee reported that, before January 2025, Siebel was regularly present in the office five days a week, but that beginning in January 2025 and continuing through the end of the Class Period and beyond, his attendance was sporadic and he was sometimes absent from the office for a few weeks at a time. These contemporaneous observations are corroborated by additional admissions by Siebel alleged in the SAC, where Siebel specified that the health issues he experienced over the preceding "seven to eight months," including "an autoimmune attack," and previously undisclosed "open-heart surgery," and "pulmonary surgery," all of which had prevented him from being as involved in the sales process as he had been previously. Siebel also identified specific critical duties he was incapable of performing during the Class Period due to his health, such as "structuring deals, visiting accounts," and "talking to customers." These newly alleged facts confirm that the multiple hospitalizations reported by the former employees, and their effect on Siebel's ability to participate in the sales process and secure revenue for the Company, had at least begun to occur by March 7, 2025.

21. The MTD Order further found that Siebel's May 28, 2025 statements, made in response to analysts' inquiries, discussing his red eye flight that evening to close business and telling investors that he was "back," were "akin to corporate puffery." *Id.* at 23. Additionally, the MTD Order found that, when viewed in the context of the full earnings call, it was apparent that Siebel's statements largely concerned his travel plans as opposed to giving investors the impression that he was back to traveling the way he was before his illness, though Plaintiff had alleged that he was "back" traveling for business, which previously had been limited. *Id.* The SAC now provides an additional May 29, 2025 analyst report, titled in part "Mr. Siebel Flying Again," which indicated that the market understood Siebel's remarks in the manner alleged by Plaintiff, stating that "Siebel commented that he needed to" catch a red-eye to Washington, D.C. to move some of this business along, "suggesting that he was flying again." Viewed in context, Siebel's statement during the earnings call – and his response to an analyst's question about the improvement of his health – conveyed that he had resumed traveling for the purpose of actively managing the Company, leading the sales organization, and participating in closing deals.

22. The MTD Order also found that that the facts alleged did not demonstrate that Siebel was unable to manage C3 in a hands-on manner, or that, as of June 23, 2025, the warned of risks of the loss of Siebel's critical services had already come to fruition. *Id.* at 30. The SAC now provides further detail, in addition to the new fact stated above, from an additional former employee witness who reported that they were told – in July 2025 – by Siebel's nephew Chris Siebel, that Siebel was really sick, experiencing constant complications, undergoing surgeries, and repeatedly returning to the hospital after being discharged. These examples of new particularized facts alleged in the SAC show that Siebel's hospitalizations prevented him from managing C3 in a hands-on manner and/or diminished his provision of services, such that C3 could not effectively capitalize on its business strategy. *Id.* at 30.

23. Taken together, these new allegations detailed below substantially address the deficiencies identified in the MTD Order regarding the particularized facts and the plausibility of Plaintiff's falsity allegations.

## IV. SUMMARY OF FACTS

24. On February 18, 2025, C3 published a "Note from Tom" ("February 18 Note" or "Note") on its website that was addressed to the "Team" and signed "TS." The Note described a "health setback" suffered by Siebel, who had contracted an autoimmune disease that resulted in significant vision impairment. Siebel tempered that disclosure with what he referred to as "good news, [that] it ***will not affect my ability to continue actively managing the business in a hands-on manner. It will, at least for a while, limit my ability to travel.***" The remainder of the Note focused on the Company's business, including describing its amazing progress during the last quarter and assuring the market that C3 had "never been better positioned to capitalize" on an "opportunity [that] has never been greater."

25. On February 26, 2025, Defendants held a conference call for analysts and investors to discuss the Company's third quarter 2025 ("3Q25") financial results. In addition to reporting that the total revenue for 3Q25 had increased 26% year-over-year, Defendants downplayed the seriousness of Siebel's illness and its effect on Siebel's and the Company's ability to execute deals and generate revenue. In particular, Siebel was asked by an analyst from Citizen JMP to "talk

about what the health setback was and what steps [Siebel was] taking in terms of running the business." Siebel insisted that "***about really the only thing I can't do is read e-mail***." Siebel reassured investors: "***I am fully engaged managing details of the business every day*** as you know me a little bit and you know I'm generally in touch with those details. ***My health is excellent***, okay?"

26. Investment analysts who covered the Company reported on Siebel's illness and accepted Defendants' reassurances that he was "fully engaged" in his day-to-day leadership role. For example, on February 27, 2025, UBS published a report discussing the conference call, stating that C3 "firmly pushed back against the notion Founder and CEO Tom Siebel might be taking a step back from his role. The company argued there has been ***zero diminishment*** in [Siebel's] engagement with the business and remains in office every day."

27. Throughout the Class Period, Defendants continued to assure investors that, notwithstanding Siebel's health scare, Siebel maintained the ability and continued to effectively lead the Company and participate in generating sales in order to maintain investor confidence.

28. On May 28, 2025, in connection with the Company's fourth quarter 2025 ("4Q25") and FY25 year-end results, the Company held another conference call for analysts and investors. During the call, Siebel further addressed his health status, but again minimized any effect on his productivity and implied the illness was, in fact, behind him, stating that he had resumed traveling to meet with customers: "Our federal [government] business is a large and rapidly growing business. And I am going to have to cut my Q&A short when we get to the calls because ***I need to catch a red eye to Washington, D.C. to move some of this business along***." Later on the call, Siebel emphatically declared that as of May 28, 2025, at least, "***I'm back***":

> I did get slowed down for a little bit. There's no question about it. And I had – it's very unlike me to work from home. You know that. And I had to work from home for a little while and take it easy and recover, but ***I will catch a red eye to Washington, D.C. tonight***. I will be in Washington, D.C. again for three days, I think, 10 days from now after attending a wedding . . . . ***So just when you thought it was safe, . . . I'm back***.

29. During the same May 28, 2025 earnings call, CFO Lath provided the market with a positive first quarter 2026 ("1Q26") financial outlook and optimistic guidance, stating:

> Our revenue guidance for Q1 of fiscal '26 is $100 million to $109 million. For the full fiscal 2026, we are anticipating revenue in the range of $447.5 million to $484.5 million. Our guidance for non-GAAP loss from operations for the first quarter is $23.5 million to $33.5 million. And our non-GAAP loss from operations for the year, the guidance is $65 million to $100 million.

30. Defendants' reassurances were echoed by analysts, reinforcing the false impression that Siebel had recovered from his illness and remained fully capable of leading the Company, thereby maintaining the artificial inflation of C3's stock price. For example, on May 29, 2025, Canaccord Genuity reported, "***[e]very indication is that Mr. Siebel's leadership presence at the company remains resolute*** and we're encouraged by his stalwart recovery."

31. The market reacted positively to Defendants' 4Q25 earnings report and commentary on Siebel's resumption of travel and meeting with clients to secure business, as evidenced by the 20% stock price increase from a close of $23.02 on May 28, 2025, to a close of $27.80 on May 29, 2025, with a significantly elevated trading volume of 54.9 million shares, up from the 13.1 million shares traded on May 28, 2025.

32. On June 23, 2025, the Company filed its FY25 Form 10-K, which contained purported risk warnings, substantially echoing warnings included in its March, 7, 2025 Form 10-Q, that Defendants "***may***" not be able to capitalize on C3's business strategy "***[i]f***" they were to lose Siebel's services, including such services that are "critical" to the Company's "overall management, sales strategy, culture, strategic direction, engineering, and operations." The Form 10-K, like the Form 10-Q, also falsely assured investors that Siebel's "health setback was ***not impacting his ability to manage the business in a hands-on manner***."

33. Each of the statements set forth above concerning Siebel's health and continuing leadership of the Company, including his leadership of and participation in the sales organization, and Defendants' hypothetical warning of the loss of Siebel's critical services and the resulting effects on the Company's overall management and sales strategy, was materially false and misleading when made because Defendants knew or deliberately disregarded and failed to disclose each of the following facts:

(a) Siebel's health condition was far more serious and disruptive to his leadership performance than Defendants had disclosed to investors, including that, as opposed to

managing the details of the business every day, Siebel's health condition had in fact prevented him from running the business on a day-to-day basis, prevented him from providing the necessary personal attention to current and prospective customers, and prevented him from effectively engaging with sales personnel to execute on current or potential deals in the manner he conveyed he was able to investors;

(b) The impact of Siebel's health circumstances, including his absence due to multiple hospitalizations and surgeries, on his ability to serve in his critical leadership role at the Company was not merely contingent, as the Company had warned on March 3, 2025 and June 23, 2025. Rather, Siebel's health circumstances had already substantially hindered the Company's ability to capitalize on its business strategy, which the Company admitted was integral to its success, and specifically prevented Siebel from performing his critical role in the sales process, which according to Siebel, directly contributed to the Company's poor 1Q26 revenue performance; and

(c) In light of (a) and (b) above, the Company's 1Q26 revenue outlook, which was highly dependent on Siebel's ability to execute on his leadership responsibilities in the sales organization, did not have a reasonable basis.

34. The materially false and misleading statements alleged herein concerning Siebel's ongoing engagement and the Company's day-to-day sales and operations caused C3's stock price to trade as high as $30.24 per share during the Class Period.

35. On July 24, 2025, the Company issued a press release titled: "Tom Siebel and the Board initiate search for successor CEO at C3 AI." The press release quotes Siebel as saying "'[a]fter being diagnosed with an autoimmune disease in early 2025, I have experienced significant visual impairment.'" Accordingly, Defendants admitted that in order for C3 to reach its full potential, it was necessary to identify and appoint a new CEO. More importantly, however, Siebel continued to emphasize that he "remain[ed] fully engaged as Chief Executive Officer of C3.ai":

> "After being diagnosed with an autoimmune disease in early 2025, I have experienced significant visual impairment," said Thomas M. Siebel, Chairman and CEO of C3 AI. "For C3 AI to reach its full potential – which I believe is spectacular – the board and I have initiated a search for a new CEO who can take the company to the next level of growth and success. ***I will remain fully engaged as Chief***

> ***Executive Officer of C3.ai until such time as the C3.ai board appoints my successor*** after which I will continue in the role of Executive Chairman focusing on strategy, product innovation, strategic partner and customer relationships."

36. Issued just ***seven days*** before the end of 1Q26, the July 24, 2025 press release made no mention of any hospitalizations or surgeries that had occurred since Siebel's February announcement. It also failed to disclose that, contrary to repeated Class Period-assurances otherwise, Siebel had been unable to meaningfully participate in the Company's sales strategy and execution, contributing to the quarter's still-undisclosed poor financial performance.

37. Following the July 24, 2025 disclosure, C3's stock price declined from a close of $29.16 per share on July 23, 2025, to $26.00 per share at close of market on July 24, 2025. This price decline occurred on unusually high trading volume of more than 19.9 million shares traded, up from just 4.7 million shares on July 23, 2025.

38. Just fifteen days later, after market close on August 8, 2025, C3 revealed the Company's deteriorating financial performance by preannouncing financial results for 1Q26. The press release disclosed that total revenue for the quarter was just $70.3 million, well below the $100 million to $109 million revenue guidance Defendants issued in May.

39. In a second press release issued the same day, Defendants acknowledged that the first quarter revenue miss and poor financial performance were a direct result of Siebel's extended illness, including vision impairment and, revealing for the first time, multiple hospitalizations that had occurred since February. Siebel explained that, despite Defendants' assurances to investors otherwise, "dealing with these health issues" had prevented him from actively participating in the sales process:

> "As we have previously announced, I have had a number of health issues in the past six months including multiple hospitalizations and vision impairment. Unfortunately, ***dealing with these health issues prevented me from participating in the sales process as actively as I have in the past***."

40. In response to these disclosures, C3's stock price declined from a close of $22.13 per share on August 8, 2025, to a close of $16.47 per share on August 11, 2025, the next trading day – a drop of more than 25% – on an elevated trading volume of nearly 67 million shares, a more than 900% increase from the volume traded on August 8, 2025.

41. Then, on August 12, 2025, Siebel appeared on CNBC to explain the 25% stock price drop, which resulted in C3 stock trading at its "lowest level in more than two years."[5] In a stark departure from Defendants' prior assurances, Siebel revealed for the first time the true extent of the health issues he had been dealing with throughout the Class Period, including that he had undergone both "open-heart surgery" and "pulmonary surgery." He further acknowledged that his condition had prevented him from performing core aspects of his role as CEO, including "structuring deals, visiting accounts" and "talking to customers."[6] Siebel also admitted that his inability to actively perform in what the Company described as his critical sales and strategy role had negatively impacted the Company's sales process, leading to the revenue miss and, ultimately, the stock price decline:

> [Interviewer]: So help me decode what happens here. It sounds like, ***based on your statement, you're saying the sales process needed you directly more than you realized.*** Your health challenges earlier this year really took a toll.
>
> [Siebel]: Well, in the course of the last six months, we've brought in an entirely new generation of very senior sales leadership, most of whom joined in the course of the last quarter.
>
> * * *
>
> But as you know, in the last say, 7 to 8 months I've gone through a number of health issues. ***I had an autoimmune attack, you know, open-heart surgery, pulmonary surgery. It was kind of one disaster after another. But I'm in good shape now***. Okay. But the bottom line is ***I was not able to participate nearly as actively as I always used to in the sales process in terms of structuring deals, visiting accounts, talking to customers, what have you.*** And in hindsight, I think maybe I had a little bit more impact on the sales process than I thought. And I think going forward, I think we have the sales leadership that can get the job done with me or without me.

42. During the Class Period, at the same time that Defendants issued false and misleading statements regarding Siebel's continuing participation in the leadership of C3,

---

[5] Closing Bell: Overtime: *Sales Execution Was 'Completely Unacceptable', Says C3.ai CEO on Recent Reorganization* (CNBC Aug. 12, 2025), https://www.cnbc.com/video/2025/08/12/sales-execution-was-completely-unacceptable-says-c3-ai-ceo-on-recent-reorganization.html.

[6] On May 13, 2026, after announcing his reinstatement as C3's CEO, Defendant Siebel appeared in a live interview on CNBC. During the interview, Siebel confirmed again that, during 2025, he suffered multiple serious health events beyond the autoimmune disease that resulted in his blindness, and provided further detail regarding his illness and hospitalizations, including clarifying that, in addition to multiple heart surgeries, he also had "multiple lung surgeries and other surgeries."

including leadership of the sales organization, and thereby C3's ability to execute on deals and generate revenue, Siebel sold more than 3.4 million shares of his C3 stock at artificially inflated prices as high as $29.24 per share, for illegal insider trading proceeds of more than $81 million. Besides being lucrative, Siebel's trades were suspiciously timed. For example, on July 18, 2025, just six days before Defendants announced Siebel would be stepping down as CEO, Siebel sold more than 589,000 shares for over $16 million in proceeds. Then, on August 4, 2025, just four days before Defendants pre-announced their historic 1Q26 revenue miss, Siebel sold an additional 336,000 shares, pocketing another $7 million in proceeds. Significantly, prior to January 2025,[7] Siebel had not sold a single share of C3 stock since November 16, 2021.

43. Members of the putative class seek to recover their economic losses as a result of the conduct alleged herein.

## V. JURISDICTION AND VENUE

44. The claims asserted arise under §§10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

45. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b). Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material fact, occurred in this District. The Company's headquarters are also located in this District in Redwood City, California.

46. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

[7] In January 2025, Siebel sold 665,432 shares of C3 stock for more than $20 million, and between February 1 and February 17, 2025, he sold 652,123 shares for more than $21 million. These trades were conducted after Siebel contracted his illness, which occurred in December 2024, as he later admitted, but before he first informed the market of his illness on February 18, 2025.

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## VI. THE PARTIES

47. Lead Plaintiff David S. Mottahedeh purchased or acquired C3 common stock during the Class Period and was damaged by the conduct alleged herein.

48. Defendant C3.ai, a Delaware corporation headquartered in Redwood City, California, provides a platform for developing, building, and operating AI applications for global corporations to improve operations, analyze information, and orchestrate workflows. C3's common stock is listed and traded on the NYSE, an active market, under the ticker symbol "AI."

49. Defendant Thomas M. Siebel is C3's founder and at all relevant times during the Class Period served as the Chairman of C3's Board, and as CEO. As CEO, Siebel was frequently quoted in C3's press releases and regularly spoke on C3's quarterly earnings calls with Wall Street analysts and investors. Siebel also signed or authorized the filing of C3's reports filed with the SEC.

50. Defendant Hitesh Lath at all relevant times during the Class Period served as C3's Senior Vice President and CFO. Prior to the Class Period, Defendant Lath served as the Vice President and Chief Accounting Officer from December 2023 to February 2024. As CFO, Lath had the power to authorize or approve publicly disseminated information about the Company. He regularly spoke on C3's quarterly earnings calls with Wall Street analysts and investors, and signed or authorized the filing of C3's reports filed with the SEC.

51. Defendants named in ¶¶49-50 are referred to herein as the "Individual Defendants." C3 and the Individual Defendants are collectively referred to herein as "Defendants."

## VII. SOURCES OF INFORMATION

52. In addition to SEC filings, analysts and media reports, and other publicly disclosed information, the allegations herein are based in part on information and belief, and are further supported by the firsthand accounts of former C3 employees, referred to herein as a "former employee(s)" or "FE." Each of the FE's: (i) worked at C3 during the Class Period; (ii) held positions within C3 with responsibilities demonstrating that they had access to the facts on which

they reported; and (iii) provided an account that is corroborated by other former employees, publicly available information concerning the Company's business, or Defendants' admissions, as alleged herein.

(a) FE1, a former Senior Director of Strategic Solutions from November 2024 to May 2025, was responsible for selling C3's technology to customers in the oil and gas sector. FE1's reporting chain ultimately went up to C3's Chief Revenue Officer ("CRO"), who hosted daily, company-wide sales meetings for all sales personnel that FE1 regularly attended;

(b) FE1 reported that, during their tenure, they had regularly visited C3's headquarters in California, including for quarterly sales meetings, and had personally witnessed Siebel, whose health was such that he needed assistance to even sit in a chair. FE1 also reported that there had been talk that, after the April 2025 sales meeting, Siebel had to be hospitalized for a week or two and had a live-in health professional. According to FE1, Siebel had to sign off on everything, whether it be deals or expenses, and was required to be included on all emails to potential customers. FE1 also reported hearing from the CRO during multiple meetings of the sales staff held during the Class Period that various customer deals were delayed because Siebel was unavailable. FE1's account is largely corroborated by other former employees, discussed below, and a series of public disclosures made by the Company and Siebel on August 8, 2025, August 12, 2025, September 3, 2025, September 9, 2025, December 3, 2025, and May 13, 2026, that in the six months prior to August 8, 2025, Siebel had suffered a number of health issues, including "multiple hospitalizations," open-heart surgery, and pulmonary surgery, all of which prevented him from effectively participating in the sales process and contributed to the Company's significant 1Q26 revenue guidance miss and drop in stock price.

(c) FE2 was a C3.ai Senior Director of Strategic Solutions in the Company's state and local government sales division from June 2025 through February 2026. FE2 was responsible for sales to state and local governments, with a specific focus on selling to law enforcement agencies. According to FE2, they were recruited to join C3 by and reported directly to Tom Siebel's nephew, Chris Siebel.

(d) FE2 reported that, in July 2025, Chris Siebel told FE2 that Siebel had been seriously ill, had been experiencing ongoing complications and had undergone surgeries. According to FE2, Chris Siebel informed them that because of the persistent complications, Siebel would be discharged from the hospital only to be readmitted shortly thereafter. FE2 also reported that Siebel did not attend a sales kickoff meeting from June 2025 through February 2026.

(e) FE3 worked at C3.ai as a Director of Product Management in the state and local government division from November 2023 to January 2025, and then as a Senior Director of Product Management in the government division from January 2025 to January 2026. During their employment, FE3 was based at the C3 headquarters in Redwood City, California. According to FE3, they had been accustomed to seeing Siebel at the headquarters almost five days a week prior to Siebel's illness, but, from January 2025 to FE3's departure in January 2026, Siebel's presence in the office had been sporadic, with absences lasting for a few weeks at a time.

(f) FE3 also reported that, based on their direct interactions with Siebel during the Class Period, they assessed that Siebel's health was affecting his ability to keep up with the pace of C3's business and finalize customer deals. For example, FE3 reported a specific meeting in March 2025, during which FE3 and a team of C3 executives were trying to work through a sales contract with Siebel over the phone. Because of Siebel's impaired vision, the meeting took most of the day, as executives had to read ten to fifteen pages of dense, fine print contract language to Siebel over the phone. FE3 described this experience as difficult and stressful for everyone, especially because of the extended time it took to perform a routine task.

## VIII. CONTROL PERSONS

53. The Individual Defendants, because of their positions with the Company, individually and collectively possessed the power and authority to control the contents of C3's reports to the SEC, press releases, and public presentations to securities analysts, money portfolio managers, and institutional investors. The Individual Defendants were provided with copies of the Company's reports, press releases, and articles alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. The Individual Defendants participated in drafting, preparing, disseminating,

and/or approving the various documents and other communications alleged to be false and misleading herein. Because of their positions within the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements and omissions pleaded herein. Additionally, because of their positions of control and authority as officers or directors of the Company, the Individual Defendants were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.

## IX. FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A. C3 Announces that Siebel Suffered Health Scare but Continues Hands-On Management of the Company

54. On February 18, 2025, C3 published the Note on its website. The Note was addressed "Dear Team" and announced a "health setback" recently suffered by Siebel. The Note assured investors that "[t]he good news" was that, despite significant vision impairment, this health setback would not affect Siebel's "ability to continue [to] actively manag[e] the business in a hands-on manner." The Note read:

> I am sorry to report that I have suffered a health setback. Somehow, I picked up an autoimmune disease and that has resulted in significant vision impairment. ***The good news, it will not affect my ability to continue actively managing the business in a hands-on manner. It will, at least for a while, limit my ability to travel***.

55. In addition to assuring investors that Siebel remained active in hands-on management of the Company, the Note further stated that work underway during 4Q25, which began on February 1, 2025, would ensure the expansion of both the sales and services capacity to meet the market opportunity that, according to Defendants, had never been greater:

> Q3 was a quarter focused on building distribution capacity and Agentic AI capability. Q4 will ensure the company is properly organized to expand both direct sales and services and support capacity to our dramatically enlarged distribution ecosystem. FY26 and FY27 will be about realizing continually expanded growth and market share. The market has never been larger, the opportunity has never

> been greater, and our product family has never been stronger. The company has never been better positioned to capitalize on all of this.

### B. C3 Announces Financial Results and Reaffirms Siebel's Day-to-Day Leadership

56. On February 26, 2025, the Company issued a press release announcing its 3Q25 financial results, reporting 26% year-over-year revenue growth and multiple new partnership agreements:

> **C3 AI Announces Fiscal Third Quarter 2025 Financial Results**
>
> ***26% Year-Over-Year Revenue Growth***
>
> ***Dramatically Expanded Strategic Partnerships with Microsoft, AWS, and McKinsey QuantumBlack C3***
>
> ***Generative AI Makes History with First Ever Agentic AI Earnings Call***
>
> . . . C3.ai, Inc. ("C3 AI," "C3," or the "Company") (NYSE: AI), the Enterprise AI application software company, today announced financial results for its fiscal third quarter ended January 31, 2025.
>
> "In the third quarter, C3 AI achieved significant milestones – expanding our global distribution network, advancing our leadership in agentic and generative AI, and delivering total revenue reaching $98.8 million, up 26% year-over-year," said Thomas M. Siebel, Chairman and CEO, C3 AI.

57. On February 26, 2025, after the market closed, C3 held a conference call hosted by Siebel and Lath to discuss the Company's 3Q25 financial results. During the call, analysts inquired about the February 18 Note regarding Siebel's health. Siebel was asked by an analyst from Citizens JMP to talk about the health setback and the steps that were being taken in terms of running the business. In response, Siebel explained that he was sick and had infirmities after Christmas, and his vision had been impaired:

> Yes. I came down with something like flu-like symptoms after Christmas, which lasted some weeks and that kind of degenerated into kind of a pretty bad flu like symptoms, and the – so I was sick – and then that turned out was a precursor for an autoimmune disease, that autoimmune disease has been identified as – I'm sorry, giant cell arteritis, okay? And so when we get into February, this autoimmune disease kicks in and attacks my optical nerve. And so my optical paths kind of fried, so my vision is impaired. Now as it relates to operating the business, it has so – Tom has to learn some new skills, and we put the accommodations in place.

58. While providing details regarding his health status, Siebel assured investors that despite the setback, neither his illness nor his impaired eyesight was impacting his work and that

he was "fully engaged managing details of the business every day." In addition, he stated that his "health [was] excellent," and that he remained intimately involved in the details of the business, including describing being personally involved with the Company's lighthouse customers, and that he was managing the business every day:

> I mean, ***you know me to be intimately familiar with the details of this business, okay?*** And you can imagine that we spent exacting detail with this management team or how we were reorganizing this company around this new opportunity that's here. We've done the same – we have the same meeting with all of our salespeople around . . . the world. ***I spent a lot of time personally with all of the – a lot of time personally, okay, with all of the partners that we've discussed***.
>
> I put the accommodations in place for – about really t***he only thing I can't do is read e-mail***. So the – so we put the [accommodation] in place, there is somebody here with a hot computer who reads the e-mails to me, ***I comment, I respond, I approve***, I don't prove what have you. ***I am here in the office. I am managing the business every day***.
>
> *  *  *
>
> ***I am fully engaged managing details of the business every day*** as you know me a little bit and you know I'm generally in touch with those details. ***My health is excellent, okay?*** So beyond all of the infirmities that I had, I just can't see.

59. By stating that he was "beyond all of the infirmities," except for his vision impairment, Siebel conveyed to investors that his health issues were behind him and that he was, at the time of the statement, managing the business every day.

60. Following the February 18 Note and the Company's February 26, 2025 earnings call, several securities analysts issued reports discussing Siebel's health announcement. For example, on February 26, 2025, Canaccord Genuity issued a report titled: "Solid Q3 results but signs of growth moderation; PT to $30," that referenced the February 18 Note and summarized Siebel's comments from the investor earnings call, including that, according to Defendants, Siebel will remain very active in managing the business, despite his limited travel:

> While he is in good spirits and speaks as effusively about the prospects of the business as ever, his ability to travel is impaired, at least in the near term. Jim Snabe, former co-CEO of SAP has stepped in to assume the role of Special Advisor to the CEO. ***Mr. Siebel will remain very active in managing the business, and there is a well defined strategy set in place***, but we have to acknowledge that this is a meaningful change for a company with such a vocal and visible leader as Mr. Siebel.

61. On February 27, 2025, UBS published a report titled: "(Non-License) Subscription Revenue Declines" that highlighted Defendants' firm rejection of the idea that Siebel's illness was or would be impacting his ability to perform his critical role at the Company. UBS reported that, according to C3, there was "zero diminishment" in Siebel's engagement with the Company and also recognized how important Siebel is to the financial performance of the Company, noting that if Siebel were to depart, investors would likely react negatively:

> ***C3.ai firmly pushed back against the notion Founder and CEO Tom Siebel might be taking a step back from his role.*** The company argued there has been ***zero diminishment*** in [Siebel's] engagement with the business and remains in office every day. In our view, ***if Founder and CEO Tom Siebel was to depart***, we think ***investors would view this as a negative***.

62. Also on February 27, 2025, the same Citizens JMP analyst who questioned Siebel during the conference call about his health setback, published a report titled: "Rev Grows 26% from 29% Last Q; Guides in Line for F4Q; Stock Down 6%." The Citizens JMP report acknowledged Defendants' assertion that Siebel's health setback would not impair his active management of the business, and relied on Defendants' reassurances when advising investors that Citizens JMP "continue[d] to like C3.ai" as an investment, specifically due to the strong industry partnerships that were based on Siebel's active involvement with lighthouse and other customers:

> While C3's founder and CEO Thomas Siebel has recently suffered a health setback that will limit his ability to travel, at least for a while, . . . ***we continue to like C3.ai as an opportunity for long-term capital appreciation*** for multiple reasons, including: . . . strong industry partnerships . . . .

63. Following the February 26, 2025 financial report and conference call, C3 shares traded at artificially inflated prices above $23.00 per share.

64. On March 3, 2025, Defendants presented at the Citizens JMP Technology Conference, during which Siebel appeared virtually for a question-and-answer segment. During the segment, Siebel spoke positively about C3's year-over-year growth rate, and provided details about the Company's sales strategy. The appearance and commentary from Siebel not only gave the impression that Siebel was in fact continuing with his day-to-day leadership responsibilities, but also assured investors that business was continuing to grow, in fact accelerate, under Siebel's

watchful eye, with him doing weekly, and sometimes daily, sales reviews with executives and accounts:

> Business is great.
>
> * * *
>
> Growth rate has gone from, what, 6% to 16%. And this year, we're looking at 25% growth. . . . So, we're quite pleased with the growth acceleration that we're seeing returning to the C3 AI story.
>
> * * *
>
> ***We have quarterly executive reviews. We have almost daily sales reviews. We have weekly sales executive reviews, and we are on the feet at the account.*** We were in Detroit last week. We're in Paris today. We're in London today. We're in joint sales, joint demos, joint value propositions, and making a very, very – and Microsoft, like AWS, is bringing their balance sheet to bear to make it easy for customers to do this. And so, we're moving.

65. On March 7, 2025, C3 filed a Form 10-Q for 3Q25. The Form 10-Q included risk warnings that failed to disclose that the warned of risk had already come to pass. For example, the Form 10-Q purported to warn that Defendants "***may***" not be able to capitalize on C3's business strategy "***[i]f***" they were to lose Siebel's services, including such services that are "critical" to the Company's "overall management, sales strategy, culture, strategic direction, engineering, and operations."[8] The risk warning additionally assured investors that, although Siebel informed the Company that he had contracted an autoimmune disease and was experiencing significant vision impairment, in fact, Siebel's health was not impacting his ability to manage the business in a hands-on manner:

> ***If*** we were to lose the services of our CEO or other members of our senior management team, we ***may*** not be able to execute our business strategy.
>
> Our success depends in a large part upon the continued service of key members of our senior management team. In particular, ***our founder and CEO, Thomas M. Siebel, is critical to our overall management, sales strategy, culture, strategic direction, engineering, and operations***. In addition, Mr. Siebel is a recognized leader in information technology and is critical to the continued

---

[8] Attached to the Company's Form 10-Q were certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 signed by Siebel and Lath. These certifications verified that both Siebel and Lath reviewed the Form 10-Q, including the risk warnings, and falsely affirmed, *inter alia*, that the report contained no "untrue statement of a material fact" and did not "omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

> development of our C3 AI Software. On February 18, 2025, Mr. Siebel informed the Company that he had contracted an autoimmune disease and was experiencing significant vision impairment. In that communication, ***Mr. Siebel also stated that this health setback was not impacting his ability to manage the business in a hands-on manner*** . . . .

66. Each of the statements set forth above ¶¶54, 58, 65 concerning Siebel's health and his continuing leadership of the Company, including leadership of and participation in the sales organization, as well as Defendants' hypothetical warning of the loss of Siebel's critical services and the resulting effects on the Company's overall management and sales strategy, was materially false and misleading when made because Defendants knew or deliberately disregarded and failed to disclose each of the following facts:

(a) Siebel's health condition was far more serious and disruptive to his leadership performance than Defendants had disclosed to investors, including that, as opposed to managing the details of the business every day, Siebel's health condition had in fact prevented him from running the business on a day-to-day basis, prevented him from providing the necessary personal attention to current and prospective customers, and prevented him from effectively engaging with sales personnel to execute on current or potential deals in the manner he conveyed he was able to investors. As detailed below, multiple former C3 employees provided both firsthand and corroborated accounts concerning what Defendants knew of Siebel's health and its effect on his participation in the management, sales process, and strategic direction of the business. These facts, when viewed in combination with Defendants' admissions on August 8, 2025 (¶89), August 12, 2025 (¶96), September 3, 2025 (¶¶97-98), September 9, 2025 (¶105), December 3, 2025 (¶106), and May 13, 2026 (¶111) and, as set forth below, establish the liability for the alleged false and misleading statements

(i) As alleged, Siebel made the following admissions revealing the true extent of his health issues during the Class Period:

> <u>August 8, 2025:</u> ***I have had a number of health issues in the past six months including multiple hospitalizations and vision impairment***. Unfortunately, dealing with ***these health issues prevented me from participating in the sales process as actively as I have in the past***.
>
> <u>August 12, 2025</u>: ***I had an autoimmune attack, you know, open-heart surgery, pulmonary surgery***. It was kind of one disaster after another. . . . ***I was not able***

> ***to participate nearly as actively as I always used to in the sales process, in terms of structuring deals, visiting accounts, talking to customers***.
>
> September 3, 2025: Financial performance in Q1 was completely unacceptable. . . . ***I have had a number of unanticipated health issues***. Unfortunately, ***this prevented me from participating in the sales process as actively as I have in the past***.
>
> September 9, 2025: We experienced a decline in revenue and an increase in operating losses in the first quarter of fiscal year 2026. ***The results were attributed, in part, to . . . our Executive Chairman's unanticipated health limitations during the quarter***.
>
> December 3, 2025: ***The biggest thing I would say is sales execution . . . . Tom would probably acknowledge that his health contributed towards that***. So I think he spoke about that at length on the last call. ***That was attributed towards the poor performance***.
>
> May 13, 2026: I did go blind ***and then I had, you know, multiple heart surgeries and lung surgeries and other surgeries***.

(ii) These admissions corroborate and confirm the accounts of the former C3 employees. For example, a former C3 Senior Director of Strategic Solutions (FE1) who was responsible for selling C3's technology to customers in the oil and gas sector reported that Siebel was a hands-on leader and had to sign off on everything, whether it be deals or expenses, and was required to be included on all emails to potential customers. According to FE1, they regularly visited C3 headquarters in California, during the Class Period and personally witnessed Siebel requiring assistance to even sit in a chair and that there had been talk that after the April 2025 sales meeting, Siebel had to be hospitalized for a week or two and had a live-in health professional. FE1 also reported hearing from the CRO during multiple daily sales meetings during the Class Period that various deals were delayed because Siebel was unavailable. FE1's account is largely corroborated by other former employees, discussed below, and a series of public disclosures made by the Company and Siebel on August 8, 2025, August 12, 2025, September 3, 2025, September 9, 2025, December 3, 2025, and May 13, 2026, that in the six months prior to August 8, 2025, Siebel had suffered a number of health issues, including "multiple hospitalizations," open-heart surgery, and pulmonary surgery, all of which prevented him from effectively participating in the sales process and contributed to the Company's significant 1Q26 revenue guidance miss and drop in stock price;

(iii) FE3 was a C3 Director of Product Management in the state and local government division from November 2023 to January 2025, and then a Senior Director of Product Management in the government division from January 2025 to January 2026. FE3 was based at the C3 headquarters in Redwood City, California. According to FE3, they were accustomed to seeing Siebel at the headquarters almost five days a week. However, from January 2025 to FE3's departure in January 2026, Siebel's presence in the office had been sporadic, with his absences lasting for a few weeks at a time; and

(iv) FE3 also reported that, based on their direct interactions with Siebel during the Class Period, they assessed that Siebel's health was affecting his ability to keep up with the pace of C3's business and finalize customer deals. For example, FE3 reported a specific meeting in March 2025, during which FE3 and a team of C3 executives were trying to work through a sales contract with Siebel over the phone. Because of Siebel's impaired vision, the meeting took most of the day, as executives had to read ten to fifteen pages of dense, fine print contract language to Siebel over the phone.

(b) As discussed above in ¶¶(a)(i)-(iv), the impact of Siebel's health circumstances, including his absence due to multiple hospitalizations and surgeries, on his ability to serve in his critical leadership role at the Company was not merely contingent, as the Company had warned on March 3, 2025. Rather, Siebel's health circumstances had already substantially hindered the Company's ability to capitalize on its business strategy, which the Company admitted was integral to its success, and specifically prevented Siebel from performing his critical role in the sales process, which according to Siebel, directly contributed to the Company's poor 1Q26 revenue performance.

67. During the period between March 14, 2025 and April 16, 2025, Siebel sold 1,265,380 shares of C3 stock at artificially inflated prices as high as $22.25 per share, for proceeds of more than $26 million.

### C. C3 Reports 4Q25 and FY25 Financial Results and Reaffirms Siebel Is Back Leading the Sales Staff

68. On May 28, 2025, Defendants issued a press release that announced C3's financial results for 4Q25 and FY25, which ended on April 30, 2025. The press release also provided financial guidance for 1Q26 and full year FY26:

> **C3 AI Announces Record Fiscal Fourth Quarter and Full Fiscal Year 2025 Financial Results**
>
> ***Revenue for the fourth quarter grows 26% year-over-year***
>
> ***Baker Hughes and C3 AI renewed and expanded strategic alliance through June 2028***
>
> * * *
>
> **Fiscal Fourth Quarter 2025 Financial Highlights**
>
> - **Revenue**: Total revenue for the quarter was $108.7 million, an increase of 26% compared to $86.6 million one year ago.

69. The press release contained revenue guidance for 1Q26 of $100 million to $109 million, and FY 26 at $447.5 to $484.5 million.

70. Later in the day on May 28, 2025, C3 hosted a conference call to discuss the FY25 earnings results. During the call, Siebel touted the expansion of C3's partner ecosystem, and emphasized the purportedly significant efforts expended by C3 to prepare an "army" of "tens of thousands" of salespeople:

> [W]e've seen enormous growth in our market, again, in the last few years, going from 6% to 16% to 25%. And our focus, if we look at Q3 and Q4 of fiscal year '25 has been building an ecosystem to be able to address this huge sucking sound that we hear out there that is the demand for enterprise AI applications.
>
> * * *
>
> So what else are we focused on in the last 2 quarters? We've been focused [on] enabling these partners to be effective. We have tens of thousands of salespeople at Azure. I believe tens of thousands of salespeople at AWS. Thousands of salespeople at GCP.

71. During his prepared remarks, Siebel reassured investors that he was once again traveling to meet with customers, implying that one of the two symptoms of his illness that he had disclosed to investors was no longer limiting his ability to engage with customers. "Our federal [government] business is a large and rapidly growing business. ***And I am going to have to cut my***

***Q&A short when we get to the calls because I need to catch a red eye to Washington, D.C. to move some of this business along***."

72. Following this, analysts asked Siebel for an update on his health. Siebel again affirmed that he had gotten sick and while he had been limited in his travel, "tonight" he would be catching a red eye flight to Washington, D.C. Boasting of his renewed ability to travel for both business and pleasure, Siebel asserted, "I'm back":

> [Analyst]: And then if I could ask a follow-up. With your permission, Tom, I hope this is okay. But in February, you informed us that you'd suffered a health setback and it was limiting your ability to travel and then you're going to have Jim Snabe help out, but I was delighted to hear on this call that you're – I mean, you're probably not delighted to get out of red eye, but I was delighted to hear that you're getting on a red eye because that sounds like some positive development. So I don't know, any comments that you're okay sharing with us on that, I'm sure, would be greatly appreciated.
>
> [Siebel]: I did get slowed down for a little bit. There's no question about it. And I had – it's very unlike me to work from home. You know that. And I ***had to work from home*** for a little while and ***take it easy and recover, but I will catch a red eye to Washington, D.C. tonight. I will be in Washington, D.C. again for three days***, I think, 10 days from now after attending a wedding in Cabo. So just when you thought it was safe, . . . ***I'm back***.

73. Siebel's purported health recovery and renewed ability to travel underpinned the Company's optimistic revenue guidance for 1Q26, which began on May 1, 2025. Lath stated "Our revenue guidance for Q1 of fiscal '26 is $100 million to $109 million. For the full fiscal [2026], we are anticipating revenue in the range of $447.5 million to $484.5 million. Our guidance for non-GAAP loss from operations for the first quarter is $23.5 million to $33.5 million. And our non-GAAP loss from operations for the year, the guidance is $65 million to $100 million."

74. Following the May 28, 2025 earnings call, analyst reports repeated Defendants' positive outlook, including the robust partner ecosystem trumpeted by C3 and its purported effect on the Company's revenue. On May 29, 2025, Wedbush published "Ending FY25 on High Note; Solid FY26 Guide Capturing AI Demand; PT to $35," which expressed confidence in Defendants' purported efforts to establish and prepare an extensive network of sales partners: "We believe that C3 is starting to gain significant traction across the enterprise AI space by strengthening its partner ecosystem to drive growth . . . ."

75. Also on May 29, 2025, Canaccord Genuity issued a report titled: "Growth not an issue in Q4 despite choppy macro, durable profit will come in time." The report relayed Defendants' confidence in Siebel's recovery and ability to travel, calling the CEO "back on the road" and describing his leadership presence at the Company as "resolute":

> ***Growth not an issue in Q4 despite choppy macro, durable profit will come in time***. . . .
>
> ***Investment Recommendation***
>
> C3.ai delivered solid F4Q25 results, with continued top-line momentum and better-than-expected profit performance.
>
> * * *
>
> CEO Tom Siebel, ***who spoke as effusively as ever about the prospects of the business on the call, has made meaningful strides in recovering his physical health over the past quarter and is back on the road meeting with customers***. ***Every indication is that Mr. Siebel's leadership presence at the company remains resolute and we're encouraged by his stalwart recovery***.

76. Similarly, Citizens published a May 29, 2025 report titled "Grows 25%; Renews Baker Hughes; Ken Goldman Joins Board; Mr. Siebel Flying Again; Pops 12%" that gave an "update" on Siebel's health. To provide context to Siebel's earlier representations that his illness prevented him from traveling for work, the Citizen's report juxtaposed Siebel's May 28, 2025 comments with his February 2025 statements informing investors of the two specific ways his illness would affect his work at C3 (*i.e.*, his impaired vision and limited ability to travel), with his May statement detailing his upcoming travel for work and pleasure. The May 29, Citizens report specifically noted that, after Siebel's comment which suggested he was in fact flying again, an analyst for Citizens asked him about this improvement, to which Siebel proclaimed that he was "back":

> **Tom Siebel's health update**: As a reminder, on February 18, C3.ai published an update on Mr. Siebel's health that stated he had, "suffered a health setback . . . that has resulted in significant vision impairment." Although a setback, he noted in his note three months ago that "it will not affect my ability to continue actively managing the business in a hands-on manner. It will, at least for a while, limit my ability to travel."
>
> ***However, on the call last night, Mr. Siebel commented that he needed to "catch a redeye to Washington, D.C. to move some of this business along" suggesting that he was flying again***. In response to our question about this improvement, he commented that, "it slowed down for a little bit. There's no question about it . . . I

> was very unlikely to work from home, you know, that, okay . . . I had to work from home for a little while . . . and take it easy and recover. But I will catch a redeye [to] Washington, D.C. tonight. Okay. I will be in Washington, D.C. again for three days, I think 10 days from now . . . attending a wedding in Cabo . . . I'm back."

77. After the May 28, 2025 earnings call, C3's stock price increased from a close of $23.02 per share on May 28, 2025, to a close of $27.80 per share on May 29, 2025, and continued to trade on an increased volume of 54.9 million shares traded, up from 13.1 million shares traded on May 28, 2025.

78. On June 23, 2025, C3 filed a Form 10-K for the fiscal year ended April 30, 2025. The Form 10-K was signed by Defendants Siebel and Lath and all of the then-current members of C3's board of directors and included identical risk warnings to those in the March 7, 2025 3Q25 Form 10-Q. Like the 3Q25 Form 10-Q, the FY25 Form 10-K failed to disclose that the warned of risk, that Defendants "may" not be able to capitalize on C3's business strategy "[i]f" they were to lose Siebel's services, had already come to pass.[9] And, like the 3Q25 Form 10-Q, the risk warning continued to assure investors that, although Siebel had contracted an autoimmune disease and was experiencing significant vision impairment, in fact, Siebel's "health setback was ***not impacting his ability to manage the business in a hands-on manner***":

> ***If*** we were to lose the services of our CEO or other members of our senior management team, we ***may*** not be able to execute our business strategy.
>
> ***Our success depends in a large part upon the continued service*** of key members of our senior management team. In particular, ***our founder and CEO, Thomas M. Siebel, is critical to our overall management, sales strategy, culture, strategic direction, engineering, and operations***. In addition, Mr. Siebel is a recognized leader in information technology and is critical to the continued development of our C3 AI Software. On February 18, 2025, Mr. Siebel informed the Company that he had contracted an autoimmune disease and was experiencing significant vision impairment. In that communication, ***Mr. Siebel also stated that this health setback was not impacting his ability to manage the business in a hands-on manner***, and that Jim H. Snabe, a member of our Board of Directors, had assumed the interim role of Special Advisor to the CEO to assist where and as needed.

---

[9] Attached to the Company's Form 10-K were certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 signed by Siebel and Lath. These certifications verified that both Siebel and Lath reviewed the Form 10-K, including the risk warnings, and falsely affirmed, *inter alia*, that the report contained no "untrue statement of a material fact" and did not "omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

79. Following the June 23, 2025 filing of C3's FY25 Form 10-K, C3's stock price continued to trade at artificially inflated prices as high as $29.16 per share on July 23, 2025.

80. Each of the statements set forth above ¶¶72-73, 78 concerning Siebel's health and his continuing leadership of the Company, including leadership of and participation in the sales organization, as well as Defendants' hypothetical warning of the loss of Siebel's critical services, and the resulting effects on the Company's overall management and sales strategy, was materially false and misleading when made because Defendants knew or deliberately disregarded and failed to disclose each of the following facts:

(a) Siebel's health condition was far more serious and disruptive to his leadership performance than Defendants had disclosed to investors, including that, as opposed to managing the details of the business every day, Siebel's health condition had in fact prevented him from running the business on a day-to-day basis, prevented him from providing the necessary personal attention to current and prospective customers, and prevented him from effectively engaging with sales personnel to execute on current or potential deals in the manner he conveyed he was able to investors. As detailed below, multiple former C3 employees provided both firsthand and corroborated accounts concerning what Defendants knew of Siebel's health and its effect on his participation in the management, sales process, and strategic direction of the business. These facts, when viewed in combination with Siebel's admissions on August 8, 2025 (¶89), August 12, 2025, (¶96), September 3, 2025 (¶¶97-98), September 9, 2025 (¶105), December 3, 2025 (¶106), and May 13, 2026 (¶111) establish the liability for the alleged false and misleading statements:

(i) For example, a former C3 Senior Director of Strategic Solutions (FE1) who was responsible for selling C3's technology to customers in the oil and gas sector reported that Siebel was a hands-on leader and had to sign off on everything, whether it be deals or expenses, and was required to be included on all emails to potential customers. According to FE1, they regularly visited C3 headquarters in California during the Class Period and personally witnessed Siebel requiring assistance to even sit in a chair and that there had been talk that after the April 2025 sales meeting, Siebel had to be hospitalized for a week or two and had a live-in health professional. FE1 also reported hearing from the CRO during multiple daily sales meetings

during the Class Period that various deals were delayed because Siebel was unavailable. FE1's account is largely corroborated by other former employees, discussed below, and a series of public disclosures made by the Company and Siebel on August 8, 2025, August 12, 2025, September 3, 2025, September 9, 2025, December 3, 2025, and May 13, 2026, that in the six months prior to August 8, 2025, Siebel had suffered a number of health issues, including "multiple hospitalizations," open-heart surgery, and pulmonary surgery, all of which prevented him from effectively participating in the sales process and contributed to the Company's significant 1Q26 revenue guidance miss and drop in stock price;

(ii) FE2 was a C3 Senior Director of Strategic Solutions in the Company's state and local government sales division from June 2025 through February 2026, and was focused on selling C3 technology to law enforcement agencies. According to FE2, they were recruited to join C3 by and reported directly to Tom Siebel's nephew, Chris Siebel. FE2 reported that in July 2025, Chris Siebel told FE2 that Tom Siebel had been seriously ill, had been experiencing ongoing complications and had undergone surgeries. According to FE2, because of the persistent complications, Siebel would be discharged from the hospital only to be readmitted shortly thereafter. FE2 also reported that Siebel did not attend a sales kickoff meeting from June 2025 through February 2026;

(iii) FE3 was a C3 Director of Product Management in the state and local government division from November 2023 to January 2025, and then a Senior Director of Product Management in the government division from January 2025 to January 2026. FE3 was based at the C3 headquarters in Redwood City, California. According to FE3, they were accustomed to seeing Siebel at the headquarters almost five days a week. However, from January 2025 to FE3's departure in January 2026, Siebel's presence in the office had been sporadic, with his absences lasting for a few weeks at a time; and

(iv) FE3 also reported that, based on their direct interactions with Siebel during the Class Period, they assessed that Siebel's health was affecting his ability to keep up with the pace of C3's business and finalize customer deals. For example, FE3 reported a specific meeting in March 2025, during which FE3 and a team of C3 executives were trying to work

through a sales contract with Siebel over the phone. Because of Siebel's impaired vision, the meeting took most of the day, as executives had to read ten to fifteen pages of dense, fine print contract language to Siebel over the phone.

(b) As discussed above in ¶¶(a)(i)-(iv), the impact of Siebel's health circumstances, including his absence due to multiple hospitalizations and surgeries, on his ability to serve in his critical leadership role at the Company was not merely contingent, as the Company had warned on March 3, 2025 or June 23, 2025. Rather, Siebel's health circumstances had already substantially hindered the Company's ability to capitalize on its business strategy, which the Company admitted was integral to its success, and specifically prevented Siebel from performing his critical role in the sales process, which according to Siebel, directly contributed to the Company's poor 1Q26 revenue performance.

(c) In light of (a) and (b) above, the Company's 1Q26 revenue outlook, which was highly dependent on Siebel's ability to execute on his leadership responsibilities in the sales organization, did not have a reasonable basis.

81. Between May 2, 2025 and July 18, 2025, Siebel sold more than 1,848,000 C3 shares for prices as high as $29.24 per share, for proceeds of more than $47 million, including his sale of more than 580,000 shares on July 18, for more than $16 million in proceeds.

**D. C3 Announces that Siebel's Illness Would Require Him to Step Down as CEO**

82. On July 24, 2025, just seven days before the end of the quarter and only six days after Siebel made over $16 million selling hundreds of thousands of shares in C3, the Company filed a Form 8-K with the SEC with a press release and blog post attached as exhibits, partially disclosing the true impact that Siebel's health condition was having on the Company and its revenue stream. The press release, published after the market closed and titled: "Tom Siebel and the Board initiate search for successor CEO at C3 AI," announced that due to the previously reported health issues, C3 had initiated a search for Siebel's successor as CEO. The similarly attached blog post falsely reassured investors that, despite the announcement, the only remaining

effects of his illness were to Siebel's eyesight and limitations on his ability to travel "at the drop of a hat," claiming that he was otherwise "operating again at 100%" and remained "fully engaged":

> [Siebel]: As many of you know, I was diagnosed with an autoimmune disease in early 2025 and have had some consequent health issues that damaged my optic nerve, causing significant visual impairment. ***The good news is that I have regained my strength, but for my eyesight, I am operating again at 100%***.
>
> That being said, having given this a lot of thought, I am satisfied that for C3.ai to reach its full potential – that I continue to believe is spectacular – C3.ai needs a CEO who can get on a plane at the drop of a hat and visit the White House, the Pentagon, New York, Paris, London, etc., and if necessary, do so for an extended duration, given my vision limitations that is not possible.
>
> As a result, the board and I have decided to initiate a search for a highly experienced and highly qualified Chief Executive Officer of C3.ai who can take this company to the next level and realize its full potential. The search will be conducted by an internationally renowned search firm reporting to a search committee consisting of members of the C3.ai board and management team.
>
> ***Be assured that I will remain fully engaged as Chief Executive Officer of C3.ai until the board appoints my successor***. When a successor is identified, I will continue in the role of Executive Chairman, focusing on strategy, product innovation, strategic partners, and customer relationships.

83. Analysts reacted immediately to the news that a new CEO would be appointed to lead C3. That same day, Wedbush reported on Siebel's impending departure and considered the negative effects his absence could have on C3, including significantly increasing the likelihood of a near-term acquisition of the Company, especially because Siebel was "key in closing large enterprise deals":

> **CEO Transition; Siebel Stepping Down**
>
> Siebel will remain as CEO until his successor is appointed where he will transition to the role of Executive Chairman where he will focus on strategy, product innovation, strategic partners, and customer relationships. ***We view the transition as a net negative as Siebel's departure represents a pivotal moment for C3, as Tom is an integral figure in the tech world from his Siebel Systems/Oracle days, and will be difficult to replace as he was key in closing large enterprise deals***.
>
> * * *
>
> We believe that coming off the news that Siebel is stepping down as CEO significantly increases the chances of C3 being an M&A over the next 3-12 months.

84. Also on July 24, 2025, Canaccord Genuity published a report that pointed out Defendants' departure from earlier messaging on Siebel's health, which had purportedly improved,

and noted that the market was "clearly disappointed" by news of Siebel's imminent departure, as evidenced by a 10% stock price decline:

> **Exit Stage Right: Siebel's final act as CEO, executive search commences**
>
> * * *
>
> This announcement follows on the tails of the previously announced news regarding a health setback faced by Mr. Siebel. ***In recent months it was reported that his health had improved, but as noted in the press release today, Siebel has experienced significant visual impairment tied to his diagnosis in early 2025***. We sympathize with the difficult nature of Mr. Siebel's decision and anyone that knows him well understands his perennial drive and motivation to lead C3 forward.
>
> ***Shares are trading down 10% today on the news as the market is clearly disappointed by Mr. Siebel's plan to take a step back. Near-term uncertainty is rarely viewed positively by investors***.

85. On July 25, 2025, Citizens JMP published a report titled: "C3.ai, Inc. (AI) Initiates Search for New CEO; Tom Siebel Announces Intent to Step Down; Remains Chairman." Citizens JMP was encouraged that, although Siebel was stepping down as CEO, he was ostensibly able to maintain his deep relationships with customers and others in the industry. The Citizens JMP report mirrored Defendants' message, which tempered the negative disclosure by emphasizing Siebel's continued involvement in managing C3:

> ***1) Mr. Siebel noted he will remain CEO until a successor is appointed, where he will then "continue in the role of Executive Chairman"***; 2) in our opinion, this transition presents a highly attractive opportunity for both C3.ai and a new executive who can leverage the existing platform and ***still benefit from Mr. Siebel's continued involvement and deep relationship***; 3) looking back at Mr. Siebel's long and distinguished career, there are a number of executives he has worked with in the past who strike us as strong potential candidates for the role; and 4) particularly given that ***Mr. Siebel still holds a large position in C3.ai, with ~27% economic ownership and 54.2% of the vote, per the company's latest proxy filed August 22, 2024***, we think it might be prudent for the board of directors to at least consider reviewing strategic alternatives in parallel with the new CEO search.

86. Following the July 24, 2025 disclosure, C3's stock price declined from a close of $29.16 per share on July 23, 2025, to $26.00 per share at close of market on July 24, 2025. This price decline occurred on an unusually high volume of more than 19.9 million shares traded, up from just 4.7 million shares on July 23, 2025. C3's stock price continued to trade at artificially inflated prices, as the true state and impact of Siebel's illness had not been fully revealed.

87. On August 4, 2025, Siebel sold an additional 336,000 shares of C3 stock at prices as high as $22.77, for proceeds of more than $7 million.

## X. THE TRUE IMPACT OF SIEBEL'S ILLNESS ON C3'S FINANCIAL PERFORMANCE IS REVEALED

### A. Defendants Preannounce 1Q26 Financial Results, Badly Missing Revenue Outlook, Restructuring Sales Force, and Departure of Tom Siebel

88. After market close on August 8, 2025, C3 issued a press release titled: "C3 AI Fiscal First Quarter 2026 Preliminary Financial Results," which reported preliminary revenue for 1Q26 of $70.3 million at the midpoint, approximately 30% below its previously issued guidance range of $100 million to $109 million:

> C3.ai, Inc. ("C3 AI," "C3," or the "Company") (NYSE: AI), the Enterprise AI application software company, today announced preliminary financial results for its fiscal first quarter ended July 31, 2025. All numbers reported are unaudited, preliminary estimates. Completed financial results for the first quarter ended July 31, 2025, an update on fiscal 2026 guidance, and additional details will be provided on September 3, 2025.
>
> **Fiscal First Quarter 2026 Preliminary Business Update**
>
> - Total revenue for the quarter was $70.2 million - $70.4 million.
> - GAAP loss from operations was ($124.7) million - ($124.9) million.
> - Non-GAAP loss from operations was ($57.7) million - ($57.9) million.
> - $711.9 million in cash, cash equivalents, and marketable securities as of July 31, 2025.

89. Also on August 8, 2025, Defendants issued a second press release that tied the revenue shortfall to Siebel's ongoing health issues and announced the completion of a wholesale restructuring of C3's sales and services organizations. The press release attempted to explain the quarter's dismal results by attributing, in large part, the Company's poor performance to the previously undisclosed severity of Siebel's health condition, noting a number of health issues and multiple hospitalizations since February, which prevented Siebel from participating in the sales processes at the level he had repeatedly assured the market he was:

> **C3 AI Restructures Sales and Services Organizations to Accelerate Growth**
>
> *New leadership includes Chief Commercial Officer, General Manager of EMEA, North*

> . . . C3 AI (NYSE: AI), the Enterprise AI application software company, in the course of Q1, has restructured its global sales and services organization, including new leadership. That restructuring is now complete.
>
> * * *
>
> "The good news is we have completely restructured the sales and services organization, including new and highly experienced leadership across the board to ensure a return to accelerating growth and increased customer success at C3 AI. ***The bad news is that sales results in Q1 were completely unacceptable***. Having given this a lot of thought, I attribute this to two factors. One: ***It is clear that in the short term, the reorganization with new leadership had a disruptive effect***. Two: As we have previously announced, ***I have had a number of health issues in the past six months including multiple hospitalizations and vision impairment***. Unfortunately, dealing with ***these health issues prevented me from participating in the sales process as actively as I have in the past***. With the benefit of hindsight, it is now apparent that my active participation in the sales process may have had a greater impact than I previously thought.

90. Market reaction was swift. On August 10, 2025, D.A. Davidson published a report lamenting C3's "catastrophic results." The D.A. Davidson report grimly predicted that "finding a successor to CEO Tom Siebel" will create "more disruption," and, evincing Siebel's perceived industry value, forecasted C3's "business trends as likely to get worse before they get better."

91. On August 11, 2025, a Wedbush report titled: "C3.ai (AI) Pre-Announces Disaster FY1Q26 Results, Sales Org Restructured; PT to $23," plainly identified Siebel's absence as a catalyst for the quarter's "horrific performance" because it prevented him from being active in the sales process and had a major impact on C3's ability to close necessary deals, ultimately leading to the significant revenue guidance miss:

> FY1Q26 results which came in well below the Street's expectations across the board as the company struggled to find its footing this quarter with sales results being "completely unacceptable" according to management while announcing a sales restructuring to improve its performance moving forward. ***~2 weeks ago, it was announced Tom Siebel will step down due to health issues, which we wish him the best, and prevented him from being active within the sales process, which had a major impact on getting deals across the finish line, leading to C3's operational performance coming in significantly weaker than expectations as the company hit a major hurdle in its overall growth story***.

92. In the same article, under the heading: "Operating While Asleep at the Wheel," Wedbush described C3's attempt to "restructure its sales and services organization [by] announcing multiple new leadership roles" and address the significant hole left by Siebel:

> [T]he company now has the necessary manpower with significant experience within the Enterprise AI space to capture the greater opportunity over the coming

> years. With this new team leading the sales organization to capitalize on the significant opportunity ahead, the company addressed a significant hole and major issues with its performance in the quarter, ***but it will take lots of time to regain Street confidence and build further momentum in the stock given the weakness in its operational performance***.

93. The market was unanimous in its reaction to this news, with multiple analysts downgrading C3 following its announcement. For example, on August 12, 2025, Oppenheimer removed its price target for C3, citing extremely weak results:

> We are downgrading C3.ai to Perform and removing our $45 price target following ***extremely weak preliminary 1Q26 results***. . . . ***CEO and founder Tom Siebel will be stepping down due to health issues. We are concerned that these results indicate secular weakness in underlying trends***. The company is very difficult to forecast, but ***we are reducing estimates dramatically***.

Northland Capital Markets similarly downgraded C3 on August 11, 2025, after the "Dramatic Miss," noting the preliminary results "***not only missed our revenue estimates, but also came in lower than our subscription estimates, which are supposed to be relatively visible on a quarterly basis***. The miss happens at a time of strong enterprise AI demand."

94. In response to this preliminary announcement, C3's stock price declined from $22.13 per share at close of trading on August 8, 2025, to $16.47 per share – a more than 25% drop – at the close of trading on August 11, 2025, the next trading day, on a massive volume of more than 66 million shares, the most volume traded on a single day in 2025.

### B. Post-Class Period Admissions Reveal Extent of Siebel's Health Issues and Confirm Siebel's Inability to Participate in Sales Process Due to Poor Health Was Significant Cause of Revenue Guidance Miss

95. On August 12, 2025, Siebel participated in a televised interview hosted by CNBC, during which he discussed the many significant health challenges that impaired his ability to manage the business during the Class Period. Siebel acknowledged that his reduced involvement, in turn, hindered the Company's execution on sales goals and ultimately caused the Company to perform significantly below expectations during the quarter. Specifically, Siebel disclosed for the first time that, during the Class Period, not only did he have an autoimmune disease that had affected his eyesight, he also subsequently had "open-heart surgery" and "pulmonary surgery." These events, which required hospitalization and periods of incapacitation and recovery, had not

previously been disclosed and provided additional context and information regarding Siebel's inability to perform his critical leadership role and tasks as described to investors.

96. Siebel's comments also corroborated and confirmed the reports of FE1 and FE2 regarding Siebel's hospitalization(s) during the Class Period which, in light of the significance of such adverse health events, establish that Siebel was effectively incapacitated for periods during the Class Period.[10] In addition, Siebel explained that these health events "definitely affected the quarter['s]" financial performance because he was not able to participate in the sales process as actively as he had in the past. Siebel identified multiple discrete tasks he was unable to complete during the Class Period, including (i) visiting accounts; (ii) structuring deals; and (iii) talking with customers:

> [Interviewer]: So, the stock is at the lowest level in more than two years. Since early 2023, May 23rd was also the last time the revenue number was this low. ***What happened?***
>
> [Siebel]: Honestly, John, the sales execution was just completely unacceptable. I mean, the market is huge, the product is great, the customers are satisfied. We had a huge pipeline, and the execution was just dreadful. ***The company stock is taking a beating by the market, and honestly, I think it's well deserved***.
>
> [Interviewer]: So help me decode what happens here. It sounds like, ***based on your statement, you're saying the sales process needed you directly more than you realized.*** Your health challenges earlier this year really took a toll. . . .
>
> [Siebel]: Well, in the course of the last six months, we've brought in an entirely new generation of very senior sales leadership, most of whom joined in the course of the last quarter.
>
> * * *
>
> I think, in hindsight, also, ***the other element that definitely affected the quarter*** – and I didn't really realize it at the time – but, you know, ***as you know, in the last, say, seven to eight months, I've gone through a number of health issues. I had an autoimmune attack, you know, open-heart surgery, pulmonary surgery. It was kind of one disaster after another.***

---

10 *See* Susan S. Muck et al., *Best Practices for Disclosing Executive Health Issues*, Harvard Law School Forum on Corporate Governance (Jan. 8, 2020), https://corpgov.law.harvard.edu/2020/01/08/best-practices-for-disclosing-executive-health-issues/ ("Although a company does not have a general duty to disclose an executive's health issues, a bright line rule is that if a senior executive is incapacitated and therefore unable to perform his or her duties, disclosure is required (particularly if the executive performs certain roles or is otherwise ***reasonably believed to be critical to the success of the company***).")

> But I'm in good shape now, okay?
>
> But ***the bottom line is,*** you know, ***I was not able to participate nearly as actively as I always used to in the sales process, in terms of structuring deals, visiting accounts, talking to customers,*** what have you.
>
> And, in hindsight, ***I think maybe I had a little bit more impact on the sales process than I thought***.[11]

97. Then, on September 3, 2025, C3 issued a press release formally announcing the Company's final results for 1Q26. The September 3, 2025 press release reiterated the significant revenue guidance miss that C3 preannounced on August 8, 2025, including 1Q26 revenue of $70.3 million, considerably below the Company's guidance of $100 million to $109 million. The press release used nearly identical language to describe the cause of the miss, reaffirming that Siebel's inability to participate in the sales process was a key reason for the Company's poor financial performance:

> The bad news is that ***financial performance in Q1 was completely unacceptable***. Having given this a lot of thought, ***I attribute this to two factors***. One: it is clear that in the short term, the reorganization with new sales and services leadership had a disruptive effect. Two: as we have previously announced, ***I have had a number of unanticipated health issues***. ***Unfortunately, this prevented me from participating in the sales process as actively as I have in the past***.

98. Defendants provided further details during C3's earnings call held later in the day on September 3, 2025. On the call, Siebel described the financial results, which were "completely unacceptable in virtually every respect," and clearly identified the cause of the poor financial performance:

> I've given this a lot of thought as to what the root cause of this is.
>
> * * *
>
> ***The fact of the matter is that it boiled down to poor sales, execution[,] and poor resource coordination***.
>
> * * *
>
> As I have previously announced, I ran into some unanticipated health issues. ***As a result of these health issues, I was unable to participate as actively as I used to in the sales process and the coordination of resources necessary to make these sales processes successful and come to closure***.

[11] *See supra* note 5.

> In hindsight, ***it's clear that my active involvement in that sales process had a greater impact than any of us knew***. The good news is that we have completely restructured our sales and service organizations, globally.

99. As part of his remarks, Siebel situated the quarter's poor financial performance within the historical context of the Company, admitting that "Q1 202[6] was our 19th quarter operating as a public company. This is the first quarter in which we have missed our revenue guidance."

100. At the end of his prepared remarks, Siebel again attempted to downplay the damage caused by his absence and assured investors: "Going forward, I will continue to remain actively engaged in the business. Now, in the role as Executive Chairman. In that role, I will particularly focus on strategic partner relationships, strategic customer relationships, and keep an eye on direction and product strategy, going forward."

101. Analysts were eager for more information about Siebel's transition to a new role and what that would mean for C3's prospects. An analyst from UBS inquired about the critical nature of Siebel's involvement in the sales process and how the Company would perform with new leadership:

> [Analyst]: First for Tom, you're [sic] involvement in the sales process has obviously been very critical here. Is there any way to more concretely understand how involved you're planning on being in the sales process going forward and what you're doing to ensure a smooth hand-off to Stephen and the new sales leadership?
>
> * * *
>
> [Siebel]: ***I will continue to be involved as necessary, okay, in monitoring that process and assisting that process to ensure that this transition goes very smoothly*** and we dramatically ramp up the sales and service capacity globally.

102. Later during the call, an analyst from Needham & Company LLC asked Siebel to quantify just how much his illness attributed to the quarter's significant miss: "Tom, how would you rate the underperformance this quarter between sales disruption and your impact on the sales process?" Siebel told the analyst: "I think it was a combination of both. But I would put it probably 70% sales rep disruption and 30% might not being as involved in the details as I've previously been. I think that – so those are the facts."

103. On September 4, 2025, Canaccord Genuity published a report titled: "Licking Wounds: Painful growth reset raises questions but sets up re-acceleration in FY27" that noted:

> [W]e struggle to find guardrails around growth for the remainder of the year. . . .
>
> To the extent that these numbers matter, mgmt. estimated that 70% of the quarter's disruption was a result of sales force changes instituted mid-quarter while 30% was a result of Chairman Tom Seibel's [sic] absence as a hands-on sales leader.

104. On September 4, 2025, C3 stock price fell yet again, from a close of $16.68 per share on September 3, 2025, to as low as $14.80 per share on September 4, 2025, on the news of the Company attribution of 70% of the revenue miss to sales disruption and 30% to Siebel's inability to effectively participate in managing the Company or generating revenue.

105. On September 9, 2025, the Company filed a Form 10-Q with the SEC for the period beginning May 1, 2025 and ending July 31, 2025. The Form 10-Q discussed, *inter alia*, the Company's poor financial performance in 1Q26, and again specifically attributed, in part, the quarter's results, and particularly the sales and revenue miss, to Siebel's inability to participate in the sales process during the quarter (*i.e.*, from May 2025 through July 2025) as actively as he had in the past. The Form 10-Q further explained that the decline in revenue ***during the quarter*** was attributed, in part, to the impact of Siebel's health issues which prevented him from participating in the sales process. These disclosures further confirm that, during the Class Period, while Siebel assured investors that he was back and traveling to meet with customers to close deals (*see* ¶¶71-72), Defendants concealed numerous hospitalizations for multiple heart surgeries and lung surgeries, which both incapacitated Siebel and hurt sales. Defendants' false assurances, which were substantially reiterated by analysts like UBS, Canaccord Genuity, and Citizens JMP, gave investors the impression that Siebel had recovered from his autoimmune disease except for his impaired vision. In reality, Siebel's health issues were more severe and, by his own admissions, compounding, and thus were continuing to negatively impact the Company's sales results:

> ***Restructuring of Sales and Services Organization***
>
> During the three months ended July 31, 2025, we restructured our sales and services organization to provide a more seamless, high-touch customer experience with a consistent focus on realizing significant economic benefit rapidly from each C3 AI customer engagement. However, the restructuring has had a disruptive effect on

> our financial performance. This disruptive effect, together with onboarding of new leadership, ***and the impact of our Executive Chairman's*** unanticipated ***health issues preventing him from participating in the sales process as actively as he had in the past***, may have had and may continue to have a negative effect on our sales results.
>
> * * *
>
> ***We experienced a decline in revenue*** and an increase in operating losses ***in the first quarter of fiscal year 2026***, as compared to the previous quarter and as compared to one year prior. ***The results were attributed, in part***, to disruption from a comprehensive restructuring of our global sales and services organizations and ***our Executive Chairman's unanticipated health limitations during the quarter***. Our results of operations may continue to be negatively impacted by our Executive Chairman's ability to engage in oversight of our sales and marketing organization and/or our announced CEO transition.
>
> * * *
>
> ***Our ability to*** expand our customer base and ***achieve broader market acceptance of our C3 AI Software*** depends to a significant extent on our ability to continue to expand our marketing and sales operations and ***the effectiveness of those operations has been in the past and may in the future be negatively impacted by our Executive Chairman's inability to actively participate in the sales process***. Moreover, the effectiveness of our marketing and sales operations may be negatively impacted by the transition of the CEO role from Mr. Siebel to Mr. Ehikian.

106. On December 3, 2025, Defendants issued a press release announcing C3's financial results for second quarter 2026 ("2Q26") and hosted a conference call to discuss the results. During the question-and-answer session, analysts pressed C3's replacement CEO Stephen Ehikian about the cause of the Company's suboptimal results and to explain "why the business fell off by so much." Ehikian again confirmed that Siebel's health issues were a significant cause of the Company's inability to meet its revenue targets for the prior quarter:

> [Analyst]: Now, the business is shrinking. The gross margins are down. The losses are big. I think some of us understand the set-up that you that you walked into. But ***if you could just take a minute and explain why the business fell off by so much***; and then, the steps you're taking to bring it back, big picture, I think that would be really helpful.
>
> [Stephen Ehikian, C3.ai CEO]: . . . . ***The biggest thing I would say is sales execution – and Tom hit on this last quarter – fell off. It was totally unacceptable. Tom would probably acknowledge that his health contributed towards that. So I think he spoke about that at length on the last call. That was attributed towards the poor performance***.

107. On February 25, 2026, the Company issued a press release announcing C3's poor financial results for third quarter 2026 ("3Q26"), reporting a total revenue of $53.3 million despite forecasting total revenue between $72 million and $80 million.

108. Also on February 25, 2026, after market close, the Company held a conference call to discuss the "clearly inadequate" 3Q26 results. On the call, Defendants revealed to investors that to "materially improve . . . operating efficiency" and "position the company for long-term success" they had reduced the "global workforce by about 26%."

109. The market's assessment of C3 after Siebel's departure was consistently negative. Indeed, the stock fell from a close of $26.00 on July 24, 2025, when Defendants announced Siebel's departure, down to as low as $7.73 on February 26, 2026.

110. Then, on May 12, 2026, in an attempt to course-correct the underperforming Company, C3 issued a press release announcing its financial results for fourth quarter 2026 ("4Q26") and, importantly, announcing Siebel's return as CEO after his health issues, excluding his vision impairment, had been "largely resolved":

> "I am energized to be back in the CEO role and to lead C3 AI through this next chapter in this exciting market," said Thomas M. Siebel, Chairman and Chief Executive Officer. "Stephen has done important work over the past two quarters to right-size our cost structure, sharpen our sales motion, and accelerate product velocity. I look forward to partnering with Stephen closely in his role as President to execute the path to consistent free cash flow generation, non-GAAP profitability and a return to significant top line growth."
>
> "***While my vision remains impaired, it is improving. The health issues I encountered during 2025 are largely resolved.***"

111. The next day, on May 13, 2026, Defendant Siebel took part in another live interview on CNBC to discuss his recent return to C3.ai as Chief Executive Officer.[12] During the interview, Siebel confirmed yet again that, during 2025, he suffered multiple serious health events beyond the autoimmune disease that resulted in his blindness. Siebel also provided further detail regarding his 2025 illness and hospitalizations, including clarifying that in addition to the multiple heart surgeries, he also had multiple lung surgeries. The interview in relevant part is below:

---

[12] A Fortt Knox Update: *Tom Siebel, C3.ai CEO*, (CNBC, May 13, 2026) https://www.cnbc.com/video/2026/05/13/tom-siebel-c3ai-ceo-a-fortt-knox-update.html.

> [Interviewer]: Welcome to, I don't know whether they call this Fortt Knox earnings or Fortt Knox update, because I'm with Tom Siebel now, again the CEO, not just Founder and Chairman of C3.ai. You guys did release preliminary results yesterday, along with the announcement that you're back as CEO, Tom, you just couldn't stay away.
>
> * * *
>
> [Interviewer]: Tell me the story. We know what's been happening with the financials. You told investors about your health challenges and I believe you said in this announcement that your eyesight is getting better. So walk me through your thought process here and the path forward.
>
> [Siebel]: John 2025 was kind of a tough year and you know I did go blind ***and then I had, you know, multiple heart surgeries and lung surgeries and other surgeries. These guys kind of beat me up pretty badly in 2025***.
>
> But the good news is that's all behind me. Yes, my vision is still impaired, but you know, vision is not that big a deal.

112. Each of those health events, as previously acknowledged by Siebel (*see* ¶96), contributed to the Company's poor sales and financial performance in 1Q26 because they negatively impacted Siebel's ability to actively participate in the sales process, which in turn negatively affected execution and resulted in the huge miss of the Company's financial targets. These facts confirm witness reports and earlier admissions that, during the Class Period, Siebel was hospitalized on multiple occasions. Despite the undisclosed hospitalizations and multiple surgeries plausibly incapacitating Siebel, during the same period, Defendants were assuring investors that Siebel's active, hands-on management of the Company remained unaffected by his health issues.

## XI. LOSS CAUSATION AND ECONOMIC LOSS

113. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions concerning the current strength of the Company's business, Siebel's ongoing participation in the day-to-day leadership of C3, including leadership of the sales organization and the performance of his critical job duties as CEO, in light of an autoimmune illness he contracted in late 2024. These material misrepresentations and omissions caused C3's stock price to trade at artificially inflated prices, including the Class Period-high of $30.24 per share on July 23, 2025, and operated as a fraud or deceit on all persons who purchased C3's common stock during the Class Period (the "Class"). When the truth regarding Defendants'

misrepresentations and omissions became apparent to the market, the price declined as the artificial inflation dissipated and Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

114. The facts concerning Defendants' false and misleading statements and omissions were revealed to the market through a series of partial disclosures – many mitigated by further false or misleading statements or omissions – beginning with the revelation on July 24, 2025, by Defendants that, as a result of Siebel's ongoing health issues, they had initiated a search for a replacement CEO.

115. On this disclosure, C3's stock price declined from a close of $29.16 per share on July 23, 2025, to $26.00 per share at close of market on July 24, 2025.

116. Despite disclosing the search for Siebel's replacement, Defendants continued making false and misleading statements and omissions regarding Siebel's ability to successfully manage C3, including by assuring investors, in the very same July 24, 2025 press release attached to the Form 8-K, that Siebel "regained [his] strength, but for [his] eyesight, [he is] operating again at 100%. . . . Be assured that [he] will remain fully engaged as Chief Executive Officer of C3.ai until the board appoints [his] successor."

117. On August 8, 2025, after market close, C3 published a press release reporting preliminary revenue for 1Q26 of $70.3 million at the midpoint, approximately $30 million below its earlier issued guidance and a nearly 30% miss. Defendants' press release tied the revenue miss to Siebel's illness, noting that his health issues prevented him from participating in the sales process as actively as he had in the past. The press release also revealed the Company's amended non-GAAP loss from operations was $57.8 million, a $29 million increase over the previous guidance.

118. On August 11, 2025, the next trading day, C3's stock price opened at $15.17 per share, down from a close of $22.13 per share on August 8, 2025, and fell to a low of $14.70 per share during intraday trading before closing at $16.47 per share.

119. In the days that immediately followed C3's disclosure about the true nature of Siebel's illness and its role in the Company's substantial revenue miss, analysts cut their price

targets on C3 stock, with Citizens JMP cutting its price target by $20 per share from $50 per share to $30 per share, Wedbush cutting its price target by $12 per share from $35 per share to $23 per share, D.A. Davidson cutting its price target by $12 per share from $25 per share to $13 per share, and Oppenheimer removing its $45 per share price target altogether, citing "extremely weak preliminary 1Q26 results."

120. The timing and magnitude of the declines in C3's stock price reflected in ¶¶115, 118 above negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

121. The economic loss, *i.e.*, damages, suffered by Plaintiff and other members of the Class was a direct and proximate result of Defendants' misrepresentations, artificially inflating C3's common stock price, and the subsequent significant declines in the value of C3 common stock as the true state of the Company's operations was revealed to the market in a series of partial disclosures correcting the misrepresentations or revealing the economic impact thereof.

## XII. NO SAFE HARBOR

122. The statements alleged herein to be false and misleading are not subject to the protections of the Private Securities Litigation Reform Act of 1995 ("PSLRA") statutory safe harbor for forward-looking statements ("FLS") because they are either: (a) not forward looking; (b) subject to exclusion; or (c) not identified as forward looking or accompanied by meaningful cautionary language. 15 U.S.C. §78u-5(b)(2)(A).

123. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading, and the FLS was authorized and approved by an executive officer of C3 who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by

Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## XIII. APPLICABILITY OF FRAUD ON THE MARKET AND *AFFILIATED UTE* PRESUMPTION OF RELIANCE

124. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e) Plaintiff and other members of the Class purchased C3 common stock between the time Defendants misrepresented or failed to disclose material facts and the time the facts were disclosed, without knowledge of the misrepresented or omitted facts.

125. At all relevant times, the market for C3's common stock was efficient for the following reasons, among others:

(a) As a regulated issuer, C3 filed periodic public reports with the SEC;

(b) C3's stock traded on the NYSE; and

(c) C3 regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

126. Plaintiff will also rely upon the presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), for the claims asserted herein against Defendants that are predicated upon omissions of material fact for which there was a duty to disclose.

## XIV. CLASS ACTION ALLEGATIONS

127. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the Class. Excluded from the Class are Defendants and their families, directors and officers of C3 and their families, and affiliates.

128. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of June 2025, C3 had 130,885,934 shares of common stock outstanding.

129. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a) Whether the Exchange Act was violated by Defendants;

(b) Whether Defendants omitted or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew, or were deliberately reckless in not knowing, that their statements were false and misleading;

(e) Whether the price of C3's common stock was artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

130. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

131. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

132. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)**

133. Plaintiff incorporates ¶¶1-132 by reference.

134. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

135. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of C3 common stock during the Class Period.

136. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for C3's common stock. Plaintiff and the Class would not have purchased C3 common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

137. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of C3 common stock during the Class Period.

**COUNT II**

**For Violation of §20A of the Exchange Act (Against Siebel)**

138. Lead Plaintiff incorporates ¶¶1-137 by reference.

139. Count II is brought pursuant to §20A of the Exchange Act against Siebel, on behalf of Lead Plaintiff and members of the Class who were damaged by Siebel's insider trading.

140. As detailed herein, Siebel was in possession of material non-public information concerning C3. Siebel took advantage of his possession of material nonpublic information regarding C3 to obtain millions of dollars in insider trading proceeds during the Class Period.

141. Siebel's sales of C3 common stock (set forth below) were made contemporaneously with Lead Plaintiff's purchases of C3 common stock (set forth below and in Lead Plaintiff's certification (ECF 23-3)) during the Class Period.

142. While C3's securities traded at artificially inflated and distorted prices, Siebel personally profited by selling a total of more than 3,450,130 million shares of C3 common stock while in possession of adverse, material non-public information about C3, pocketing over $81.75 million in illegal insider trading proceeds:

| Date of Siebel's Sale | Amount | Price |
|---|---|---|
| 5/2/25 | 27,010 | $22.27 |
| 5/13/25 | 341,698 | $24.00 |
| 5/14/25 | 272,079 | $23.99 |
| 6/2/25 | 17,000 | $26.30 |
| 6/11/25 | 10,503 | $25.76 |
| | 590,995 | $25.01 |
| 7/18/25 | 13,594 | $29.24 |
| | 575,874 | $28.56 |

143. During the Class Period, Lead Plaintiff purchased the following shares of C3 stock contemporaneously with Siebel's stock sales listed above:

| Date of Lead Plaintiff's Purchase | Amount | Price |
|---|---|---|
| 6/11/25 | 330,000 | $24.63-$25.31 |
| 6/20/25 | 135,000 | $23.45-$23.85 |
| 7/07/25 | 100,000 | $24.90-$24.96 |
| 7/21/25 | 75,000 | $28.15-$28.20 |

| | | |
|---|---|---|
| 7/22/25 | 25,000 | $27.70 |
| 7/24/25 | 295,000 | $26.06-$27.10 |
| 7/28/25 | 110,000 | $25.65-$25.80 |

144. Lead Plaintiff and all other members of the Class who purchased shares of C3 stock contemporaneously with the sales of C3 common stock by Siebel have suffered damages because:

(a) In reliance on the integrity of the market, Lead Plaintiff paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and

(b) Lead Plaintiff would not have purchased the C3 stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements and omissions alleged herein.

145. By reason of the foregoing, Siebel violated §20A of the Exchange Act and is liable to Lead Plaintiff and the other members of the Class for the substantial damages suffered in connection with their purchase of C3 common stock during the Class Period.

**COUNT III**

**For Violation of §20(a) of the Exchange Act**
**(Against the Individual Defendants)**

146. Plaintiff incorporates ¶¶1-145 by reference.

147. The Individual Defendants acted as controlling persons of C3 within the meaning of §20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about C3, the Individual Defendants had the power and ability to control the actions of C3 and its employees. C3 controlled the Individual Defendants and its other officers and employees. By reason of such conduct, Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## XV. PRAYER FOR RELIEF

148. WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper Class action, having designated Plaintiff as Lead Plaintiff, and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable, injunctive, or other relief as may be deemed appropriate by the Court.

## XVI. JURY DEMAND

149. Lead Plaintiff demands a trial by jury.

DATED: August 7, 2026

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS
HAILEY S. ZANUTTO
SHAO-JIA CHANG

s/ Shawn A. Williams
SHAWN A. WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
shawnw@rgrdlaw.com
hzanutto@rgrdlaw.com
schang@rgrdlaw.com

Lead Counsel for Lead Plaintiff