**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Linda J. Brewer (Bar No. 217730)
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
lindabrewer@quinnemanuel.com

Michael B. Carlinsky (*pro hac vice*)
Jesse Bernstein (*pro hac vice*)
Leigha Empson (*pro hac vice*)
Amy Shehan (*pro hac vice*)
295 Fifth Avenue
New York, NY 10016
Telephone: (212) 849-7000
michaelcarlinsky@quinnemanuel.com
jessebernstein@quinnemanuel.com
leighaempson@quinnemanuel.com
amyshehan@quinnemanuel.com

*Attorneys for Defendants C3.ai, Inc., Thomas M. Siebel, and Hitesh Lath*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN LIGGETT SR., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>C3.AI, INC., THOMAS M. SIEBEL, and HITESH LATH,<br><br>Defendants. | Case No. 3:25-cv-7129-TLT<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Date: November 10, 2026<br>Time: 2:00 p.m.<br>Location: Courtroom 9, 19th Floor<br>Before: Hon. Trina L. Thompson |

**TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ....................1
RELEVANT BACKGROUND....................3
A. Mr. Siebel's Struggle With An Autoimmune Disease ....................3
B. C3 Announces Mr. Siebel's Resignation And Falls Short Of Revenue Guidance....................4
C. The First Amended Complaint Is Dismissed And Plaintiff Amends ....................5
LEGAL STANDARD ....................6
ARGUMENT ....................6
I. PLAINTIFF DOES NOT ALLEGE A FALSE OR MISLEADING STATEMENT ....................6
A. Defendants Disclosed Mr. Siebel's Health Troubles And The Associated Risks ....................6
B. The Alleged Misstatements Are Inactionable Puffery ....................7
C. The Alleged Misstatements Are Protected By The PSLRA Safe Harbor ....................8
D. Plaintiff Does Not Allege Any Of The Statements Were False Or Misleading ....................9
II. PLAINTIFF DOES NOT ALLEGE A STRONG INFERENCE OF SCIENTER....................17
A. Plaintiff Ignores More Compelling, Non-Culpable Inferences ....................17
B. Stock Sales Do Not Allege A Strong Inference Of Scienter....................18
C. Plaintiff Has Not Alleged Knowledge Of Falsity Or Deliberate Recklessness....................20
III. PLAINTIFF FAILS TO PLEAD LOSS CAUSATION....................23
IV. PLAINTIFF'S SECTION 20A CLAIM SHOULD BE DISMISSED ....................24
V. PLAINTIFF'S SECTION 20(A) CLAIM SHOULD BE DISMISSED....................25
CONCLUSION ....................25

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) .......... 7

*In re Apple Comput. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) .......... 19

*Aramic LLC v. Revance Therapeutics, Inc.*,
2024 WL 1354503 (N.D. Cal. Apr. 2, 2024) .......... 22

*Bodri v. GoPro, Inc.*,
252 F. Supp. 3d 912 (N.D. Cal. 2017) .......... 8, 15

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) .......... 24

*Brody v. Transitional Hosp. Corp.*,
280 F.3d 997 (9th Cir. 2002) .......... 11

*Browning v. Amyris, Inc.*,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) .......... 22

*Buban v. O'Brien*,
1994 WL 324093 (N.D. Cal. June 22, 1994) .......... 25

*Chen v. Lyft, Inc.*,
762 F. Supp. 3d 909 (N.D. Cal. 2025) .......... 8

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .......... 18

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013) .......... 17

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) .......... 14, 21

*In re Countrywide Fin. Corp. Sec. Litig.*,
2009 WL 943271 (C.D. Cal. Apr. 6, 2009) .......... 25

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) .......... 8, 9

*Dabestani v. Geron Corp.*,
2026 WL 861010 (N.D. Cal. Mar. 30, 2026) .......... 20

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024) .......... 14

*In re Fastly, Inc. Sec. Litig.*,
2021 WL 5494249 (N.D. Cal. Nov. 23, 2021) .......... 20

*Ferreira v. Funko Inc.*,
2021 WL 8820650 (C.D. Cal. Oct. 22, 2021) .......... 19

*In re FVC.COM Sec. Litig.*,
32 F. App'x 338 (9th Cir. 2002) .......... 22

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) .......... 8, 23

*In re Gupta Corp. Sec. Litig.*,
900 F. Supp. 1217 (N.D. Cal. 1994) .......... 25

*In re Hansen Nat. Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) .......... 23

*Hefler v. Wells Fargo & Co.*,
2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) .......... 24, 25

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
189 F.3d 971 (9th Cir. 1999) .......... 7

*Hoang v. ContextLogic, Inc.*,
2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) .......... 18, 19

*In re Intel Corp. Sec. Litig.*,
792 F. Supp. 3d 1008 (N.D. Cal. 2025) .......... 25

*Kairos Inv. Mgmt. Co. v. J.P. Morgan Sec. LLC*,
2023 WL 9375171 (C.D. Cal. Dec. 11, 2023) .......... 9

*Kipling v. Flex Ltd.*,
2020 WL 2793463 (N.D. Cal. May 29, 2020) .......... 10

*In re LeapFrog Enters., Inc. Sec. Litig.*,
527 F. Supp. 2d 1033 (N.D. Cal. 2007) .......... 9

*Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*,
39 F.4th 1092 (9th Cir. 2022) .......... 6

*McGovney v. Aerohive Networks, Inc.*,
2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) .......... 14

*In re Metawave Commc'ns Corp. Sec. Litig.*,
629 F. Supp. 2d 1207 (W.D. Wash. 2009) .......... 22

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ........ 15, 17, 23

*Mosco v. Motricity, Inc.*,
649 F. App'x 526 (9th Cir. 2016) ........ 22

*In re Nektar Therapeutics*,
2020 WL 3962004 (N.D. Cal. July 13, 2020) ........ 19

*In re Netflix, Inc., Sec. Litig.*,
964 F. Supp. 2d 1188 (N.D. Cal. 2013) ........ 24

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ........ 17, 18

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
2016 WL 7475555 (N.D. Cal. Dec. 29, 2016) ........ 12

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
2018 WL 3126393 (N.D. Cal. June 26, 2018) ........ 18

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ........ 6

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ........ 6, 7, 24

*Patel v. Edwards Lifesciences Corp.*,
2025 WL 2724388 (C.D. Cal. Sep. 19, 2025) ........ 25

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
2024 WL 5399664 (N.D. Cal. Sep. 18, 2024) ........ 21

*Police Ret. Sys. v. Intuitive Surgical*,
759 F.3d 1051 (9th Cir. 2014) ........ 7, 9, 20

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
2012 WL 1868874 (N.D. Cal. May 22, 2012), *aff'd*, 759 F.3d 1051 (9th Cir. 2014) ........ 19

*Prodanova v. H.C. Wainwright & Co.*,
993 F.3d 1097 (9th Cir. 2021) ........ 20

*In re Rackable Sys., Inc. Sec. Litig.*,
2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ........ 18

*Reckstin Fam. Tr. v. C3.ai, Inc.*,
718 F. Supp. 3d 949 (N.D. Cal. 2024) ........ 18, 19

*In re Redback Networks, Inc.*,
2006 WL 1805579 (N.D. Cal. Mar. 20, 2006) .......... 24

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) .......... 13

*Sakkal v. Anaplan Inc.*,
557 F. Supp. 3d 988 (N.D. Cal. 2021) .......... 21

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
485 F. Supp. 3d 1113 (N.D. Cal. 2020) .......... 25

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
2023 WL 11691540 (N.D. Cal. Aug. 18, 2023) .......... 20

*In re Silver Lake Grp., LLC Sec. Litig.*,
108 F.4th 1178 (9th Cir. 2024) .......... 24, 25

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
545 F. Supp. 3d 120 (S.D.N.Y. 2021) .......... 24

*Smith v. NetApp, Inc.*,
2021 WL 1233354 (N.D. Cal. Feb. 1, 2021) .......... 18

*Sneed v. Talphera, Inc.*,
147 F.4th 1123 (9th Cir. 2025) .......... 18, 20

*In re Sorrento Therapeutics, Inc. Sec. Litig.*,
97 F.4th 634 (9th Cir. 2024) .......... 9

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
2000 WL 1727377 (N.D. Cal. Sep. 29, 2000) .......... 8

*Stephens v. Maplebear Inc.*,
2025 WL 1359125 (N.D. Cal. May 9, 2025) .......... 19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) .......... 17

*In re Twitter, Inc. Sec. Litig.*,
506 F. Supp. 3d 867 (N.D. Cal. 2020) .......... 19

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) .......... 16, 23

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011) .......... 17

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022) .......... 16

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) .......... 18

*Wilbush v. Ambac Fin. Grp., Inc.*,
271 F. Supp. 3d 473 (S.D.N.Y. 2017) .......... 8

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) .......... 9

*Xiaojiao Lu v. Align Tech., Inc.*,
417 F. Supp. 3d 1266 (N.D. Cal. 2019) .......... 14, 16, 24

*Yaron v. Intersect ENT, Inc.*,
2020 WL 6750568 (N.D. Cal. June 19, 2020) .......... 24

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .......... 14, 17, 25

**Other Authorities**

15 U.S.C. § 78u-5(i)(1)(A) .......... 8

17 C.F.R. § 240.10b5-1(c)(1)(i) .......... 25

Private Securities Litigation Reform Act of 1995 .......... 1, 2, 6, 8, 22

**NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT**

PLEASE TAKE NOTICE THAT on November 10, 2026 at 2:00 p.m. before the Honorable Trina L. Thompson in Courtroom 9, 450 Golden Gate Avenue, San Francisco, CA, Defendants C3.ai, Inc. ("C3" or the "Company"), Thomas Siebel, and Hitesh Lath (together, "Defendants") will move this Court for an order dismissing with prejudice Plaintiff's Second Amended Complaint (ECF No. 87, "SAC"). This Motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") and is based upon the following Memorandum; the Declaration of Linda J. Brewer filed concurrently herewith; Defendants' Request for Judicial Notice filed concurrently herewith; the arguments of counsel; and any additional material as may be submitted to the Court before its decision.

**ISSUES TO BE DECIDED**

1. Whether Plaintiff failed to plead adequately that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), given that the SAC identifies no materially misleading statement, does not plead facts showing a strong inference of scienter, and does not plead that any alleged conduct caused Plaintiff or the purported class losses.

2. Whether Plaintiff failed to plead that Mr. Siebel violated Section 20A of the Exchange Act, given that the SAC fails to plead a primary violation and that Mr. Siebel traded contemporaneously with Plaintiff and to Plaintiff's disadvantage.

3. Whether Plaintiff failed to plead that either Mr. Siebel or Mr. Lath violated Section 20(a) of the Exchange Act, given that the SAC fails to plead a primary violation and that each was a control person over any actionable alleged misstatement.

**MEMORANDUM OF POINTS AND AUTHORITIES**

This is Plaintiff's second amended complaint attempting to allege securities fraud, and it fares no better than the last. In dismissing Plaintiff's prior complaint, the Court held that "[r]equiring Defendants to disclose the precise details of Mr. Siebel's health treatments and the exact degree of his day-to-day sales process involvement or management of C3 would transform missed revenue guidance into securities fraud" and "impose a completeness rule on Defendants' disclosures, counter to Ninth Circuit precedent." That is still precisely what the SAC asks the Court

to do. Plaintiff has failed to cure the deficiencies that doomed the prior complaint and has introduced new flaws that warrant dismissal—this time with prejudice.

*First*, Plaintiff still does not allege that Defendants made any materially misleading statement. Several of the purported misstatements are projections for C3's financial results and expectations regarding Mr. Siebel's ability to continue managing the business, which are the precise types of forward-looking statements protected by the PSLRA's Safe Harbor. Others are inactionable statements of optimism. And critically, Plaintiff has failed to allege with particularity that any statement was materially false when made. That Mr. Siebel was hospitalized or underwent surgeries at some unidentified point during the Class Period does not render any of his statements fraudulent. In fact, Plaintiff's amendments *confirm* that Mr. Siebel was still actively managing the Company throughout his illness, even if—as he repeatedly disclosed—he needed accommodations to do so.

*Second*, Plaintiff fails to allege particularized facts supporting an inference of fraudulent intent stronger than the obvious non-fraudulent inferences. Plaintiff's heavy reliance on post-Class Period statements—which all discuss the effect of Mr. Siebel's illness *in hindsight*—says nothing about any Defendant's knowledge during the Class Period as Mr. Siebel's disease rapidly developed. Plaintiff's reliance on three confidential witnesses falls far short of pleading fraud, alleging only hearsay and vague allegations of Mr. Siebel's health issues that are in fact *consistent with* Defendants' disclosures during the Class Period. Lacking allegations that Defendants knew any statement was false, Plaintiff falls back on purportedly "suspicious" stock sales, which were, in reality, all predetermined, non-discretionary sales that were unremarkable in size. The far more compelling inference is that Defendants transparently disclosed Mr. Siebel's health setback the very month he became ill, did not anticipate how the unexpected illness would impact Mr. Siebel and the business, and provided timely and transparent updates to investors as the situation evolved.

*Third*, Plaintiff fails to plead that Mr. Siebel's temporary departure and C3's financial results "revealed" fraud rather than being the materialization of a known—and repeatedly disclosed—risk.

*Fourth*, Plaintiff's Section 20A claim fails because Plaintiff fails to plead a primary violation and that Mr. Siebel traded contemporaneously with Plaintiff and to Plaintiff's disadvantage.

The SAC should be dismissed in its entirety, with prejudice.

## RELEVANT BACKGROUND

Founded by Tom Siebel in 2009, C3 is an enterprise artificial intelligence software company. ¶¶ 4, 6.[1] During the Class Period, C3 routinely emphasized the importance of its founder and CEO, Mr. Siebel, and warned that the Company's "success depends in a large part upon the continued service of key members of [its] senior management team" and that Mr. Siebel was "critical to [C3's] overall management, sales strategy, culture, strategic direction, engineering, and operations." Ex. A (2024 Form 10-K) at 31; Ex. B (Q3 2025 Form 10-Q) at 57. C3 further warned that "[t]he loss of any member of [its] senior management team could make it more difficult to execute [its] business strategy and, therefore, harm [the] business." Ex. A at 31; Ex. B at 57.

### A. Mr. Siebel's Struggle With An Autoimmune Disease

On February 18, 2025, the first day of the purported Class Period, C3 published a "Note from Tom" on its website that disclosed that Mr. Siebel had "suffered a health setback" in the form of an "autoimmune disease … that has resulted in significant vision impairment." Ex. C (Note from Tom) at 1; ¶¶ 24, 54. Although Mr. Siebel expected that his illness would not affect his ability to remain actively engaged at the Company, Mr. Siebel shared that it would "limit [his] ability to travel" and that he "asked [Mr.] Jim Snabe … to assume the role of Special Advisor to the CEO to help fill in activities where [Mr. Siebel] may be constrained." Ex. C at 1; ¶ 24.

A week later, on February 26, 2025, the Company held an earnings call in which Mr. Siebel told investors that he began experiencing "flu-like symptoms" after December 25, 2024, and *once* "*into February*, th[e] autoimmune disease kick[ed] in and attack[ed] [his] optic[] nerve," resulting in his vision being "impaired." ¶ 57. Regarding the business, Mr. Siebel disclosed that he would need to "learn some new skills" and C3 had to put "accommodations in place," one of which was adding someone "who reads [] e-mails to" Mr. Siebel. ¶¶ 57-58.

A few days later, on March 3, 2025, Mr. Siebel spoke at an industry conference, again explaining that he had suffered "a lot of damage to [his] optic[] nerve" causing "significant visual impairment." Ex. D (Citizens JMP Tech. Conf. Tr.) at 9. Mr. Siebel also spoke about how his

[1] References to "¶ _" are to the SAC. Unless otherwise noted, internal citations and quotation marks are omitted, alterations are adopted, and emphasis is added.

health was affecting his work, explaining that Mr. Snabe was "advising" Mr. Siebel and "filling in for a lot of the events [Mr. Siebel] would normally do," emphasizing that Mr. Snabe had become "a more important part of the picture" in light of Mr. Siebel's illness. *Id.* Mr. Siebel explained that "[his] role is now much, much less supervisory," meaning "[*w*]*e're delegating the responsibility*," "[*w*]*e're delegating the authority*," *and* "*we're delegating to the management team*." *Id.* at 10. Mr. Siebel noted that this "transition" had been planned, but the Company had "now *accelerated it dramatically*." *Id.* at 9. A few weeks later, in May 2025, Mr. Siebel told investors that "[t]here's no question" that he "did get slowed down for a little bit" and that he "had to work from home for a little while" due to his illness. Ex. E (Q4 2025 Earnings Call Tr.) at 10.

**B. C3 Announces Mr. Siebel's Resignation And Falls Short Of Revenue Guidance**

On July 24, 2025—only five months after Mr. Siebel first announced his health setback—C3 announced that Mr. Siebel would step down from his role as CEO. Ex. F (July 24, 2025 Form 8-K) at 3. Reiterating he had "experienced significant visual impairment," Mr. Siebel explained that "[f]or C3 AI to reach its full potential … the board and [Mr. Siebel] have initiated a search for a new CEO who can take the [C]ompany to the next level of growth and success." *Id.* at 5.

On August 8, 2025, C3 reported preliminary financial results for Q1 2026, which fell short of the Company's guidance. Ex. G (Aug. 11, 2025 Form 8-K) at 10; ¶ 88.[2] Mr. Siebel attributed the results to (1) the "disruptive effect" of the restructuring "with new leadership" in Q1; and (2) Mr. Siebel's "previously announced … health issues" which "prevented [him] from participating in the sales process as actively as [he] [had] in the past." ¶ 89; Ex. G at 10. Mr. Siebel emphasized that "[*w*]*ith the benefit of hindsight*, it is now apparent that [his] active participation in the sales process may have had a greater impact *than* [*he*] *previously thought*." ¶ 89.

After the purported Class Period, Mr. Siebel discussed certain surgeries he underwent and noted that "*in hindsight*" his health issues affected the Company's performance, emphasizing that he "*didn't really realize it at the time*." ¶ 96; Ex. I (Sep. 3, 2025 Form 8-K) at 5 ("*With the benefit of hindsight*, it is apparent that my active participation in the sales process may have had a greater

[2] C3's fiscal years end on April 30. Ex. H (2025 Form 10-K) at 98.

impact *than I previously thought*."); Ex. J (Q1 2026 Earnings Call Tr.) at 5 ("*In hindsight*, it's clear that my active involvement in th[e] sales process had a greater impact *than any of us knew*."). Mr. Siebel also explained that C3 brought in new leadership, and "*in hindsight*, [he] think[s] that caused some confusion in sales management." August 12, 2025 CNBC Interview[3] at 1:16-50.

On May 12, 2026, the Company announced that Mr. Siebel had stepped back into the role of CEO. ¶ 110. Mr. Siebel shared that, while his "vision remains impaired," the "health issues [he] encountered during 2025 [have] largely resolved." Ex. K (May 12, 2026 Form 8-K) at 2, 5; ¶ 110.

**C. The First Amended Complaint Is Dismissed And Plaintiff Amends**

On July 14, 2026, the Court granted Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 68, "FAC"), finding that Plaintiff failed to adequately allege any misleading statement. ECF No. 84 ("Order"). Specifically, the Court held that Defendants were not required "to disclose the precise details of Mr. Siebel's health treatments," including hospitalization, or "the exact degree of his day-to-day sales process involvement or management of C3" because there is no "completeness rule" in the securities laws. *Id.* at 28. The Court found FE1's allegations regarding delayed deals "too generalized" (*id.* at 18, 22, 25) and "vague" (*id.* at 26, 30) to plead with particularity that any statement was false when made. The Court also held that the post-Class Period disclosures, made with the benefit of hindsight, did not establish that any statement was contemporaneously false. *Id.* at 19, 22, 27-28, 30-31. And the Court found that during the Class Period, "*the market already knew*" that Mr. Siebel was dealing with an illness that caused significant vision impairment, took on a much less supervisory role, delegated more responsibility to the management team, and required assistance from an advisor. *Id.* at 24.

On August 7, 2026, Plaintiff filed the SAC, which is largely identical to the FAC save for the addition of two former employees ("FEs") and certain post-Class Period disclosures. Plaintiff's allegations regarding FE1—which the Court previously rejected—have not changed. FE2 started at C3 on an unspecified date in "June 2025" and alleges he was "told" that Mr. Siebel had

[3] Available at https://www.cnbc.com/video/2025/08/12/sales-execution-was-completely-unacceptable-says-c3-ai-ceo-on-recent-reorganization.html (cited at ¶ 41 n.5).

"undergone surgeries" and experienced "complications." ¶ 52(c)-(d). FE3 offers two main allegations: (i) Mr. Siebel's physical presence at C3's headquarters became more "sporadic"; and (ii) after Mr. Siebel's visual impairment, there was an occasion in March 2025 when Mr. Siebel spent "most of the day" working on a contract, which needed to be read to Mr. Siebel over the phone. ¶ 52(e)-(f). The post-Class Period statements by Mr. Siebel concern surgeries he underwent and how his illness affected the Company "in hindsight." *E.g.*, ¶ 96.

## LEGAL STANDARD

To state a claim for securities fraud, Plaintiff must allege particularized facts showing (1) a misrepresentation or omission of a material fact; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014). Section 10(b) claims are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA, which apply to "all elements of a securities fraud action," *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604-05 (9th Cir. 2014), and "present no small hurdle for the securities fraud plaintiff," *Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1096 (9th Cir. 2022). Plaintiff cannot clear this hurdle.

## ARGUMENT

### I. PLAINTIFF DOES NOT ALLEGE A FALSE OR MISLEADING STATEMENT

Plaintiff alleges six statements (¶¶ 54, 58, 65, 72-73, 78) were materially false or misleading in light of Mr. Siebel's health issues. ¶¶ 66, 80. Once again, *none* of these statements gives rise to securities fraud. Even if actionable, Defendants timely warned the market of Mr. Siebel's health issues, and despite the addition of two new confidential witnesses and post-Class Period disclosures, Plaintiff still fails to allege with particularity any facts rendering these statements false when made.

#### A. Defendants Disclosed Mr. Siebel's Health Troubles And The Associated Risks

Plaintiff's theory that Defendants hid Mr. Siebel's health issues and their impact on his management of the Company cannot be squared with Defendants' transparent and timely disclosures to the market. Shortly after Mr. Siebel was affected by his unexpected and rapidly progressing autoimmune disease, he disclosed the disease to investors, warning that he was suffering from "significant vision impairment," that his ability to travel was limited, and he was bringing on an

advisor because he "may be constrained." Ex. C at 1. In March 2025, he candidly discussed that planned leadership restructuring had to be "accelerated ... dramatically," his "role is now much, much less supervisory," and he is "delegating the responsibility," "delegating the authority," and "delegating to the management team." Ex. D at 9-10. He also made clear that he "did get slowed down for a little bit" and "had to work from home." Ex. E at 10. Throughout this time period, C3 issued repeated warnings about the risks of losing Mr. Siebel's services given his importance to the Company. *See supra* at 3. As Mr. Siebel's condition changed, he provided updates, culminating in the search for a new CEO and disappointing financial results that followed. *See supra* at 3-5. This all happened in the span of less than six months.

These transparent disclosures preclude Plaintiff's fraud claims, as the total mix of information available to the market made clear that Mr. Siebel was suffering from health issues that could—and did—affect the Company and its results. Indeed, as the Court previously recognized, during the Class Period, "the market already knew that, among other things: (1) Mr. Siebel was dealing with an illness that caused significant vision impairment; (2) Mr. Snabe, another C3 director, was assisting Mr. Siebel as Special Advisor to the CEO and was becoming 'a more important part of the picture'; (3) it was 'very clear' that Mr. Siebel's role was 'much, much less supervisory'; and (4) more responsibility was being delegated to the management team." Order at 24. The Court need not look further to dismiss this case. *See, e.g.*, *Or. Pub. Emps.*, 774 F.3d at 607 (dismissing claims where "Defendants clearly disclosed material information to investors"); *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 976-77 (9th Cir. 1999) (similar).

**B. The Alleged Misstatements Are Inactionable Puffery**

Several alleged misstatements (#1, #2, #4) are the type of corporate optimism courts routinely reject. *See Police Ret. Sys. v. Intuitive Surgical*, 759 F.3d 1051, 1060 (9th Cir. 2014). For instance, no amendment can plead around the Court's holding that "Mr. Siebel's optimistic remark [in Statement #4] that he was back" is "corporate puffery and not capable of objective verification." Order at 23-24. Further, Mr. Siebel's statements that he would continue to "actively manag[e] the business in a hands-on manner" (#1), that he was "fully engaged" (#2), and that his health was "excellent" (#2) are all quintessential inactionable puffery. *See, e.g.*, *In re Alphabet, Inc. Sec. Litig.*,

1 F.4th 687, 708 (9th Cir. 2021) ("very engaged" in compliance is puffery); *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 925 (N.D. Cal. 2017) ("excellent results" is "mere puffery"); *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 495 (S.D.N.Y. 2017) ("actively managing" assets is puffery).

**C. The Alleged Misstatements Are Protected By The PSLRA Safe Harbor**

Statements #1, #3, #4, #5, and #6 are expectations for how Mr. Siebel's health will affect his management and projections for financial results that are forward-looking statements protected by the PSLRA Safe Harbor. The Safe Harbor provides that "a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 767 (9th Cir. 2023) (emphases in original). Both prongs protect Defendants' statements. *See infra* at 8-9.

***Mr. Siebel's Expectations For His Health* (#1).** Mr. Siebel's February 2025 expectation that his health setback "*will not* affect [his] ability to continue actively managing the business in a hands-on manner" is forward-looking. It is also accompanied by meaningful cautionary language, because the same disclosure warned that Mr. Siebel was suffering from "significant vision impairment" and that an advisor would help where he was "constrained" (Ex. C at 1), making investors aware of the risks associated with his health setback. Statement #1 is also protected by the Bespeaks Caution Doctrine, which protects forward-looking statements when cautionary language is included in other materials available to the market, such as SEC filings. *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *10 (N.D. Cal. Sep. 29, 2000) (cautionary language need not be in the same document as the alleged misstatement). In other disclosures, C3 had expressly warned of the risks if Mr. Siebel could not serve as CEO. *See supra* at 3.

***Revenue Guidance* (#5).** Revenue projections are classic protected forward-looking statements. *See* 15 U.S.C. § 78u-5(i)(1)(A); *Chen v. Lyft, Inc.*, 762 F. Supp. 3d 909, 917 (N.D. Cal. 2025) (Thompson, J.) (projection of future financial results is forward-looking on its face); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (similar). And C3's May 2025 revenue guidance was accompanied by meaningful cautionary language. During that earnings call, C3 warned that it would make forward-looking statements that were subject to "risks and uncertainties"

(Ex. E at 2) and directed investors to C3's SEC filings (*id.*), which provided extensive disclosures of risks related to C3's results and Mr. Siebel's health (*supra* at 3). *See Cutera*, 610 F.3d at 1112 (finding similar cautionary language sufficient); *Intuitive Surgical*, 759 F.3d at 1059 (similar).[4]

***Risk Disclosures* (#3, #6).** C3's risk disclosures, including that "if we were to lose the services of our CEO ... we may not be able to execute our business strategy," are likewise forward-looking statements. *See, e.g.*, *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1195-96 (9th Cir. 2021). These disclosures are protected by the Safe Harbor because they themselves provide the very cautionary language necessary for that protection. *E.g.*, *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007). Plaintiff's allegations that the risks warned of had already come to pass fail, as set forth below. *See infra* at 12-13, 15-17.

***Mr. Siebel's Travel Plans* (#4).** Mr. Siebel's statements that he "will catch a red eye to Washington, D.C. tonight" and "will be in Washington, D.C. again for three days" are also forward-looking. *Wochos*, 985 F.3d at 1191. These travel plans are not alleged to be false (*infra* at 13-15) and, in any event, were accompanied by the same cautionary language that protects Statement #5.

### D. Plaintiff Does Not Allege Any Of The Statements Were False Or Misleading

Even if any of the alleged misstatements were actionable, Plaintiff has again failed to "allege *with particularity* each statement alleged to be misleading *and the reasons why it is misleading*." *In re Sorrento Therapeutics, Inc. Sec. Litig.*, 97 F.4th 634, 640 (9th Cir. 2024). This failure resulted in the FAC's dismissal, and the fatal flaws have not been remedied. Plaintiff relies on two types of allegations: confidential witnesses and post-Class Period statements. Both are inadequate.

#### 1. <u>February 2025 Statements (#1, #2)</u>

Plaintiff again alleges the February Statements that Mr. Siebel's health setback "will not affect [his] ability to continue actively managing the business in a hands-on manner" (#1) and that he was "fully engaged managing … the business every day" (#2) were misleading. But the SAC

[4] These forward-looking statements are also inactionable opinions, because they "express[] expectations about the future rather than presently existing, objective facts." *Kairos Inv. Mgmt. Co. v. J.P. Morgan Sec. LLC*, 2023 WL 9375171, at *3 (C.D. Cal. Dec. 11, 2023). For instance, where, as here, there is no allegation that Mr. Lath "did not honestly believe [the revenue projection] and [that] the [revenue projection] was objectively untrue," the statement is inactionable. *Id.* at *4.

adds no particularized allegations that warrant a departure from the Court's previous holding that Plaintiff failed to allege any facts rendering the February Statements false. Order at 17-19.

***FE Allegations:*** None of the FE allegations adequately plead that Statements #1 or #2 were false. The Court previously found FE1's allegations "do not plausibly allege falsity because they provide no information about Mr. Siebel's health or his day-to-day management of C3 in February 2025." Order at 19. As FE1's allegations are unchanged, they fail here too. As to FE2, Plaintiff does not (and cannot) rely on FE2 in connection with the February Statements (¶ 66), because FE2 did not join C3 until June 2025 (¶ 52(c)). *See infra* at 14-15.

FE3 fares no better. To start, the SAC alleges FE3's job titles and period of employment (¶ 52(e)), but absent from the SAC is any allegation of FE3's responsibilities or interaction with Mr. Siebel. *See Kipling v. Flex Ltd.*, 2020 WL 2793463, at *16 (N.D. Cal. May 29, 2020) (complaint that "provides only the relevant job titles, with no accompanying description of what those titles entailed," is insufficient to plead reliability of former employee allegations).

Critically, FE3 does not allege that Mr. Siebel was not managing the business (including by commenting, responding, and approving items). FE3 alleges that Mr. Siebel's attendance at the office was "sporadic" (¶ 52(e)), but that vague allegation does not specify how often Mr. Siebel was in the office or *why* Mr. Siebel was absent from the office. In any event, Mr. Siebel's alleged reduced physical presence in the office is *consistent with* Mr. Siebel's disclosures that his illness limited his ability to travel (¶ 24) and that Mr. Snabe was filling in for him in certain capacities (Ex. C at 1) and with Mr. Siebel's May disclosure that he "did get slowed down" and "had to work from home for a little while" (¶ 72).

In fact, as set forth below, FE3's description of a later March deal (¶ 52(f)) demonstrates that Mr. Siebel was fully engaged and active in the business, even if remotely (*infra* at 12), which is common post-COVID in any event. The SAC itself alleges Mr. Siebel managed the business via remote work, phone calls, and email dictation. *E.g.*, ¶¶ 52(f), 57-58, 72. The SAC also admits that Mr. Siebel continued to participate actively in conferences and earnings calls. *E.g.*, ¶¶ 57, 70-71, 98. In fact, Mr. Siebel attended the Citizens JMP Technology Conference on March 3, 2025 "virtually" (¶ 64) due to his "health setback" (Ex. D at 2), meaning the market was aware of

Mr. Siebel's restrictions. As to Mr. Siebel's statement that he was "here in the office" during the earnings call, Plaintiff does not allege that Mr. Siebel was not in fact in the office for the call, and he made no broader representation about how often he was in the office.[5] In any event, FE3's vague description of "sporadic" office attendance from January 2025 to January 2026 says nothing about Mr. Siebel's in-office presence as of February. ¶ 52(e). *Finally*, FE3 does not allege that Mr. Siebel's health was not, other than his vision, excellent in February 2025 (#2).

***Post-Class Period Disclosures:*** The post-Class Period disclosures in which Mr. Siebel observed how, in hindsight, his illness affected the Company's performance (¶ 66(a)(i)) similarly do not render any February Statement false. The Court already found that post-Class Period disclosures that "Mr. Siebel: (1) had health issues during the Class Period; (2) was hospitalized multiple times at unspecified points during the Class Period; and (3) experienced health issues that reduced his ability to participate as actively in the sales process as he had in the past" "do not support a plausible inference that the February Statements were false or misleading when made." Order at 19. The newly alleged September 9 and December 3, 2025 disclosures merely repeat the same hindsight observations (¶¶ 105-06) and should likewise be rejected.

The August 12, 2025 and May 13, 2026 disclosures that Mr. Siebel underwent surgeries (¶ 66(a)(i)) are likewise unavailing. On August 12, 2025, Mr. Siebel shared that "in the last [] seven to eight months" he had open-heart surgery and pulmonary surgery (¶ 96), and on May 13, 2026, Mr. Siebel noted that those surgeries happened "in 2025" (¶ 111). Plaintiff does not allege Mr. Siebel had undergone any surgery by February 2025. Further, the mere fact Mr. Siebel underwent surgery would not render the February Statements false, as neither statement discussed surgeries. *See Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006-07 (9th Cir. 2002) (dismissing statement that did not "affirmatively create an impression ... that differs ... from the one that actually exists"). It is certainly not the case that any executive who undergoes a surgery, even a serious one, is incapable of actively managing a company. As with the alleged hospitalizations, the Court would

---

[5] Plaintiff's theory of fraud is plagued with inconsistencies. As one example, Plaintiff alleges Mr. Siebel's ability to travel to meet with customers was important to C3's success (¶¶ 28, 30, 71-72), yet, in the same breath, Plaintiff suggests, based on FE3's allegations, that Mr. Siebel must not have been working if he was not physically in the office every day (¶¶ 52(e), 66(a)(iii), 80(a)(iii)).

have to "speculat[e]" about the surgeries' "effect on [Mr. Siebel's] management of C3 and the sales process" to conclude that #1 and #2 were misleading. Order at 27.

***Analyst Reports:*** Plaintiff again cites the same analyst reports cited in the FAC to allege Defendants created a false impression of Mr. Siebel's ability to continue managing C3 (¶¶ 60-62), but the Court already found that these analyst reports are insufficient (*see* Order at 17 n.12).

2. <u>March 2025 Risk Disclosure (#3)</u>

Plaintiff again alleges that C3's March 2025 disclosures concerning the risk of losing Mr. Siebel as CEO were misleading. But just as in the FAC, "Plaintiff fails to adequately allege that Statement #3 was false or misleading when made" because "there is no indication that the risk of losing Mr. Siebel's services as CEO had materialized by March 7, 2025." Order at 21.

***FE Allegations:*** As the Court previously found, FE1's allegations "are insufficient to support an inference of falsity." *Id.* at 22. And again, Plaintiff does not rely on FE2. ¶ 52(c). Nor does FE3 allege that "the risk of losing Mr. Siebel's services as CEO had materialized by March 7, 2025." Order at 21; *see supra* at 10-11. In fact, rather than contradicting Statement #3, FE3's allegations *confirm* that Mr. Siebel was managing the company in a "hands-on" manner: FE3 alleges that a March 2025 meeting "took most of the day" because "executives had to read ten to fifteen pages of dense, fine print contract language to [Mr.] Siebel over the phone." ¶ 52(f). That allegation is *consistent with* Mr. Siebel's disclosures that due to visual impairment, he needed "accommodations" and someone who "*reads* [] *e-mails to*" *him*. ¶¶ 57-58. Mr. Siebel working long hours on a deal despite his visual impairment demonstrates that C3 had *not* lost his services in March. In fact, it shows that C3 was adapting its processes around a disclosed limitation exactly as represented to the market and that Mr. Siebel, despite his illness, was *not* "incapacitated" (*e.g.*, ¶ 105), thus fatally undermining Plaintiff's allegations. *Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016) ("[T]he facts purportedly inconsistent with Defendants' representations do not plausibly support an inference that the representations were false or misleading."). And critically, though FE3 may have been dissatisfied by the speed of the work, *FE3 does not allege that the March deal did not close*.

***Post-Class Period Disclosures:*** None of the post-Class Period disclosures establish that as

of March 2025, C3 had lost Mr. Siebel's services as CEO. *See supra* at 11-12; ECF No. 81 at 25:14-16 ("CEOs are allowed to get sick."). Statement #3 does not purport to identify every one of Mr. Siebel's health issues or treatments, and the later disclosure of surgeries does not render Statement #3 false. *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880-81 (9th Cir. 2012) ("[S]ubsequent release of more extensive information … was not inconsistent with" alleged misstatement and "even if some investors might have wanted more extensive information …, that would not be sufficient to make the alleged [] statements false or misleading.").

3. May 2025 Earnings Call (#4)

Plaintiff again alleges that Mr. Siebel's statements during a May 28, 2025 earnings call regarding his travel plans and that he was "back" were misleading because they "implied" the illness was "behind him." ¶ 28. But the Court already held "it is apparent" that Mr. Siebel's statement "I'm back" "largely concerned [his] travel plans" and "indicate[d] … his ability to travel was improving," but it did not give "reasonable investors the impression that [his] ability to travel was back to its pre-illness levels or that his management of C3 was completely unaffected by his illness." Order at 23. The Court also held that while "investors may have desired more information about Mr. Siebel's health condition," the lack of further detail "is insufficient to give rise to a securities fraud claim, as there is no indication that Statement #4 was misleading when made." *Id.* at 25.

The SAC still does not allege that Mr. Siebel did not make the trips he referenced. Instead, Plaintiff alleges an analyst noted Mr. Siebel "was flying again" (¶ 21), but nothing about the analyst's unremarkable comment indicates that C3 had created an impression that "[his] ability to travel was back to its pre-illness levels or that his management of C3 was completely unaffected by his illness" (Order at 23). Plaintiff also alleges the market's positive reaction means Statement #4 was fraudulent (¶¶ 74-77), but Plaintiff ignores that on the same day, C3 announced positive results. *See, e.g.*, Ex. L (May 29, 2025 Wedbush Report) at 1 ("C3.ai reported its FY4Q25 results featuring slight top and bottom-line *beats*"); Ex. M (May 29, 2025 Canaccord Genuity Report) at 1 (similar). Even if the market reacted to Mr. Siebel's increased travel, that does not mean anyone understood Mr. Siebel's ability to travel was back to pre-illness levels. Indeed, as the Court previously found, Mr. Siebel's "optimism about being back" was not misleading because "the market already knew

that, among other things: (1) [he] was dealing with an illness that caused significant vision impairment; (2) Mr. Snabe … was assisting Mr. Siebel as Special Advisor to the CEO and was becoming a more important part of the picture; (3) it was very clear that Mr. Siebel's role was much, much less supervisory; and (4) more responsibility was being delegated to the management team." Order at 24. No amendment can remedy this core defect.

***FE Allegations:*** Plaintiff's attempts to cure this deficiency with FE allegations fails. Once again, "FE1's generalized allegations that various deals were delayed … are too vague to establish that Statement #4 was false or misleading when made." Order at 25. FE2 makes no allegation concerning Mr. Siebel's travels in May, given that his employment with C3 began in June (¶ 52(c)). *McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *19 (N.D. Cal. Aug. 7, 2019) (CW allegations "are entitled to little weight" where they were not employed when statements were made). FE2 alleges only that "Chris Siebel told FE2" that Mr. Siebel had undergone surgeries and experienced complications. ¶ 80(a)(ii). But absent from the SAC is any allegation as to *when* the surgeries or complications occurred, *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019) ("CW reports must be specific in their time references to support that *each alleged misstatement* was false *when made*.") (emphases in original), or any details about how, if at all, they affected the travel discussed in #4. *See* Order at 19 ("[T]here must have been some *contemporaneous* information that would have shown that the statements were false at the *exact time* that defendants made them."). Moreover, FE2's allegations about what he was told are precisely the type of hearsay that courts routinely reject. *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 536-37 (9th Cir. 2024) (FE allegations that "rel[y] on secondhand information" "lack reliability and personal knowledge"); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (similar). And FE3's observation that Mr. Siebel was not in the office as much as in the year before (¶ 80(a)(iii)) has no connection to Statement #4. *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1276-77 (N.D. Cal. 2019). If anything, Mr. Siebel being on the road more often would mean *less* time spent at the office.

***Post-Class Period Disclosures:*** As the Court previously observed, "Defendants' subsequent disclosures regarding Mr. Siebel's health and its impact on his sales process participation [] are not

inconsistent with Statement #4." Order at 23; *see also id.* at 25 ("[T]he omission of facts regarding Mr. Siebel's hospitalizations from Statement #4 does not render it false or misleading."). And Plaintiff's reliance on the August 12, 2025 and May 13, 2026 disclosures that reference surgeries do not move the needle, as there is no indication when those surgeries occurred, nor do they allege any such surgeries had an impact on Mr. Siebel's travel in May 2025. *See supra* at 11-12.

4. May 2025 Revenue Guidance (#5)

As with the FAC, the SAC "lacks particularized facts sufficient to show" that the May 2025 revenue guidance was misleading or that it did not have a reasonable basis. Order at 27.

***FE Allegations:*** "FE1's vague allegation that various unspecified deals were delayed" remains insufficient to render Statement #5 false. *Id.* at 26. FE2 lacks personal knowledge because he did not work at C3 in May 2025 (¶ 80(a)(ii)), and even if credited, FE2's allegations only "demonstrate that [Mr. Siebel] was receiving medical care" (Order at 27) at some unspecified time and say nothing about the basis for C3's revenue guidance. *See Bodri*, 252 F. Supp. 3d at 929; *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). FE3's allegations of Mr. Siebel's "sporadic" in-office presence (¶ 80(a)(iii)) are not connected to any known effect on C3's revenue guidance as of May 2025, and allegations that Mr. Siebel could not "keep up" (¶ 80(a)(iv)) are just as vague as FE1's, which the Court already rejected (Order at 26).

***Post-Class Period Disclosures:*** While the post-Class Period disclosures state Mr. Siebel underwent surgeries (¶¶ 96, 105-06, 111), they do not say when the surgeries occurred, nor how or when they affected C3's revenue guidance. These subsequent disclosures "do *not* indicate that, as of May 28, there was no reasonable basis for C3's revenue guidance" or that its "accuracy was seriously undermined." Order at 27-28. Missed revenue guidance is not securities fraud simply because Defendants did not disclose "precise details of Mr. Siebel's health treatments and the exact degree" of his sales involvement. *Id.* at 28.

5. June Risk Disclosure (#6)

Like before, "[w]ithout particularized allegations showing that Mr. Siebel's hospitalizations prevented him from managing C3 in a hands-on manner or diminished his provision of services as CEO such that C3 could not effectively capitalize on its business strategy," Plaintiff has not alleged

the June risk disclosures were misleading. Order at 30.[6] There are no such allegations in the SAC.

***FE Allegations:*** The Court already found that FE1's allegations were insufficient to render Statement #6 false. *Id.* As to FE2, absent from the SAC is any allegation that FE2 joined C3 before #6 was made. ¶¶ 78, 80(a)(ii). In any event, FE2's hearsay allegations of hospitalizations and complications, even if credited (*see supra* at 14), say nothing about their effect on Mr. Siebel's management of C3 or the Company's ability to capitalize on its business strategy. FE2 alleges that "[Mr.] Siebel did not attend a sales kickoff meeting from June 2025 through February 2026" (¶ 80(a)(ii)), but the SAC does not allege (i) how often such meetings occurred; (ii) that Mr. Siebel attended such meetings before June 2025 (which would be beyond FE2's personal knowledge); (iii) that Mr. Siebel missed any particular meeting due to his illness (rather than, for instance the disclosed increased delegation); or (iv) why Mr. Siebel's purported absence from such meetings rendered Statement #6 false. *See Xiaojiao Lu*, 417 F. Supp. 3d at 1277 ("wholly absent is the nexus between the statements and omissions and any facts that would render them false or misleading"); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 807 (N.D. Cal. 2019) ("the reasons Plaintiffs offer as to why many of the statements are false or misleading bear no connection to the substance of the statements"). And FE3's allegations do not show that as of June 2025, C3 had "los[t] the services of our CEO." ¶ 78. Instead, as discussed above (*supra* at 12), FE3's anecdote about a March sales meeting shows Mr. Siebel continued to actively manage the business despite his visual impairment.

***Post-Class Period Disclosures:*** The Court already found that Mr. Siebel's hindsight observations regarding the effect of his health on the Company did not render Statement #6 false. Order at 30. Similarly, the disclosures identifying surgeries Mr. Siebel had "do not demonstrate the existence of any contemporaneous facts inconsistent with Statement #6." Order at 30. Plaintiff does not allege when the surgeries occurred, and even if they occurred before Statement #6, there is not a single allegation in the SAC that the surgeries "prevented [Mr. Siebel] from managing C3 in a hands-on manner or diminished his provision of services as CEO such that C3 could not effectively

[6] To the extent Plaintiff relies on the temporal proximity between Statement #6 and the announcement of Mr. Siebel's departure from the CEO role, the Court has already rejected this argument. Order at 29; *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 622 (9th Cir. 2022).

capitalize on its business strategy." *Id.* That a CEO had surgery, even a serious one, does not render statements about his management false. ECF No. 81 at 25:14-16 ("CEOs are allowed to get sick.").

## II. PLAINTIFF DOES NOT ALLEGE A STRONG INFERENCE OF SCIENTER

To plead scienter, Plaintiff must allege "specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Metzler*, 540 F.3d at 1066. It is not enough to allege facts from which an inference of scienter "could be drawn"; Plaintiff must "plead with particularity facts that give rise to a strong—*i.e.*, a powerful or cogent—inference," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007), that is "*at least as compelling* as any opposing inference," *Zucco*, 552 F.3d at 991 (emphasis in original). The SAC fails to plead this strong inference.

### A. Plaintiff Ignores More Compelling, Non-Culpable Inferences

Plaintiff's theory of fraud assumes that Defendants somehow knew the effect Mr. Siebel's autoimmune disease would have on the Company and intentionally concealed it from investors. *E.g.*, ¶ 33. That theory cannot be squared with Defendants' transparent disclosures throughout the Class Period. *Tellabs*, 551 U.S. at 324 ("[A] court must consider plausible, nonculpable explanations for the defendant's conduct[.]"). The more compelling inference is that Mr. Siebel disclosed his health issue the month the disease "kick[ed] in" (¶ 57) and kept investors updated as he learned to work with accommodations. *See supra* at 3-4. It is illogical to suggest that someone who had unexpectedly contracted an autoimmune disease that resulted in significant vision impairment would immediately know exactly how that health setback would impact his daily life and work. *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1143 (E.D. Wash. 2013) (no scienter where the "far more likely" inference was that "Defendants were unable to fully predict and account for" impact of market collapse on business); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 367 (S.D.N.Y. 2011) (similar). In fact, the post-Class Period statements support that inference: Mr. Siebel repeatedly shared that he only understood the impact of his health setback on the business in "hindsight." *See supra* at 4-5.

Plaintiff's theory that Defendants concealed the extent of Mr. Siebel's illness simply "does not make a whole lot of sense." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). "It

depends on the supposition that [D]efendants would rather keep the stock price high for a time and then face the inevitable fallout" once the extent of Mr. Siebel's illness was revealed. *Id.* It is much more plausible that Defendants' understanding of Mr. Siebel's health struggles and the effects on the business evolved over the six-month Class Period, during which C3 made repeated and detailed disclosures to investors, *undermining* any inference of scienter. *See In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1165 (C.D. Cal. 2007) ("detailed risk disclosure[s] ... negate[] an inference of scienter."); *Smith v. NetApp, Inc.*, 2021 WL 1233354, at *9 (N.D. Cal. Feb. 1, 2021) (scienter undermined "where the Company was open and honest about the risks"). An executive disclosing that he is navigating a new health challenge publicly and in real time is not securities fraud. *Smith*, 2021 WL 1233354, at *9 ("[T]he inference of fraudulent intent or deliberate recklessness [] is *not* more compelling than an inference of … misplaced hope[] and is therefore not strong."). After all, Defendants "likely did not intend to defraud investors by concealing" the extent of Mr. Siebel's health setback and its impact on him and the business "while simultaneously disclosing that information in myriad contexts." *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1134 (9th Cir. 2025).

### B. Stock Sales Do Not Allege A Strong Inference Of Scienter

Plaintiff alleges that Mr. Siebel's stock sales create a strong inference of motive. ¶ 42. As an initial matter, motive is insufficient to adequately allege scienter. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017). And for stock sales to even contribute to the scienter analysis, courts consider "(1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history." *Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2018 WL 3126393, at *9 (N.D. Cal. June 26, 2018). None of these support scienter.[7]

*First*, Plaintiff fails to plead any facts showing that Mr. Siebel's stock sales were suspicious in size, as the SAC still does not allege "what percentage of his holdings [Mr.] Siebel sold." *Reckstin Fam. Tr. v. C3.ai, Inc.*, 718 F. Supp. 3d 949, 986 (N.D. Cal. 2024); *see also Hoang v. ContextLogic, Inc.*, 2023 WL 6536162, at *25 (N.D. Cal. Mar. 10, 2023) ("fail[ure] to allege critical information"

[7] Plaintiff does not allege Mr. Lath sold *any* stock during the Class Period, undermining scienter. *See In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 199703, at *8 (N.D. Cal. Jan. 13, 2010).

of "what percentage of … holdings were sold"); *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *23 (N.D. Cal. May 22, 2012) (similar), *aff'd*, 759 F.3d 1051 (9th Cir. 2014). The absence of such allegations is not surprising, as Mr. Siebel's stock holdings remained relatively stable through 2025. *Compare* Ex. N (2024 Proxy Statement) at 56, *with* Ex. O (2025 Proxy Statement) at 54. To the extent Plaintiff tries to excuse his fatal failure to plead what percentage was sold by pointing to the *value* of shares sold (¶ 42), that irrelevant inquiry is routinely rejected by courts. *See, e.g.*, *Reckstin*, 718 F. Supp. 3d at 986 ("staggering" sales value insufficient absent allegation of percentage sold); *Intuitive Surgical*, 2012 WL 1868874, at *22 ("Under Ninth Circuit law, the absolute value of the stock sale does not on its own give rise to an inference of scienter.").[8]

*Second*, Mr. Siebel's stock sales were ***all nondiscretionary*** sales, which cannot support an inference of scienter.[9] Some sales were pursuant to a predetermined Rule 10b5-1 plan adopted in September 2024—before the onset of Mr. Siebel's illness (¶ 57). *See* Ex. P (May 15, 2025 Form 4) at 1 n.1; Ex. Q (June 12, 2025 Form 4) at 1 n.1; Ex. R (July 22, 2025 Form 4) at 1 n.1; *see also* Ex. S (Q2 2025 Form 10-Q) at 87 (noting adoption of Mr. Siebel's Rule 10b5-1 plan on September 20, 2024). Such "automatic sales made pursuant to [a] Rule 10b5-1 plan[] do not support a strong inference of scienter." *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020); *see also In re Nektar Therapeutics*, 2020 WL 3962004, at *16 (N.D. Cal. July 13, 2020) (sales "made under Rule 10b5-1 trading plans … weigh[] against an inference of scienter"). The other sales were automatic, mandatory "sales" required to cover tax obligations from the vesting of restricted stock units. Ex. T (May 5, 2025 Form 4) at 1 n.2; Ex. U (June 3, 2025 Form 4) at 1 n.2; Ex. V (Aug. 5, 2025 Form 4) at 1 n.3. Such "non-discretionary sales to cover tax withholding obligations in connection with the vesting and settlement of RSUs … are not indicative of fraud." *Hoang*, 2023 WL 6536162, at *26; *see also Stephens v. Maplebear Inc.*, 2025 WL 1359125, at *8 (N.D. Cal. May 9, 2025) (similar). Since Mr. Siebel's "stock sales were all made to either satisfy

[8] Plaintiff's reliance on pre-Class Period sales (¶ 42 n.7) is irrelevant because the purported "fraud" had not yet begun. In fact, these pre-Class Period sales demonstrate Mr. Siebel's Class Period sales were not suspicious. *See In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989).

[9] Sales months before the alleged corrective disclosures (¶¶ 67, 81) do not support scienter. *See, e.g.*, *Ferreira v. Funko Inc.*, 2021 WL 8820650, at *35 (C.D. Cal. Oct. 22, 2021).

tax obligations or according to a 10b5-1 plan," "[he] did not have immediate control over these planned sales, so these sales … cut against a finding of scienter." *In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *17 (N.D. Cal. Nov. 23, 2021).

**C. Plaintiff Has Not Alleged Knowledge Of Falsity Or Deliberate Recklessness**

Where, as here, Plaintiff's motive allegations fail, it "certainly makes it much less likely that a plaintiff can show a strong inference of scienter." *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1108 (9th Cir. 2021). Plaintiff fails to plead a strong inference of scienter for either Defendant:

1. Mr. Siebel

"The glaring issue with Plaintiff['s] allegations is that there are no particularized allegations supporting a strong inference that [Mr. Siebel was] aware or should have been aware of" anything that contradicted his statements. *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2023 WL 11691540, at *8 (N.D. Cal. Aug. 18, 2023) (Thompson, J.). Absent from the SAC is any allegation that Mr. Siebel's health *at the time of each alleged misstatement* was worse than conveyed or that Mr. Siebel knew how his health would affect C3 *at the time*. Plaintiff's scienter allegations rely on FE allegations and fraud-by-hindsight based on post-Class Period statements. Neither suffice.

***FE Allegations:*** None of the FEs offer allegations that Mr. Siebel knew his statements were false when made. As Plaintiff admits, FE1 and FE2 lacked direct access to Mr. Siebel, as they: (1) were *not* based in C3's headquarters where Mr. Siebel worked; (2) were lower-level employees who did not report to Mr. Siebel; and (3) were not employed during the entire Class Period, as FE1 left C3 in "May 2025," and FE2 joined C3 in "June 2025," making it possible FE2 was not employed at C3 when *any* of the alleged misstatements were made. ¶ 52(a), (c). FE1 and FE2 thus cannot offer reliable statements about Mr. Siebel's state of mind. *See Sneed*, 147 F.4th at 1134 (CWs that "never interacted with either executive" failed to allege scienter); *Intuitive Surgical*, 759 F.3d at 1062-63 (rejecting "impressions of [CWs] who lacked direct access to the executives" and thus "lack[ed] first hand knowledge regarding what the [] defendants knew or did not know").

Given the lack of direct access to Mr. Siebel, both FE1 and FE2 merely repeat hearsay about his health. *See supra* at 14; ¶ 52(b), (d). But their regurgitation of vague watercooler talk cannot plead a strong inference of scienter. *See supra* at 14; *Dabestani v. Geron Corp.*, 2026 WL 861010,

at *2 (N.D. Cal. Mar. 30, 2026) (disregarding CW's "hearsay statement … of which CW1 did not have any personal knowledge"). In any event, even if credited, allegations of hospitalization, a live-in health professional, certain unspecified deal delays, or vague "ongoing complications" (¶ 52(b), (d)) are lacking in particulars and not inconsistent with Mr. Siebel's public statements about his health setbacks. *See supra* at 3-4. This is particularly true here, where they are untethered in time. *See Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 999 (N.D. Cal. 2021) ("the CW reports [were] neither anchored in time nor tethered to any particular … statements"); *Oracle*, 2019 WL 6877195, at *18-19 (rejecting CW allegations untethered to specific time).

There are only two allegations offered by FE1 and FE2 based on personal knowledge—both of which fail to support a strong inference of scienter. FE1 alleges that on some unspecified date, Mr. Siebel "needed assistance" to "sit in a chair." ¶ 52(b). For the same reasons these allegations did previously not render any statement false (*see generally* Order), they cannot support allegations of scienter. In any event, that allegation is *consistent with Mr. Siebel's disclosure* that he had suffered "significant vision impairment." ¶ 54. The alleged need for assistance to "sit in a chair" does not equate to knowledge that statements regarding Mr. Siebel's management of C3 were false.

Similarly, FE2's allegation that Mr. Siebel "did not attend a sales kickoff meeting from June 2025 through February 2026" (¶ 52(d)) describes a period of time that *barely* overlaps with the Class Period and requires the Court to speculate whether it overlaps with Statement #6. Regardless, the SAC lacks any allegation as to the significance of such meetings, whether Mr. Siebel attended them before becoming ill, or how missing kickoffs should have alerted Mr. Siebel that his statements to investors were false. *Supra* at 16. Further, Plaintiff ignores that it was disclosed that during this time period, Mr. Siebel was delegating authority and restructuring leadership. *Supra* at 3-4.

Further, FE3's allegation that he was "accustomed to" seeing Mr. Siebel regularly in the office prior to his illness but that Mr. Siebel's "presence in the office" became "sporadic" (¶ 52(e)) is *consistent with* Mr. Siebel's disclosures that his illness would "limit [his] ability to travel" (¶ 24) and "it's very unlike [him] to work from home" but that he "did get slowed down" and "had to work from home for a little while" (¶ 72). *See, e.g.*, *Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2024 WL 5399664, at *22 (N.D. Cal. Sep. 18, 2024) (Thompson, J.) (CW's

allegation insufficient to allege scienter where consistent with company disclosures). Regardless, absence from the office does not mean Mr. Siebel was not managing the business. *See supra* at 10. In fact, FE3's allegations regarding a meeting with Mr. Siebel that took "most of the day" cuts *against* scienter: It shows that Mr. Siebel, despite his illness, was *not* "incapacitated" (*e.g.*, ¶ 105) but rather spending "most of the day" working on deals. ¶ 52(f). It is also *consistent with* Mr. Siebel's disclosures regarding the need for "accommodations" such as someone who "reads [] e-mails to" him (¶¶ 57-58). *See Mosco v. Motricity, Inc.*, 649 F. App'x 526, 529 (9th Cir. 2016) ("Nor is scienter established by the [CWs] who simply corroborated [a defendant's] disclosure[.]").

Finally, FE3's conclusory "assess[ment]" that Mr. Siebel's health was "affecting his ability to keep up with the pace of C3's business" (¶ 52(f)) is nothing more than FE3's own subjective opinion and says nothing about Mr. Siebel's state of mind. *See, e.g.*, *In re Metawave Commc'ns Corp. Sec. Litig.*, 629 F. Supp. 2d 1207, 1216 (W.D. Wash. 2009) ("To the extent that CW 7 concluded from what he or she saw ... that Spotlight GSM was a failure, the TAC establishes only that it was his or her opinion[.]").

***Post-Class Period Disclosures:*** Plaintiff relies on post-Class Period statements regarding Mr. Siebel's health (¶¶ 89, 95-98, 105-06, 111), but these statements *undermine* scienter. Mr. Siebel confirmed his health issues were "unanticipated," with their effects only understood in "hindsight." *E.g.*, ¶ 89 ("[w]ith the benefit of hindsight"); ¶ 96 ("didn't really realize it at the time"); Ex. I at 5; ¶ 98. These statements support the more compelling, non-culpable inference that the extent of Mr. Siebel's health challenges was unanticipated. *Supra* at 17-18; *In re FVC.COM Sec. Litig.*, 32 F. App'x 338, 341 (9th Cir. 2002) (the PSLRA forbids the "bare inference by hindsight" that "because the defendants admit that they knew something later and the something is important, they must have known it earlier"); *Aramic LLC v. Revance Therapeutics, Inc.*, 2024 WL 1354503, at *14 (N.D. Cal. Apr. 2, 2024) ("Management simply may have been confident that they could overcome the problems or merely underestimated the[ir] severity[.]"); *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *20 (N.D. Cal. Mar. 24, 2014) ("Acknowledging that Amyris had more trouble scaling up its process than anticipated does not show that the defendants always knew that the projections were unattainable or that they acted with scienter because it is clearly insufficient for plaintiffs to

say that a later, sobering revelation makes an earlier, cheerier statement a falsehood.").

Plaintiff's reliance on Mr. Siebel's post-Class-Period references to surgeries (¶¶ 96, 111) is equally unavailing because those allegations are untethered in time. *Supra* at 11-12, 15-16. Plaintiff thus does not allege that Mr. Siebel had undergone a given surgery when he made any particular alleged misstatement. *Veal*, 423 F. Supp. 3d at 814 (no scienter where "[p]laintiffs fail to allege *when* … [d]efendants became aware of any facts giving rise to inference of scienter") (emphasis in original). Even if the surgeries occurred prior to any alleged misstatement, Plaintiff does not allege how Mr. Siebel should have known that they would affect the Company's performance or revenue, particularly since Plaintiff's own allegations demonstrate Mr. Siebel was still running the business (*supra* at 10). As the Court previously recognized, "CEOs are allowed to get sick" (ECF No. 81 at 25:14-16), and there is no requirement that companies disclose the granular details of an executive's medical treatment. *See* Order at 28 ("Requiring Defendants to disclose the precise details of Mr. Siebel's health treatments … would transform missed revenue guidance into securities fraud.").

At bottom, Plaintiff has set forth no particularized allegations that Mr. Siebel *knew during the Class Period* that his illness would affect C3's revenues. *Metzler*, 540 F.3d at 1068 n.12 ("post-Class Period statements do not rectify the lack of scienter pled elsewhere"); *Glazer*, 63 F.4th at 776 ("[t]he problem" with plaintiff's reliance on a "post-class period disclosure" is that defendant "made no admissions about the relevant [condition] as of the dates of the challenged statements").

2. Mr. Lath

Plaintiff sets forth zero allegations supporting an inference of scienter—much less a strong one—as to Mr. Lath. The SAC does not allege how and when Mr. Lath would have known (1) the extent of Mr. Siebel's health issues, or (2) how those issues would affect the business. *See Veal*, 423 F. Supp. 3d at 814. Nor can Plaintiff rely on Mr. Lath's CFO position. ¶ 50. *See In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) ("high rank" of defendants insufficient for strong inference of scienter).

## III. PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

To plead loss causation, a plaintiff must show that: "(1) a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements; and (2) the disclosure of the

truth caused the company's stock price to decline and the inflation attributable to the misstatements to dissipate." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 (9th Cir. 2020). Plaintiff must plead loss causation with particularity. *Or. Pub. Emps.*, 774 F.3d at 605. Plaintiff fails to do so.

***July 24, 2025 Search For New CEO:*** C3's announcement that it would search for a new CEO (¶ 82) merely represents the materialization of a disclosed risk. Defendants had been telling investors for months that Mr. Siebel had contracted an autoimmune disease and warned of the risks of losing Mr. Siebel as CEO. *See supra* at 3-4. Plaintiff cannot plead loss causation where, as here, the purported corrective disclosure was merely the materialization of a known risk. *See Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *10 (N.D. Cal. June 19, 2020) (no loss causation where loss stemmed from "known" rather than "hidden risk[s]"); *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 146 (S.D.N.Y. 2021) (similar).

***August 8, 2025 Financial Results:*** The August 8, 2025 disclosure of disappointing financial results (¶¶ 88-89) was similarly a materialization of known risks. C3 had repeatedly and extensively warned that (i) Mr. Siebel was experiencing health issues; (ii) if C3 lost Mr. Siebel's services, it could harm the business; and (iii) the Company might not meet revenue projections or guidance, and investors should not rely on forward-looking projections. *See supra* at 3-4, 8-9. This precludes Plaintiff from using disappointing financial results as a purported corrective disclosure. *Yaron*, 2020 WL 6750568, at *10; *Sjunde*, 545 F. Supp. 3d at 146.

## IV. PLAINTIFF'S SECTION 20A CLAIM SHOULD BE DISMISSED

Plaintiff's allegations that Mr. Siebel engaged in insider trading to Plaintiff's detriment should be dismissed. A claim for insider trading requires a predicate violation and contemporaneous trading to a plaintiff's disadvantage. *Xiaojiao Lu*, 417 F. Supp. 3d at 1282-83.

*First*, the Complaint has failed to plead a primary violation, and thus Plaintiff's 20A claim also fails. *In re Netflix, Inc., Sec. Litig.*, 964 F. Supp. 2d 1188, 1199 (N.D. Cal. 2013).

*Second*, Plaintiff fails to plead contemporaneous trades. The Ninth Circuit has explained "contemporaneous" means "during *the same time*." *In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1189 (9th Cir. 2024); *see In re Redback Networks, Inc.*, 2006 WL 1805579, at *7 (N.D. Cal. Mar. 20, 2006) ("[T]he same day standard is the only reasonable standard[.]"); *Hefler v. Wells*

*Fargo & Co.*, 2018 WL 1070116, at *12 (N.D. Cal. Feb. 27, 2018) ("contemporaneous" means trading the same day or day after). Only Plaintiff's June 11, 2025 purchase, which occurred on the same day as sales by Mr. Siebel, is even potentially contemporaneous. ¶¶ 142-43. The Court should, at a minimum, dismiss the remaining purchases. *See Buban v. O'Brien*, 1994 WL 324093, at *3 (N.D. Cal. June 22, 1994) (three-day gap not "contemporaneous").

*Third*, "shares purchased *below* the defendant's sale price *cannot satisfy* the contemporaneity requirement[] because it is impossible that those trades occurred with defendant at an unfair advantage." *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1136 (N.D. Cal. 2020); *Patel v. Edwards Lifesciences Corp.*, 2025 WL 2724388, at *15 (C.D. Cal. Sep. 19, 2025) (same). All except the June 11 purchase should be dismissed because those purchases were at prices *lower* than Mr. Siebel's closest preceding sale. ¶¶ 142-43.

*Fourth*, Mr. Siebel's sales (¶ 142) that most closely preceded Plaintiff's purchases (¶ 143) were all made pursuant to a predetermined Rule 10b5-1 plan adopted before the Class Period. *See supra* at 19. This is fatal to any claim of insider trading. *See* 17 C.F.R. § 240.10b5-1(c)(1)(i); *In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 943271, at *4 (C.D. Cal. Apr. 6, 2009) ("10b5-1 plans negate an inference that they made sales based on actual insider knowledge").

*Fifth*, Plaintiff fails to plead with particularity that as of any sale date, Mr. Siebel knew his health was allegedly worse than publicly disclosed. *Supra* at 20-22; *Silver Lake*, 108 F.4th at 1191.

## V. PLAINTIFF'S SECTION 20(a) CLAIM SHOULD BE DISMISSED

Plaintiff's Section 20(a) claim should be dismissed for failure to plead a primary violation. *Zucco*, 552 F.3d at 990. Further, neither Mr. Siebel nor Mr. Lath is alleged to have been in control of the other's oral or written statements. *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1242-43 (N.D. Cal. 1994) (individuals cannot be control persons over oral statements made by another).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the SAC with prejudice.[10]

[10] Dismissal with prejudice is appropriate where, as here, Plaintiff has had an opportunity to cure and has failed. *See, e.g.*, *In re Intel Corp. Sec. Litig.*, 792 F. Supp. 3d 1008, 1024 (N.D. Cal. 2025) (Thompson, J.) (granting dismissal with prejudice after amendment).

DATED: September 8, 2026

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/ Linda J. Brewer*
Linda J. Brewer (Bar No. 217730)
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
lindabrewer@quinnemanuel.com

Michael B. Carlinsky (*pro hac vice*)
Jesse Bernstein (*pro hac vice*)
Leigha Empson (*pro hac vice*)
Amy Shehan (*pro hac vice*)
295 Fifth Avenue
New York, NY 10016
Telephone: (212) 849-7000
michaelcarlinsky@quinnemanuel.com
jessebernstein@quinnemanuel.com
leighaempson@quinnemanuel.com
amyshehan@quinnemanuel.com

*Attorneys for Defendants*